UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF NORTH CAROLINA

No. 11-cv-1068

| | | |
|---|---|---|
| PLYMOUTH COUNTY RETIREMENT ASSOCIATION, on Behalf of Itself and All Others Similarly Situated, | ) ) ) ) | <u>CLASS ACTION</u> |
| Plaintiffs, | ) ) | |
| vs. | ) ) ) | |
| PRIMO WATER CORPORATION, BILLY D. PRIM, MARK CASTANEDA, DAVID J. MILLS, RICHARD A. BRENNER, DAVID W. DUPREE, MALCOLM McQUILKIN, DAVID L. WARNOCK, JACK C. KILGORE, CULLIGAN INTERNATIONAL COMPANY, ANDREW J. FILIPOWSKI, CARL V. SANTOIEMMO, STIFEL, NICOLAUS & COMPANY, INC., BB&T CAPITAL MARKETS, JANNEY MONTGOMERY SCOTT LLC, and SIGNAL HILL CAPITAL GROUP LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | <u>JURY TRIAL DEMANDED</u> |

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

I.      NATURE OF THE ACTION .................................................................1

II.     JURISDICTION AND VENUE ..........................................................2

III.    PARTIES ...........................................................................................3

IV.     CLASS ACTION ALLEGATIONS ....................................................6

V.      CONFIDENTIAL SOURCES ............................................................8

VI.     SUBSTANTIVE ALLEGATIONS ...................................................12

        A.      The Company and Its Business................................................12

        B.      The False and Misleading IPO Registration Statement and Prospectus....15

        C.      The False and Misleading Registration Statement and Prospectus in the Secondary Offering....................................................................41

        D.      Counts Arising from the Company's IPO and Secondary Offering ..........56

                COUNT I...................................................................56

                COUNT II .................................................................58

                COUNT III ................................................................60

VII.    THE EXCHANGE ACT CLAIMS....................................................61

        A.      Additional Information Related to Defendants' Scienter .........61

                1.      Defendants' Attendance at Various Meetings Made Them Aware of the Falsity of Defendants' Class Period Statements ............................................................64

                2.      Primo's Internal Data Shark Reporting System....................65

                3.      Primo Assured the Market of Its Hands-On Management of the Company's Customers and Business Through its Management Information Systems ........................66

        B.      The False and Misleading Class Period Statements ................68

                The Truth Begins to Emerge ............................................95

i

C.      Additional Scienter Allegations ..............................................................116

D.      Applicability of the Presumption of Reliance:  Fraud on the Market
        Doctrine ...................................................................................................118

E.      Loss Causation .........................................................................................119

F.      No Safe Harbor .........................................................................................123

G.      Counts Arising from the Exchange Act .....................................................124

                COUNT IV ................................................................. 124

                COUNT V .................................................................. 129

VIII.   JURY TRIAL DEMANDED… ...........................................................................131

Lead Plaintiff Employees' Retirement System of the Government of the Virgin Islands ("VI Retirement Systems") and Plaintiff Plymouth County Retirement Association ("Plymouth County") (collectively, "Plaintiffs") make the following allegations, except as to allegations specifically pertaining to Plaintiffs and Plaintiffs' counsel, based upon the investigation undertaken by Plaintiffs' counsel, which investigation included analysis of publicly available news articles and reports, public filings, securities analysts' reports and advisories about Primo Water Corporation ("Primo" or the "Company"), interviews of former Primo employees, press releases and other public statements issued by the Company, and media reports about the Company, and Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class of all persons or entities who purchased the common stock of Primo in or traceable to the Company's initial public offering on or about November 4, 2010 (the "IPO") and the Company's secondary offering of common stock on or about June 17, 2011 (the "Secondary Offering") (the IPO and the Secondary Offering are sometimes hereinafter collectively referred to as the "Offerings"), as well as purchasers of the Company's common stock between November 4, 2010 and November 10, 2011, inclusive (the "Class Period"), seeking to pursue remedies under §§11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act") and §§10(b) and 20(a) of the Securities Exchange Act of 1935

(the "Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 (the "PSLRA") and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

## II.    JURISDICTION AND VENUE

2.    The claims asserted herein arise under and pursuant to §§11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§77k, 77l(a)(2) and 77o, §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

3.    This Court has jurisdiction over this action pursuant to §22 of the Securities Act, 15 U.S.C. §77v, §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §§1331 and 1337.

4.    Venue is proper in this District pursuant to §22 of the Securities Act, §27 of the Exchange Act, and 28 U.S.C. §1391(b) and (c).  The acts and conduct complained of herein occurred in substantial part in this District and the Company's executive offices are located in this District.

5.    In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets.

- 2 -

## III.   PARTIES

6.      Plaintiff VI Retirement Systems purchased Primo common stock pursuant or traceable to the IPO, as set forth in its certification previously filed with the Court and incorporated herein by reference, and was damaged thereby. *See* D.E. 1.

7.      Plaintiff Plymouth County purchased Primo common stock pursuant to or traceable to the Secondary Offering, as set forth in its certification previously filed with the Court and incorporated herein by reference, and was damaged thereby.  *See* D.E. 34, Ex. B.

8.      Defendant Primo is a Delaware corporation with its principal place of business located at 104 Cambridge Plaza Drive, Winston-Salem, North Carolina 27104. As set forth above, Primo operates as a provider of three-and five-gallon purified bottled water, self-serve filtered drinking water and water dispensers sold through major retailers nationwide.   Primo stock trades on the National Association of Securities Dealers Automated Quotations ("NASDAQ") under the symbol "PRMW."

9.      Defendant Billy D. Prim ("Prim") and has served as the Chairman of the Board of Directors (the "Board"), President, and Chief Executive Officer ("CEO") of Primo since he founded the Company in 2004.  Defendant Prim signed or authorized the signing of the IPO Registration Statement and the Secondary Offering Registration Statement.

10.     Defendant Mark Castaneda ("Castaneda") has served as the Chief Financial Officer ("CFO"), Secretary, and Assistant Treasurer of the Company since March 2008.

Defendant Castaneda signed or authorized the signing of the IPO Registration Statement and the Secondary Offering Registration Statement.

11.    For purposes of the Exchange Act claims, the Company, Prim and Castaneda are collectively referred to as the "Defendants."

12.    For purposes of the Exchange Act claims, Prim and Castaneda are collectively referred to as the "Individual Defendants."

13.    Defendant David J. Mills ("Mills") has served as the Vice President of Finance and Treasurer of the Company since June 2011, and prior to that served as Controller of the Company from May 2008 to June 2011.  Defendant Mills signed or authorized the signing of the IPO Registration Statement and the Secondary Offering Registration Statement.

14.    Defendant Richard A. Brenner ("Brenner") served as a member of the Board at all relevant times.  Defendant Brenner signed or authorized the signing of the IPO Registration Statement and the Secondary Offering Registration Statement.

15.    Defendant David W. Dupree ("Dupree") served as a member of the Board until on or about May 18, 2011.  Defendant Dupree signed or authorized the signing of the IPO Registration Statement.

16.    Defendant Malcolm McQuilkin ("McQuilkin") served as a member of the Board at all relevant times.  Defendant McQuilkin signed or authorized the signing of the IPO Registration Statement and the Secondary Offering Registration Statement.

- 4 -

17.     Defendant David L. Warnock ("Warnock") served as a member of the Board at all relevant times.  Defendant Warnock signed or authorized the signing of the IPO Registration Statement and the Secondary Offering Registration Statement.

18.     For purposes of the Securities Act claims, Defendants Prim, Castaneda, Mills, Brenner, Dupree, McQuilkin, and Warnock are collectively referred to as the "Primo Individual Defendants."

19.     Defendant Stifel, Nicolaus & Company, Inc. ("Stifel Nicolaus") operates as an investment bank in the United States with executive offices located in San Francisco, California.  Stifel Nicolaus acted as an underwriter and sole-book running manager and representative for the Offerings and helped to draft and disseminate the IPO Prospectus and Secondary Offering Prospectus (collectively, the "Prospectuses").

20.     Defendant BB&T Capital Markets ("BB&T") operates as an investment bank in the United States with executive offices located in Richmond, Virginia. Defendant BB&T served as an underwriter for the Offerings.

21.     Defendant Janney Montgomery Scott LLC ("Janney") operates as an investment bank in the United States with executive offices located in Philadelphia, Pennsylvania.  Defendant Janney served as an underwriter for the Offerings.

22.     Defendant Signal Hill Capital Group ("Signal Hill") operates as an investment bank in the United States with executive offices located in Baltimore, Maryland.  Defendant Signal Hill served as an underwriter for the Offerings.

23.     Defendants Stifel Nicolaus, BB&T, Janney, and Signal Hill are collectively referred to as the "Underwriter Defendants."

## IV.     CLASS ACTION ALLEGATIONS

24.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Primo common stock during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest.

25.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of November 10, 2011, the last day of the Class Period, Primo had approximately 23.7 million shares of common stock outstanding, owned by hundreds if not thousands of shareholders.

26.     There is a well-defined community of interest in the questions of law and fact involved here. Questions of law and fact common to the members of the Class, which predominate over questions which may affect individual Class members include:

(a)     Whether the federal securities laws were violated by Defendants' acts as alleged herein;

- 6 -

(b)     Whether the Company's IPO Registration Statement and Secondary Offering Registration Statement (collectively, the "Registration Statements") contained untrue statements of material fact or omitted to state material facts necessary to make the statements made not misleading;

(c)     Whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and

(d)     Whether the members of the Class have sustained damages as a result of Defendants' conduct as alleged herein and, if so, what is the appropriate measure of damages.

27.     Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages arising out of Defendants' wrongful conduct.

28.     Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action and securities litigation.  Plaintiffs have no interests in conflict with those of the Class.

29.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Further, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## V.    CONFIDENTIAL SOURCES

30.    The allegations made herein are supported by the first-hand knowledge of nine (9) confidential witnesses ("CWs").  These informants are former employees of Primo, each of whom was employed during the Class Period and/or provided facts from various departments of the Company.  As detailed below, the CWs each served in positions at Primo which provided them with access to the information they are alleged to possess.

31.    Confidential Witness #1 ("CW 1") was employed by the Company as Director of Operations for the Western Region from 2008 through September/ October 2010.  CW 1 reported to Senior Vice President of Operations Michael "Mick" Gunter ("Gunter"), who reported directly to Prim.  As Director of Operations, CW 1 was primarily responsible for the delivery and distribution of Primo's three and five gallon water bottles to Primo's retail customers.  Specifically, CW 1 was responsible for overseeing retailer sales, major product roll outs to new retailers, and supervising the functions and deliveries of Regional Operators (also known as "ROs").  Primo's ROs are independent contractors who help make and distribute Primo's water products.  CW 1 also managed ROs throughout the delivery and distribution of Primo water products and tracked the frequency and volume of each RO's water deliveries.  She/he was also responsible for building customer relationships with retailers.  CW 1 has information related to Primo's financial constraints limiting its ability to market its products, the

- 8 -

number of retailers selling the Company's products, Prim's attendance at annual conventions, and Primo's internal reporting system, Data Shark, prior to the IPO.

32. Confidential Witness #2 ("CW 2") was employed by the Company as the Director of Sales for the North East Region from 2006 through March 2009. As Director of Sales for the North East Region, CW 2 was responsible for managing sales at all Kash n' Karry stores from Maine to Virginia and then eventually down to Florida. She/he was also responsible for establishing customer and distribution relationships with a number of store chains including Stop & Shop, Del Hayes, and Ahold. CW 2 primarily worked to get retailers to install Primo's 36 jug racks into their stores, that carried Primo's three-and five-gallon water bottles. CW 2 provided insight into the time intensive process required to get Primo's bulk water stations and refill vending machines into new retail locations.

33. Confidential Witness #3 ("CW 3") worked at the Company as a Sales Director from July 2006 through July 2010. She/he was the second Sales Director hired at Primo and was responsible for various large accounts including Kroger, Meijer Grocery and Kmart. While at Primo, CW 3 reported to Vice President of Business Development Brent Boydston ("Boydston"), President and Chief Operating Officer Dave Burke ("Burke"), and Senior Vice President of Business Development Duane Goodwin ("Goodwin"). Among other things, CW 3 provided insight into the extremely high rate of product loss (or shrinkage) associated with Primo's water bottle exchange machines.

34.   Confidential Witness #4 ("CW 4") was employed by the Company as Director of Sales for the Western Region from February 2005 through July 2010. Initially, CW 4 reported to Boydston, but eventually CW 4 reported directly to Prim.  As Director of Sales for the Western Region, CW 4's job duties included developing new accounts and finding new business opportunities for Primo.  More specifically, she/he worked to sell Primo's three-and five-gallon bulk water bottles, water bottle exchange vending machines and water dispensers to retail customers.

35.   Confidential Witness #5 ("CW 5") worked for the Company as a Vice President from January 2010 through April 2011.  While working at Primo, CW 5 reported to Vice President of Product Development and Global Sourcing Rick Belmont ("Belmont"), and former Vice President of Sales Goodwin.  During her/his last three months of employment, CW 5 reported directly to Prim.  While at the Company, CW 5's efforts focused primarily on the marketing and sales of Primo's three-and five-gallon water bottles.

36.   Confidential Witness #6 ("CW 6") worked for Primo as Vice President of Business Development from 2008 through March 2011.  When she/he began working at Primo, CW 6 worked in the Prima Bottle business and reported to former Primo President Burke.  In the spring of 2010, CW 6 began reporting to Goodwin, and worked in the water dispenser and bulk water side of the business to provide assistance with managing the sales force.  Specifically, she/he developed sales reporting systems, and put in place sales training programs.

- 10 -

37.    Confidential Witness #7 ("CW 7") worked at the Culligan Refill Business (defined *infra*, at ¶47) in Eagan, Minnesota during the time it was acquired by Primo in late 2010 through October 2011.  CW 7 was responsible for managing the parts to assemble the Culligan Refill Business refill machines and for refurbishing existing refill machines.  While working at the Culligan Refill Business, she/he originally reported to General Manager Larry Murphy, but after the Culligan Refill Business was acquired by Primo, CW 7 reported to Primo Senior Vice President of Operations Gunter.  CW 7 provided information related to Primo's altering of the Culligan Refill Business's business practices for the production of refill machines, resulting in huge amounts of inventory.

38.    Confidential Witness #8 ("CW 8") worked at the Culligan Refill Business as a Senior Financial Analyst for three years ending in April 2011, after Primo acquired the Culligan Refill Business in late 2010.  CW 8 reported to Controller of Culligan, Carl Werner.  While working at the Culligan Refill Business, CW 8's responsibility was to bill clients for their use of Culligan's refill machines.  Specifically, CW 8 would review reported usage of water from Culligan's refill machines and then use that information to generate a bill to be sent to the retail customer based on their usage.  CW 8 provided information related to the dramatic increase in refill machines being built throughout the Class Period.

39.    Confidential Witness #9 ("CW 9") worked for the Culligan Refill Business for fifteen years, and then for Primo for an additional thirteen months following Primo's

- 11 -

acquisition of the Culligan Refill Business, as the Plant Operations Manager at the Eagan, Minnesota facility. While working for the Company, CW 9 reported to the Vice President and General Manager of the Culligan Refill Business, Jeanne Cantu. CW 9's responsibilities included monitoring all operations, including the building of refill machines at the Eagan, Minnesota facility. CW 9 provided insight into Primo's directive to the Culligan Refill Business to build an excessive amount of refill cabinets, and the large amount of inventory that resulted.

## VI. SUBSTANTIVE ALLEGATIONS

### A. The Company and Its Business

40. Primo describes itself as "a rapidly growing provider of three-and five-gallon purified bottled water, self-serve filtered drinking water and water dispensers sold through major retailers nationwide." The Company's water dispensers are designed to dispense Primo and other dispenser-compatible bottled water.

41. Primo, together with its subsidiaries, provide multi-gallon purified bottled water, self-serve filtered drinking water, and water dispensers in the United States and Canada. For the majority of the Class Period, Primo operated in three segments: Primo Bottled Water Exchange ("Exchange"), Primo Refill ("Refill") and Primo Products ("Products").[1]

---

[1] On September 30, 2011, Primo integrated the Exchange and Refill operations into the Primo Water Business.

- 12 -

42. The Products segment primarily sells Primo's water dispensers. The Exchange segment sells Primo's three-and five-gallon bottled water, and the Refill segment provides a self-serve filtered drinking water service through retailers in the United States and Canada. The Company services the Exchange and Refill retail locations through its network of primarily independent bottlers and distributors.

43. Primo was formed in 2004, based upon the successful "razor-razorblade" strategy that Prim used to start Blue Rhino, the market leader in propane grill cylinder exchange. The Company's business model is rooted in the "razor-razorblade" strategy, where the initial sale of Primo water dispensers is intended to create a base of users who then frequently purchase Primo bottled water. The strategy is designed to generate recurring demand for Primo-branded products and/or services.

44. Primo's "razor-razorblade" strategy works through its water bottle exchange and water bottle refill machines as follows: Primo sells its water dispensers and bottled water through major retail locations, such as Wal-Mart or Lowe's Home Improvement ("Lowe's"), where they can be purchased by the ultimate consumer. Once the water is consumed, the empty water bottle can then either be recycled and exchanged at Primo's bottle exchange displays, or refilled at Primo's refill vending machines (both located at major retailers). If a customer exchanges a Primo or competitor's water bottle at the exchange display, Primo's bottle exchange displays give customers a "recycling" ticket that provides a discount towards the purchase of a full bottle of Primo water. The recycling ticket, or coupon, is intended to incentivize

customers to use Primo products as opposed to competitors' water bottles that also fit into Primo's dispensers. In the alternative, if a consumer does not want to exchange their empty bottle, they have the option of just refilling their bottle at Primo's refill vending station. Primo can then sanitize and reuse the bottles up to 40 times. The strategy is demonstrated in the chart below:



Razor
*Appliance*                         RazorBlade 1—Water Exchange                    RazorBlade 2—Water Refill
                                    *35–40 repeat trips per customer*              *Self-serve vending*

45. On or about March 12, 2010, Primo filed a Form S-1 Registration Statement with the Securities and Exchange Commission ("SEC") and subsequently filed nine amendments to the Registration Statement on Form S-1/A for the IPO (the "IPO Registration Statement"). On or about November 4, 2010, the Prospectus with respect to the IPO (the "IPO Prospectus"), which forms part of the IPO Registration Statement, became effective and 8.33 million shares of Primo common stock were sold to the public at $12.00 per share, raising approximately $99.96 million.

46.     In addition to the above-referenced 8.33 million shares, the IPO included an overallotment option for the Underwriter Defendants, for the purchase of up to an additional 1.25 million shares of common stock, which was exercised on November 18, 2010.  In total, 9.58 million shares were sold in the IPO at $12.00 per share, thereby raising approximately $114.96 million.

47.     Simultaneously with the closing of the IPO, the Company acquired certain assets of Culligan Store Solutions, LLC and Culligan of Canada, Ltd. related to their business of providing reverse osmosis water filtration systems that generate filtered water for refill vending machines and store-use water services (the "Culligan Refill Business").  The Company funded the $105 million purchase price of the Culligan Refill Business with a portion of the proceeds from the IPO.

**B.      The False and Misleading IPO Registration Statement and Prospectus** [2]

48.     The IPO Registration Statement, which incorporated the IPO Prospectus and supplements, issued in connection with the IPO was negligently prepared and, as a result, contained numerous untrue statements of material fact and omitted to disclose material information which was required to be disclosed pursuant to the regulations governing its preparation.

---

[2] In order to not just plead Defendants' false and misleading statements without any context, Plaintiffs have attempted to provide the Court with context by bolding and italicizing Defendants' statements Plaintiffs contend are false and misleading.

49.  **Material Overstatement of Locations Selling Water.**  At the time of the IPO, Primo materially overstated the number of locations where Primo's water bottle exchange services were offered, and where Primo was selling water.  As detailed herein, Primo included approximately 1,500 store locations, in its reported 7,200 water bottle exchange service locations, that did not have Primo's water bottle exchange machines and did not sell Primo water.

50.  With respect to store locations, the IPO Registration Statement stated, in pertinent part, as follows:

> *As of June 30, 2010, our water bottle exchange service and water dispensers were offered* in each of the contiguous United States *and located in approximately 7,200 and 5,500 retail locations* respectively, including Lowe's Home Improvement, Sam's Club, Costco, Wal-Mart, Target, Kroger, Albertsons and Walgreens.
>
> *          *          *
>
> In addition, we added approximately 700 exchange locations during the quarter ended September 30, 2010, *bringing the total number of our exchange locations as of September 30, 2010 to approximately 7,900*.  We have increased our rate of exchange location growth as we added approximately 700 new locations during the quarter ended September 30, 2010 compared to approximately 200 locations for the six months ended June 30, 2010 and approximately 600 locations for all of 2009. Additionally, we added Wal-Mart as a customer for our exchange business during the third quarter and, as a result of this new relationship and other retail relationships, expect to continue to add exchange locations over the near term.
>
> *          *          *
>
> Within two years of Primo's inception, we expanded our retail presence from 13 states to our current locations within each of the contiguous United States. In addition, *from 2005 through June 30, 2010, we increased our*

*water bottle exchange locations from approximately 300 to 7,200, representing a compound annual growth rate of approximately 103%.*

51.   This statement was an inaccurate statement of material fact as at the time of the IPO, Primo materially overstated the number of store locations that its water bottle exchange machines were in and were selling Primo water.  As detailed herein, Primo included 1,500 store locations that did not have Primo's water bottle exchange machines and were not selling Primo bottled water.  The number of store locations that offered Primo's water exchange machines and Primo's bottled water, was highly material information and would alter the total mix of information available to investors.

52.   CW 1, the Former Director of Regional Operations for the Western Region, whose territory included Texas, up the Mississippi River, and all the way to the Western United States coast, explained that while there was a time that Primo had a presence in every Kmart location, after Kmart merged with Sears in 2005, multiple Kmart stores no longer stocked any of Primo's water products.  Despite these numerous store closings, Primo never stopped reporting these stores as selling Primo water.

53.   When CW 1 left Primo in late 2010, Primo represented to the market that it was selling bulk water in almost 5,000 stores.  But, CW 1, like other Primo employees, knew that 1,500 of those stores in the Western region of the United States had not had a delivery of water in **18 months or more**.[3]  According to CW 1, there were stores set up in the Company's internal data reporting system, Data Shark, that had not been

---

[3] Emphasis added and internal quotations removed unless otherwise noted.

delivered to "in years." In addition, CW 1 stated there were stores that sold less than five bottles a year that Primo still counted within the purported total number of stores. Other stores listed as actively selling Primo bulk water had only two or three new bottles delivered in a year's time.

54. As part of her/his responsibilities, through the use of the Data Shark internal system, CW 1 prepared a monthly report called the "ULW Report," which detailed units of product sold per week. The ULW Report was organized by RO and listed all the stores each RO delivered to, the amount of those deliveries, and how frequently each RO visited each store. CW 1 recalled that the ULW Reports showed that many stores were receiving very few to no deliveries. CW 1 spoke with Gunter and Customer Service Representative Susan Osborne ("Osborne") about the high number of stores that were not selling any Primo products and asked them to drop these stores from the stores Primo counted as actively selling water, but they refused. Indeed, after notifying Primo's Sales Department that many Kmart stores were not stocked with, or selling, Primo's products, CW 1 stated that the stores continued to remain "active" in Data Shark. According to CW 1, while most of the stores that stopped selling in the Western region of the United Stated were Kmarts, this practice also happened in Kroger and Albertsons stores.

55. According to CW 1, during the time leading up to Primo going public, the fact that many stores were not selling any Primo products was frequently discussed during weekly operational meetings. CW 1 stated the operational meetings were held

every Tuesday with Gunter, Regional Director of Operations Mike Kreitz, Customer Service Employees Kimberly Smith, Osborne and Lisa Briggs, Supply Chain Manager Kyle Cunningham ("Cunningham"), Inventory Control Manager Tom McKearney and MIS Director Dana Warren.

56.    CW 4's (who was at the Company until July 2010) experiences confirm that Primo materially overstated the number of stores it reported as selling Primo products.  CW 4 explained that on "weekly" conference calls with a small group of sales people, the number of stores actually selling Primo products was discussed and the real number of stores selling Primo's products was always far lower than the number of stores Primo claimed to be selling to.

57.    CW 4 stated that the Company's store count was overstated because Primo was counting Wal-Mart and Kmart stores as selling locations even though the locations did not have any Primo water products in them.  According to CW 4, everyone who participated in the weekly sales calls knew that the number of locations Primo purported to have "wasn't true."  In fact, CW 1 independently confirmed that prior to the IPO, Primo was not selling water products in any Wal-Mart locations.

58.    **Misrepresentations Concerning Promotional Activities, Market Opportunities and Retailer Demand.**  As discussed above, Primo's business model was rooted in a "razor-razorblade" strategy, based upon management's past experiences with Blue Rhino.  Because Blue Rhino sold the "razorblade" products, Blue Rhino did not require or dedicate resources to marketing.  Primo's management operated Primo in

- 19 -

an identical manner. Primo's retail customers were very dissatisfied with the Company's lack of marketing. At the time of the IPO, the Company purposefully and dramatically constrained its financial resources, and decreased its spending and expenses, further depleting the already sparse amounts spent on marketing and promotions of the Company's products. As a result, at the time of the IPO, 40% of the store locations that were selling Primo's water products were performing poorly, selling only one bottle every one to two weeks.

59. The IPO Registration Statement also set out the efficient and hands-on management of the Company's customers and business through its management information system ("MIS"):

> We have made a substantial investment in MIS tools which enhance our ability to process orders, manage inventory and accounts receivable, maintain distributor and customer information, maintain cost-efficient operations and assist distributors in delivering products and services on a timely basis. Our technology utilizes highly integrated, scalable software applications that cost-effectively support our growing retail network. Our MIS tools also allow us to analyze historical trends and data to further enhance the execution, service and identification of new markets and marketing opportunities.

60. The IPO Registration Statement represented that "based on discussions" with retailers, the Company had significant opportunities to increase store penetration with its existing retail relationships and develop new retailer relationships, stating, in pertinent part, as follows:

> We believe we have significant opportunities to increase store penetration with our existing retail relationships. As of June 30, 2010, *our water bottle exchange service was offered at 5,600 of our top ten retailers' nationwide*

- 20 -

*locations.* Such retailers present us an *opportunity* of approximately 13,900 additional nationwide locations.

*     *     *

Our long-term strategy includes targeting more than 50,000 total retail store locations (*which includes new locations with our existing retail customers*) within our primary retail categories of home centers, hardware stores, mass merchants, membership warehouses, grocery stores, drug stores and discount general merchandise stores for our water bottle exchange service or the Culligan Refill Business.

*     *     *

As a result of our strategy of developing innovative water dispensers, we believe *based on discussions with our retail customers* that we became a leading seller of water dispensers to retailers within less than two years of our entry into the market. Since we began selling our water dispensers in 2005, we have sold over 590,000 units, and have expanded our retail network from four locations as of December 31, 2007, *to our current network of approximately 5,500 locations.*

    61.    The IPO Registration Statement also contained representations concerning Primo's marketing efforts, including working with retailers, as well as the Company's "plan[s] to increase" such marketing in the future, stating, in pertinent part, as follows:

Our marketing efforts *focus primarily on developing and maintaining a brand identity* synonymous with an environmentally friendly, economical, convenient and healthy solution for purified water consumption. *We direct our marketing efforts as close as possible to the point of sale to strengthen our brand and promote consumer awareness of our water bottle exchange service.* We believe our water bottle exchange service develops consumer loyalty through the use of our recycling tickets.  Our marketing efforts include the following initiatives:

*     *     *

. . . *Our displays include Primo graphics, slogans and instructions on the exchange process that simply attach to the displays*. We have the ability to quickly replace, customize or introduce new marketing materials on our

- 21 -

displays throughout our retail network. ***In addition, we work with retailers to customize in-store solutions to best promote our brand.***

Promotions

***Our promotional activities*** target new customers by:

• Accepting third-party dispenser-compatible water bottles in the exchange process (which we believe is unique in the industry);
• Providing attractive pricing on our water dispensers;
• Offering a free bottle of water with the purchase of a water dispenser;
• Advertising in retailers' weekly circulars; and
• Providing samples of our purified water and water dispensers on-site at ours' locations and educating consumers on the benefits of our purified bottled water and dispensers.

           \*       \*       \*

We ***plan to increase*** our promotional activity as we expand our business.

           \*       \*       \*

We expect that our branding, marketing and sales efforts will result in greater usage of our water bottle exchange and, following the Culligan Refill Acquisition, refill vending services. ***We are also increasing our public relations initiatives associated with new market launches, developing additional cooperative advertising programs with retail distribution partners and increasing our field marketing activities.*** In addition, as consumers exchange dispenser-compatible water bottles, we encourage the use of our water bottle exchange service by providing them a recycling ticket that provides a discount on a full bottle of Primo purified water.

    62.    The statements referenced above in ¶¶59-61 were each material inaccurate statements of fact for the reasons set forth in ¶51 above, and because they failed to disclose the following material adverse facts:

           (a)     Leading up to the IPO, Primo was failing to properly promote and market its products, if at all, resulting in minimal sales, retailer dissatisfaction with Primo

- 22 -

and the erosion of retailer relationships. As such the Company's "significant opportunities" to increase store penetration either didn't exist or were decreasing;

(b)     At the time of the IPO, 40% of the locations that were selling Primo water, were performing poorly, selling only one bottle every one to two weeks; and

(c)     At the time of the IPO, Primo was not: planning to "increase" its promotional activities; "increasing" its public relations initiative, cooperative advertising programs with retail distribution partners or its field marketing activities. Indeed, just one month after the IPO, in December 2010, Primo reduced its marketing budget by $130,000 and fired its outside marketing/promotions company.

63.    Primo's inefficient business model, retail customer dissatisfaction, poor sales, and failure to properly market and promote its products were highly material information and would alter the total mix of information available to investors.

64.    As mentioned above, Primo's "razor-razorblade" business model was based upon Prim's experience at his previous company Blue Rhino. Specifically, Blue Rhino's business focused on selling propane tanks (compatible with almost any grill) that can be purchased, exchanged and returned at various home improvement and convenience stores like Lowes and Walgreens.

65.    While the "razor/razorblade" model proved incredibly successful at Blue Rhino, Primo's direct delivery of bulk water products were vastly different than Blue Rhino's propane grill cylinder exchange. Most notably, selling bulk water required much more advertising than propane gas. According to CW 6, Primo's former Vice

President, people had wanted and bought gas grills for their homes (the razor), based in part on marketing done by grill makers such as Weber, and as a result they needed, and repeatedly purchased Blue Rhino propane (the razor blade). Because grill makers provided a huge amount of marketing to get customers to buy gas grills, it made it very easy for Blue Rhino to sell propane tanks without expensive and aggressive marketing.

66. In contrast to Blue Rhino, Primo, on the other hand, was the seller of both the "razor" and the "razor blade." According to CW 6, Prim could not "get it through his head" that Primo was not the same company as Blue Rhino. Because of Prim's prior successful experience with Blue Rhino, he did not see the value in investing in marketing, and was focused almost exclusively on operations. As a result, CW 6 stated that Primo had "literally no consumer based marketing." CW 6 stated that because Prim "wouldn't put money into marketing" Primo's water cooler dispensers, there was no "pull through" to sell bulk water. CW 6 further explained that because Prim did not value sales or marketing, when the sales department had ideas about how to promote sales of dispensers or water, it was very difficult because marketing and sales "didn't have power." Rather, the Operations department had a lot of the "final say" on decisions. Moreover, as a consequence of the lack of marketing, she/he stated that consumers did not even know if certain brands of bulk water only worked with certain kinds of dispensers, and typically could not buy the dispensers in the same grocery stores where Primo sold its bulk water. Due to all these reasons, there was little demand for the razor (the dispensers), which resulted in limited sales for the razor blades (the

bulk water).  CW 5 also explained that dispensers had "slow growth" and without those dispensers acting as the razor, it was very hard to generate sales of bulk water.

67.  CW 3 discussed how Blue Rhino and Primo also differed due to the location of Primo's water bottle exchange locations.  Blue Rhino products were located on the sidewalks outside of stores, and according to CW 3, "its was easy" to get sidewalk space out in front of a store, but getting "four feet of space in stores" was much more difficult because this indoor space was expected to generate money for the store.  CW 1 also explained that supermarkets wanted re-stocking to occur between "5 a.m. and noon," which represented a very tight deadline for ROs to make given the number of stores and the large territories they were responsible for.

68.  According to CW 4, beginning in 2009, Primo began to lack both sufficient capital and the will to invest what was needed to keep existing retail customers happy and establish relationships with new ones.  CW 4 explained that, although the business had "legs to grow," it was incredibly difficult to service existing accounts because the Company's resources were stretched so thin.

69.  Leading up to the IPO, CW 4 stated that all expenses "were closely scrutinized" and that finances were severely cut back.  Boydston, Primo's Vice President of Sales, specifically told CW 4 that the Company needed to "tighten things up" to show profitability to investors.  CW 5 confirmed Primo's poor financial condition leading up to the IPO, as she/he was told directly by Company executives, including Belmont, the Company's Vice Ppresident of Product Development and Global Sourcing,

- 25 -

that the Company had accelerated its IPO plans because it was running out of money, needed capital and literally had no money left.

70. One of the most widely used ways that Primo constrained resources leading up to the IPO was by greatly restricting product promotions. CW 4 explained that there were store chains that expressed interest in selling Primo water, but Primo did not have the finances to properly "promote the product." CW 4 further discussed how retailers wanted Primo to commit to providing money to advertise Primo's products upon arrival at the retailer, or to pay slotting fees for store floor space, but Primo's finances were "very constrained" leading up to the IPO, such that Primo could not comply with its retailers' requests.

71. For example, according to CW 4, during the middle of 2010, both Safeway Supermarket headquarters ("Safeway") and various Albertsons' divisions had an interest in using Primo's products. While CW 4 was able to get Primo's water into a few Safeway stores as a test run, because Primo failed to properly promote the product, the Company lost the potential to have its products placed in approximately 1,500 additional Safeway stores. After this occurred, CW 4 spoke specifically to Boydston about why Primo was unwilling to provide the requisite level of promotional funds to get into 1,500 new stores. CW 4 was told by Boydston that Prim did not think investing in promotions was a "good investment." Along these lines, CW 4 explained that leading up the IPO, Boydston was no longer permitted to approve promotional offers and, instead, Primo's product promotions required the approval of the Company's Controller or Prim himself.

72.    Mirroring and corroborating CW 4's experiences, CW 5 explained that Primo's financial problems were apparent internally because the Company shifted its promotional strategy in 2010.  To that end, CW 5 recalled that Primo was no longer spending money on promotions with stores because any such money was "re-prioritized."  CW 5 discussed how stores wanted Primo to agree to run promotions or offer coupons when stores began selling Primo water, which would have given sales a "push" at the start.  But in 2010, Primo stopped agreeing to such promotions.  CW 5 also discussed how she/he was tasked with re-designing all of Primo's display graphics for the bulk water shelving because the displays and shelving were "starting to age."  CW 5 specifically recalled that the displays were supposed to be updated at one third of Lowe's stores, plus some other stores.  CW 5 recalled that refreshing the advertising graphics would have cost Primo $100 per store, plus a greater expense to install in new stores that needed all new equipment.  Although CW 5 recalled that Primo was re-allocating money from sales to spend money on graphics refreshing, by the time she/he left the Company in April 2011, the displays were never refreshed.

73.    CW 3 confirmed that Primo did not offer price promotions to sell its water or induce stores to stock Primo's products.  CW 3 recalled that most "CPG" or Consumer Product Good manufacturers run five or six temporary price reductions per year.  CW 3 stated that there was "nothing" like that for Primo.  Primo simply did not devote money to promotions like other brands.  CW 3 stated the lack of promotional funds made it difficult to persuade stores to stock Primo's products.

- 27 -

74. CW 1 also confirmed that shortly before the Primo IPO, Primo stopped investing money in operations. For example, Gunter, Primo's Senior Vice President of Operations, refused to send out the water bottles and Company graphics that ROs required in order to properly perform their jobs.

75. Moreover, according to CW 1, Kmart and Lowe's sold Primo goods on consignment, meaning the ownership remained with Primo, and only when the products were sold to the ultimate consumer was the retailer responsible for paying Primo for the products. CW 1 explained that because Primo rolled out sales to many stores with no marketing or promotions, after 60 or 90 days, it was no longer worth it for the store to keep Primo's bulk water, let alone in its racks at stores. As a result, in many instances, after not selling for 60 to 90 days, Primo's bulk water was just thrown out, or taken home by the store managers. CW 1 further explained how sometimes it would be six months or more before Primo or the RO assigned to a retail store ever noticed that the store was no longer stocking or selling Primo water.

76. CW 5 stated that 40% of Primo's retail stores had terrible sales. She/he estimated that 40% of the Company's locations were selling just one bottle every one to two weeks. According to CW 5, the fact that 40% of the Company's stores were barely selling any product was discussed with Prim and Castaneda numerous times at executive meetings that took place every other Monday. In fact, CW 5 detailed that Data Shark reports were circulated at the executive team meetings to among others, Prim and Castaneda "weekly," which reported on sales by region, retail chain and individual retail

- 28 -

store. CW 5 explained that pictures were circulated at these meetings from the field, which were also saved on Primo's corporate computer servers, "all the time" that showed Primo water stacked on racks with no graphics and no pricing. She/he explained that there was no explanation for what the product was or how much it cost. These pictures also showed bottles and racks at stores, covered in dirt and dust tucked behind larger objects like law furniture, because stores were not selling the Company's products. In response to these pictures, Prim would typically ask Gunter about ways to get stores to sell Primo's products.

77.     Based on the weekly sales calls, the reports, and other discussions with Senior Vice President of Business Development Goodwin or others at Primo, CW 6 explained that, at the time she/he was working at Primo, from 2008 through March 2011, 40% of the stores selling Primo's water were performing very poorly. For example, she/he explained that there were locations where we had to pick up "dust bottles" (bottles covered in dust) because they were sitting unsold on store racks for so long. Likewise, CW 6 explained that in other locations, it would take "a couple of months" to sell only five or more bottles.

78.     Due to this ongoing issue of Primo's stores consistently not stocking Primo water, CW 1 explained that in 2010, Primo rolled out a new initiative called Route-view, which required ROs to visit each store selling Primo products at least every thirty days. ROs began reporting back that there were many stores with no equipment, and therefore selling no Primo water. The assigned RO or CW 1 would then talk to the store

managers to see where the equipment was. CW 1 recalled that in some cases, CW 1 and other ROs were told that if Primo brought in new equipment and water, Primo could resume selling its products. According to CW 1, however, Gunter had "tight reins" on money and would not authorize any funds to get equipment back into non-selling stores.

79. CW 6 also explained that only 15% to 20% of stores carrying Primo water were performing "incredibly well" in selling Primo's products. CW 6 explained further, that you could "always find something" that caused such unusually high sales. For example, CW 6 stated that one Safeway store in Denver, Colorado was very close to an air force base, and as a result there was a very high amount of water being sold. In contrast, another Safeway located nearby the high selling Safeway, but located further from the base sold "barely anything."

80. Primo also had insufficient resources to set up new locations. For example, CW 1 covered a large area that included Texas, up the Mississippi River, and all the way to the Western United States coast. From March 2010 through when CW 1 left the Company, shortly before the IPO, CW 1 was told by Gunter that he would not authorize operations expenses because Primo was trying to conserve money before the IPO. As a result, CW 1 made frequent trips to stores in the field to help with the installation of racks and Primo graphics so the stores could continue trying to sell Primo water. On numerous occasions when CW 1 arrived for such installations, CW 1 was only provided with "50 percent" of the materials needed to do the job.

- 30 -

81. When CW 1 called Cunningham, who was Primo's Supply Chain Manager and responsible for making sure all the necessary supplies were delivered to a location for an installation, CW 1 was told that Gunter did not approve the rest of the supplies. Despite this, Gunter told CW 1 that Primo needed "these locations." As a result, many locations only had half the required equipment installed. This, in turn, materially hurt the Company's ability to sell water at the locations it reported to the market at the time of the IPO.

82. As an example, CW 1 was assisting with the installation at 400 H-E-B grocery stores during the spring and summer of 2010. She/he repeatedly complained to Gunter that CW 1 and other Primo employees lacked the equipment needed to complete installations. But, CW 1 was told to use the products that were already "in the field" to reduce inventory. According to CW 1, the products in the field did not match the newer products, equipment and graphics that Primo was been using on its devices. As a result, there was little consistency between stores and the quality of Primo's brand suffered.

83. According to CW 5, when she/he was first hired as one of Primo's Vice Presidents in January of 2010, Primo's annual marketing budget was approximately $280,000. This amount had to cover all coupons, promotions and advertising. Primo, however, rolled the $725,000 per year spent on Primo's bottled water return and exchange stations into its marketing budget to make it appear that the Company was spending approximately $1,000,000 annually on advertising.

- 31 -

84.   In December of 2010, one month after its IPO, CW 5 stated that Primo cut its marketing budget by $130,000 and fired its outside marketing company.   CW explained that in doing so, Primo eliminated all "consumer facing marketing" such as graphics used on Primo's water machines.

85.   **Misrepresentations Regarding the High Margin and Benefits of Primo's Water Bottle Exchange Machines.**   At the time of the IPO, Primo's water exchange machines were poorly manufactured and, without retailer supervision, people were able to steal water bottles from the water bottle exchange machines without purchasing them, and obtain discount coupons from the machines without returning a water bottle.

86.   The IPO Registration Statement represented, among other things, that Primo's bottle water exchange machines required "minimal management supervision" and would yield "high margin" returns for retail customers:

> We have created a new nationwide single-vendor water bottle exchange solution for our retail customers, addressing a market demand that we believe was previously unmet. ***Our water bottle exchange solution is easy for retailers to implement, requires minimal management supervision and store-based labor*** and provides centralized billing and detailed performance reports.  Our solution offers retailers ***attractive financial margins and the ability to optimize typically unused retail space with our displays***. ***Additionally, due to the recurring nature of water consumption and water bottle exchange, retailers benefit from year-round customer traffic and highly predictable revenue***.
>
> We offer retailers a single-vendor solution. ***Our water bottle exchange service provides retailers with a year-round consumer product and an opportunity to increase sales and profits with minimal labor and financial investment***. Through our national network, we are able to service major retailers nationwide. ***Retailers benefit from our water bottle exchange***

- 32 -

*service that offers high margin and generates productivity from often underutilized interior and exterior retail space.*

87. The IPO Registration Statement further represented that Primo's water dispensers drive customer demand through the use of coupons and recycling tickets, stating, in pertinent part, as follows:

> We are a rapidly growing provider of three- and five-gallon purified bottled water and water dispensers sold through major retailers nationwide. . . . Our business is designed to generate recurring demand for Primo purified bottled water through the initial sale of our innovative water dispensers. This business strategy is commonly referred to as "razor-razorblade" because the initial sale of a product creates a base of users who frequently purchase complementary consumable products. . . Once our bottled water is consumed using a water dispenser, empty bottles are exchanged at our recycling center displays *where consumers receive a recycling ticket that offers a discount toward the purchase of a full bottle of Primo purified water*. . . .
>
> \*     \*     \*
>
> We acquire new consumers and enhance recycling efforts by accepting most dispenser-compatible water bottles *in exchange for a recycle ticket discount toward the purchase of a full bottle of Primo purified water.*
>
> \*     \*     \*
>
> We sell our water dispensers at minimal margin and *provide a coupon for a free three- or five-gallon bottle of water with the sale of various water dispensers at certain retailers to drive consumer demand for our water bottle exchange* and, following the Culligan Refill Acquisition, refill vending services. We believe increasing unit sales of Primo purified bottled water is dependent on generating greater consumer awareness of the environmentally friendly and economical aspects of and the convenience associated with our purified bottled water and our water bottle exchange and, following the Culligan Refill Acquisition, refill vending services. We expect that our branding, marketing and sales efforts will result in greater usage of our water bottle exchange and, following the Culligan Refill Acquisition, refill vending services.

- 33 -

88.    The statements referenced above in ¶¶86-87 were each material inaccurate statements of fact because they failed to disclose that at the time of the IPO, Primo's water bottle exchange machines were poorly manufactured and, without retailer supervision, people were able to steal water bottles from the water bottle exchange machines without purchasing them, and obtain discount coupons from the machines without returning a water bottle which resulted in monthly product loss of up to 25%. As a result, Primo's water exchange machines required significant "management supervision" and did not result in positive financial results or "high margins" for Primo's retail customers.

89.    The fact that Primo's water exchange machines were poorly manufactured, and, without retailer supervision, resulted in product loss, stolen discount coupons and poor financial results for retail customers, was highly material information and would alter the total mix of information available to investors.

90.    According to CW 1, the Former Director of Sales for the Western Region, Primo's water bottle exchange machines were "set up to fail" because any customer could claim they returned a bottle, go to a store manager and get a discount ticket. CW 1 also stated that people were keeping their water bottles and not returning them because they could physically position their hand in the Primo recycling center in place of a bottle and receive a return ticket without actually using a bottle. As a result of this design defect, CW 1 explained, Primo experienced a very large amount of "shrink[age] and loss."

91.   According to CW 1, in the Company's operations group realized it was facing a substantial and material shrinkage problem when it noticed it had fewer bottles returned than it should.   In response, the Company's operations group conducted an analysis and determined that consumers had figured out how to lift up the top on the exchange centers to steal the returned bottles.   Put simply, people were buying bottles and not returning them.   For five-gallon bulk water Primo sold in stores, the initial retail price was $14 and the return price was $9 with a return ticket discount.   According to CW 1, this was occurring at every location and was a "system" problem.

92.   CW 3, a former Sales Director, stated the level of shrinkage experienced by Primo was "way above" normal industry standards of 1% to 3%.   In fact, for some months, Primo's shrinkage numbers reached as high as 15% to 25%.   CW 3 stated that this problem was "known forever" within Primo and by its executives, but no solution ever resolved it.

93.   CW 1 also discussed that retail customers became aware of the massive shrinkage problem, and, as a result, "wouldn't agree" to have Primo install its exchange machines and bottle racks in their stores.   CW 1 recalled multiple instances in which Primo salespersons told potential retail customers they would give them credit for returned bottles, but having heard about the shrinkage problem, stores would then specifically ask who was responsible for stolen bottles.   Primo's policy was that the selling stores were responsible for such losses.   According to CW 1, because the return machines are located outside of the retail stores, it was very hard for the retail customers

to monitor them to ensure empty bottles were not stolen out of the machines. This further increased the reluctance of stores to agree to sell Primo products because the retailers did not want to be responsible for the ongoing shrinkage problems.

94. CW 3 explained that there were two "major components" of shrinkage. First, people could wave their hands in the machines and the machines would wrongly react as if an empty bottle had been returned, therefore issuing a $5 discount ticket. CW 3 explained that this product loss was very evident in stores like Kmart, Lowe's, and Kroger, who operated on consignment and used "scan based" payments, meaning they only paid to Primo what was actually "scanned" or sold in their store. CW 3 and the other members of the sales department analyzed the gulf between what Primo delivered to the stores and what the stores scanned as sold, and there was a substantial discrepancy. Primo was delivering much more than was being reported as sold, and therefore actually paid for by the consignment stores. The members of the Primo sales department received scan sales reports every day that showed very few initial purchases being scanned, because people were getting tickets from the machines without first returning a bottle.

95. Indeed, CW 3 recalled how Primo even attempted to pass the loss from its shrinkage onto its retailers, like Kroger, by asking them to switch over to a "deliver and

bill' payment, instead of the scan based consignment system.[4]  Not surprisingly, Kroger

would not agree to convert to "deliver and bill."

96.    According to CW 5, the former Company Vice President, it was so

widespread for persons to improperly obtain discount tickets from the exchange

machines without returning bottles that the discount tickets were even bought and sold

on eBay.  She/he explained that "shrinkage was phenomenal" and well known.  For

example, CW 5 also confirmed that the problems with the bottle return machines

leading to shrinkage were widely discussed during Executive Team meetings.  These

meetings were held every other Monday, in a conference room on the second floor

outside of Prim's office.  In addition to CW 5, the attendees included Alan Left,

Belmont, Gunter, Boydston, Goodwin, Head of Human Resources Mike Reeves and

Prim.  During Executive Team meetings that took place around mid- 2010, CW 5 was

told there was a "taskforce" put in place under Gunter's authority to address shrinkage

problems, but CW 5 did not see any results improving the problem.  CW 5 stated that

shrinkage was "huge."

97.    According to CW 3, the second Sales Director ever hired at Primo, many

retailers, after stocking Primo's products for only a very short time, realized that

---

[4] With "deliver and bill," Kroger would have to pay for every bottle of water delivered to the
store and would then be responsible for payment at the time of delivery.  This contrasted the scan
based consignment system where Kroger only paid for what it actually sold.  Under the scan
based consignment system, it was Primo's responsibility to make up for the presence of any short
fall between deliveries and sales.

stocking Primo's bulk water and associated exchange vending machines was not producing enough revenue to justify continues selling. According to CW 3, in order for distributors to make a profit on stocking Primo's water, stores needed to sell approximately 40 bottles per location, per week. In reality, many stores were only selling four or five bottles per week. For example, in Kroger stores, CW 3 had to visit each division of every store in order to sell in that store. Then, after six months of deliveries, CW 3 recalled that many stores said "no more." CW 3 explained that Primo was not producing enough revenue for stores to warrant stocking Primo's products.

98. According to CW 6, Primo's former Vice President of Business Development, Primo and Prim specifically "cared less about the profitability of installations" and more about the raw number of installations. For example, CW 6 explained that grocery stores did not want to stock and sell Primo bulk water because Primo's water had a "run-rate" of "one every two weeks," meaning stores were only selling one bottle of Primo bulk water per week or one every other week. CW 6 explained that it was very hard for retail stores to commit floor space to a rack of Primo water generating such low sales because the stores would rather use their limited space for better selling items that were capable of generating more profits for the stores.

99. **Failure to Comply with Rules and Regulations Governing the Preparation of the Registration Statement.** Under applicable SEC rules and regulations governing the preparation of the IPO Registration Statement and IPO Prospectus, the IPO Registration Statement and IPO Prospectus were required to

disclose that: (a) Primo was materially overstating by 1,500 the number of store locations offering Primo's bottle exchange machines and selling Primo bottled water; (b) Primo's failure to properly promote and market its products resulted in minimal sales, retailer dissatisfaction with Primo and the erosion of retailer relationships. As such, the Company's "significant opportunities" to increase store penetration were decreasing; (c) 40% of the locations that were selling Primo water, were performing poorly, and only selling one bottle every one to two weeks; (d) Primo was not: planning to "increase" its promotional activities; "increasing" its public relations initiative, cooperative advertising programs with retail distribution partners, or its field marketing activities; and (e) Primo's water bottle exchange machines were poorly manufactured and, without retailer supervision, allowed consumers to receive Primo's recycling tickets and coupons by merely waving their hands inside the machines, without returning a bottle of water, resulting in monthly product loss (or shrinkage) of up to 25%. The IPO Registration Statement failed to contain any such disclosures.

100. Pursuant to Item 11(h) of Form S-1, the IPO Registration Statement was required to furnish the information required by Item 303 of Regulation S-K. Under Item 303(a) of Regulation S-K an issuer is required to, among other things, "describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." At the time of the IPO, the following trends and uncertainties were reasonably expected to have an impact on the Company's continuing operations

and therefore should have been disclosed in the IPO Registration Statement but were not, such as: (a) Primo was materially overstating by 1,500 the number of store locations offering Primo's bottle exchange machines and selling Primo bottled water; (b) Primo's failure to properly promote and market its products resulted in minimal sales, retailer dissatisfaction with Primo and the erosion of retailer relationships. As such, the Company's "significant opportunities" to increase store penetration either didn't exist or were decreasing; (c) 40% of the locations that were selling Primo water were performing poorly, and only selling one bottle every one to two weeks; (d) Primo was not: planning to "increase" its promotional activities; "increasing" its public relations initiative, cooperative advertising programs with retail distribution partners, or its field marketing activities; and (e) Primo's water bottle exchange machines were poorly manufactured and, without retailer supervision, allowed consumers to receive Primo's recycling tickets and coupons by merely waving their hands inside the machines, without returning a bottle of water resulting in monthly product loss (or shrinkage) of 25%.

101. Pursuant to Item 3 of Form S-1, the IPO Registration Statement was required to furnish the information required by Item 503 of Regulation 503. Under Item 503(c) of Regulation S-K, an issuer is required to, among other things, provide a "discussion of the most significant factors that make the offering risky or speculative." The IPO Registration Statement included a "Risk Factors" section. None of these so-called risk disclosures were meaningful or advised investors in the IPO that the

Company's overstatement of store locations, insufficient marketing practices, decreasing or non-existent growth opportunities, poor sales performance in 40% of its selling locations, and poorly manufactured water exchange machines were negatively impacting the Company's operations. Accordingly, the Company's overstatement of store locations, insufficient marketing practices, decreasing or non-existent growth opportunities, poor sales performance in 40% of its selling locations, and poorly manufactured water exchange machines were each a "significant factor" that made the IPO "risky or speculative" and were required to be disclosed in the IPO Registration Statement but were not.

C.    **The False and Misleading Registration Statement and Prospectus in the Secondary Offering**

102.    On or about April 15, 2011, Primo filed a Form S-1 Registration Statement with the SEC, which was signed by Primo Individual Defendants Prim, Castaneda, Mills, Brenner, Dupree, McQuilkin and Warnock. The S-1 was amended multiple times. Thereafter on June 17, 2011, the Company filed the Secondary Offering Registration Statement.

103.    As discussed above, the Secondary Offering resulted in approximately $42.2 million in proceeds for Primo.

104.    **Material Overstatement of Locations Selling Water and Misrepresentations Concerning Promotional Activities, Market Opportunities, Retailer Demand, and the High Margin and Benefits of Primo's Water Bottle Exchange Machines.** The Secondary Offering Registration Statement, including the

- 41 -

Secondary Offering Prospectus, discussed the Company's numerous store locations and the "attractive financial margins" and "year round customer traffic" associated with Primo's water bottle exchange program, stating, in pertinent part, as follows:

> *As of March 31, 2011, our exchange and refill services were offered in each of the contiguous United States and in Canada at approximately 14,600 combined retail locations,* including Lowe's Home Improvement, Wal-Mart, Kroger, Safeway, Albertsons, Winn Dixie, H-E-B Grocery and Walgreens.
>
>         \*        \*        \*
>
> *Our solutions are easy for retailers to implement, require minimal management supervision* and store-based labor, and provide centralized billing and detailed performance reports. *Our exchange solution offers retailers attractive financial margins and the ability to optimize typically unused retail space with our displays. . . . Additionally, due to the recurring nature of water consumption, retailers benefit from year-round customer traffic and highly predictable revenue.*
>
>         \*        \*        \*
>
> Our services provide retailers with a year-round consumer product and *an opportunity to increase sales and profits with minimal labor and financial investment.* Through our bottling and distribution network, we are able to service major retailers nationwide and in Canada. Retailers benefit from our water bottle exchange and refill vending services that offer *high margin and generate productivity from often underutilized interior and exterior retail space*. In addition, these services have the potential to increase retailers' sales of ancillary products through *increased traffic from repeat water consumers*, who we believe purchase an average of 35 multi-gallon water bottles annually.

    105. The Secondary Offering Registration Statement also discussed the Company's growth strategy rooted in increasing penetration with existing retail relationships and developing new retailer relationships, and also discussed a focus on

same-store-sales, product development and strategic acquisitions, stating, in pertinent part, as follows:

> We believe we have **significant opportunities** to increase store penetration with our existing retail relationships. **As of March 31, 2011, our water bottle exchange service and our refill vending service were offered at a combined total of 11,500 of our top ten retailers' locations.** If we were to offer both our water bottle exchange service and our refill vending service at each of our top ten retailers' approximate 20,200 individual locations, these top ten retailers would provide us with a combined total of approximately 40,400 locations to provide our services. As a result, these top ten retailers present us an **opportunity** to add either our water bottle exchange service or our refill vending service at a combined total of approximately 28,900 additional locations. There is minimal overlap where our water bottle exchange and refill vending services are both currently offered. We intend to further penetrate our other existing retail customers with our supplementary hydration solutions, which collectively provide us the opportunity to be present in more than a combined total 50,000 additional water bottle exchange or refill vending locations.
>
> Our long-term strategy includes increasing our locations to 40,000 to 50,000 retail store locations (which includes **new locations with our existing retail customers**) within our primary retail categories of home centers, hardware stores, mass merchants, membership warehouses, grocery stores, drug stores and discount general merchandise stores for our water bottle exchange service or our refill vending service.

107. The Company continued to discuss the benefits of its "razor-razorblade" strategy, and how it resulted in "recurring demand," stating, in pertinent part, as follows:

> Our business is designed to generate recurring demand for our purified bottled water or self-serve filtered drinking water through the sale of innovative water dispensers. This business strategy is commonly referred to as "razor-razorblade" because the initial sale of a product creates a base of users who frequently purchase complementary consumable products. . . . Once our bottled water is consumed using a water dispenser, empty bottles are exchanged at our recycling center displays, **which provide a recycling ticket that offers a discount toward the purchase of a new bottle of Primo purified water (exchange)** or they are refilled at a self-serve filtered drinking water location (refill).

- 43 -

*     *     *

We offer "razor-razorblade" products designed to generate recurring demand for Primo bottled water (the razorblade) through the initial sale of our innovative water dispensers (the razor), which include a coupon for a free three- or five-gallon bottle of Primo purified water. ***We acquire new consumers and enhance recycling efforts by accepting most dispenser-compatible water bottles in exchange for a recycle ticket discount toward the purchase of a full bottle of Primo purified water.*** In addition, we believe our offering high-quality water dispensers enhances consumer awareness and adoption of our water bottle exchange and refill vending services, increases household penetration and drives sales of our water.

*     *     *

We sell our water dispensers at minimal margin and ***provide a coupon f***or a free three- or five-gallon bottle of water with the sale of various water dispensers at certain retailers to drive consumer demand for our water bottle exchange and refill vending services. We believe increasing unit sales of Primo water is dependent on generating greater consumer awareness of the environmentally friendly and economical aspects of and the convenience associated with our water bottle exchange and refill vending services. We expect that our branding, cross-promotion marketing and sales efforts will result in greater usage of our water bottle exchange and refill vending services.

    107. The Secondary Offering Statement also discussed the Company's

marketing, stating, in pertinent part, as follows:

Our marketing efforts ***focus primarily on developing and maintaining a brand identity*** synonymous with an environmentally friendly, economical, convenient and healthy solution for bottled water consumption. We direct our marketing efforts as close as possible to the point of sale to strengthen our brand and promote consumer awareness of our water bottle exchange and refill vending services. ***We believe our water bottle exchange service promotes consumer loyalty through the use of our recycling tickets, while our refill vending service promotes consumer loyalty through attractive pricing***. Our marketing efforts include the following initiatives: (i) ***prominent display of our Primo logo and distinctive four-bubble design on water bottles, sales and recycling displays and water dispensers***; (ii)

- 44 -

*highly visible sales and recycling center displays*; and (iii) *regular cross marketing promotions*.

108. The statements referenced above in ¶¶104-07 were materially inaccurate for the reasons set forth above in ¶¶51, 62, 88. In addition, the Company's statements regarding location growth opportunities with existing retailers were false and misleading because:

(a)     Primo failed to properly market and promote its products, by failing to "prominently display" the Primo logo, or ensure its products were "highly visible." In addition, Primo did not engage in promotions "regular[ly]," and was not focused on "developing and maintaining a brand identity." As a result, the Company failed to increase "customer loyalty";

(b)     The Company's primary retail customers would not be in a position to order any of the Company's products until after those retail customers cleared out other inventory sitting on their shelves including inventory related to products sold by competitors of the Company; and

(c)     The Company was dependent upon the Company's two largest customers, Wal-Mart and Lowe's agreeing to start massive Primo product promotions.

109. The fact that the Company was overstating store location, failing to properly market and that the company's location growth opportunities were dependent upon the Company's primary retail customers clearing out competitors inventory and product promotions by the Company's two largest retail customers was highly material information and would alter the total mix of information available to others.

- 45 -

110. Just two months after the Secondary Offering, in August 2011, Primo shocked the market when it announced that two of its major retailers, Wal-Mart and Lowe's, had decided to postpone their rollout of Primo's dispensers. For the year ended December 31, 2010, Lowe's and Wal-Mart had represented approximately 37% and 21% of Primo's consolidated net sales, respectively.

111. According to CW 5, while Primo had "forecasted" that Lowe's would take on a certain amount of new Primo products, in reality, Primo's forecast was unrealistic because Lowe's already had a large amount of existing un-sold Primo product in its inventory. CW 5 also stated that Primo was not selling its products in all Lowe's locations, just those in the South and Southeast.

112. When CW 5 left the Company in April 2011, Lowe's was in negotiations with Primo to begin a dispenser promotion, where consumers would receive a coupon for a free bottle of water with a water dispenser purchase. According to CW 5, in order for Lowe's to take on new models, it needed to get rid of its existing un-sold Primo inventory, by discounting its already existing product. Primo, however, did not want Lowe's to discount its existing dispenser inventory because doing so would cause Primo's revenues and margins to suffer. CW 5 stated that, despite knowing about Lowe's already existing inventory, Primo still planned to sell "one million" more dispensers at Lowe's. According to CW 5, other than Lowe's, Primo had no one else lined up to take the million dispensers. CW 5 explained that these issues were discussed with Director of Business Development Terry Gobble, Belmont and Gunter.

- 46 -

113.  CW 5 also provided information related to the Company's relationship with Target when she/he left the Company in April 2011, just two months before the Secondary Offering.  According to CW 5, Primo had been trying to get Target to agree to undertake a promotion to sell more Primo appliances.  Specifically, Primo tried to convince Target to run a promotion in which dispenser purchasers would receive a buy one get one free coupon for bulk water.  CW 5 explained that negotiations were not going well because there was an issue as to whether Primo would be able to deliver enough dispensers from its new factory in China.  In addition, Target did not see the benefit of running Primo promotions, because two previous Primo promotions were unsuccessful.

114.  **Misrepresentations Concerning the Omnifrio Acquisition.**  On April 11, 2011, Primo announced it had completed the acquisition of Omnifrio Single-Serve Beverage Business ("Omnifrio").  The technology obtained from the Omnifrio acquisition for single-serve carbonated beverages, however, was only "conceptual" and not manufacturable at a price at which Primo could to sell it, thus requiring a significant amount of time to re-engineer.  As a result, it was impossible for the Company to launch its single-serve carbonated beverage products in the fourth quarter of 2011.

115.  The Secondary Offering Registration Statement represented that the Company expected to launch the Company's single-serve cold carbonated beverage appliance in the fourth quarter of 2011, stating in pertinent part, as follows:

> The Omnifrio Single-Serve Beverage Business primarily consists of technology related to single-serve cold carbonated beverage appliances and

- 47 -

consumable flavor cups, or "S-cups," and CO2 cylinders used with the appliances to make a variety of cold beverages.

*　　　*　　　*

**With our purchase of the Omnifrio Single-Serve Beverage Business, we expect to introduce an appliance that dispenses single-serve cold carbonated beverages is the fourth quarter of 2011.**

116. The statements above were inaccurate statements of material fact as at the time of the Secondary Offering, Primo had purchased patents in the Omnifrio acquisition that were unworkable and needed to be re-engineered, and therefore it was not possible for Primo to begin selling its single-serve carbonated beverage appliances by the fourth quarter of 2011. The timing of the launch of Primo's single-serve carbonated beverage appliance was highly material and would alter the total mix of information available to investors.

117. According to CW 5, Primo entered into the agreement with Omnifrio to purchase what CW 5 described as a "conceptual" patent, with product manufacturing plans that were so unworkable they amounted to a "joke." CW 5 explained that the prototype purchased along with the Omnifrio acquisition was "not manufacture-able" at a price at which Primo could afford to sell it. In CW 5's opinion, the Company did not perform sufficient due diligence before acquiring the patent. Simply stated, CW 5 described the purchase as a "catastrophe."

118. CW 5 explained that after showing the product at a March 2011 trade show, Primo spent money to market its single-serve carbonated beverage appliance, which came to be known as the Flavor Station, in the fourth quarter of 2011. CW 5 explained

- 48 -

that the deadline of having the Flavor Station on sale by the fourth quarter of 2011 was impossible.

119.  CW 6 confirmed that the decision to buy Omnifrio came out of "nowhere" and was "very strange."  She/he explained that in the past there had always been "a lot more due diligence" before making such an acquisition.  CW 6 went on to say that in his/her opinion it "seemed very desperate."  CW 6 also stated that when the Company acquired Omnifrio, the Flavor Station product was not ready to be manufactured and had serious mechanical problems.

120.  **Misrepresentations Concerning the Culligan Refill Business.**  The Company acquired the Culligan Refill Business with some of the proceeds from the IPO.  In January 2011, however, Primo altered the previous production policies associated with making the Culligan Refill Business's refill machines.  Instead of making the machines on a per-order basis, as in the past, Primo directed the Eagan, Minnesota facility to manufacture refill machines on a continuous basis, even though there were no orders for the machines, which resulted in millions of dollars of excess inventory.

121.  The Secondary Offering Registration statement represented the Eagan, Minnesota facility, responsible for assembling, refurbishing and repairing refill vending machines, as follows:

> ***We employ an operations team which assembles, refurbishes and repairs the refill vending machines.*** This team is located at our Eagan, Minnesota facility, where it routinely refurbishes equipment that has been in service for several years or when a customer requests a refreshed system. The

- 49 -

operations team also procures new filtration systems component parts and assembles the units and ships them to locations for installation by distributors. The component parts are generally sourced from multiple suppliers.

122. This statement was an inaccurate statement of material fact as of the time of the Secondary Offering, because in January of 2011, Primo had directed the Eagan, Minnesota facility to manufacture refill machines on a continuous basis which was resulting in millions of dollars of excess inventory. The fact the Primo had altered the Culligan Refill Business's previous production practices, resulting in millions of dollars of excess inventory was highly material information and would alter the total mix of information available to investors.

123. According to CW 7, who had worked for the Culligan Refill Business at the Egan, Minnesota facility both before and after it was acquired by Primo, Primo dramatically changed the Culligan Refill Business's production policies for building water refill machines. According to CW 7, the practice at the Culligan Refill Business had always been to build water refill machines on a per-order basis.

124. According to CW 9, the former Plant Operations Manager at the Eagan, Minnesota facility, in January of 2011, Primo, under the directive of Gunter, started to "ramp up" production of the refill machines at the Eagan, Minnesota facility, and CW was given the "message" to "build as much as possible." According to CW 9, Primo had told the Eagan, Minnesota facility that it was to ship 600 refill cabinets in each of the first, second, third, and fourth quarters of 2011. Prior to the acquisition, however, the Culligan Refill Business built only 250-300 refill machines in all of 2010 on a per-

- 50 -

order basis, and never had more than 10 to 20 finished units in inventory at any given time.

125. According to CW 9, by the end of the first quarter in 2011, the Eagan, Minnesota facility completed the manufacture of approximately 150 to 200 completed refill machines. Although a significant number of refill machines were manufactured, they were never shipped out to customer locations.

126. The refill cabinets were being built under the Culligan Refill Business brand until the summer of 2011, when the Eagan, Minnesota facility received Primo's graphics and was able to re-label the already labeled systems. CW 9 stated that the cabinets were originally meant to be installed in Kmart stores. According to CW 7, by late spring to mid-summer 2011, Primo had only put a few refill cabinets into Kmart stores as a "test." CW 9 eventually learned that Primo's machines could not interface with Kmart's billing systems taken out of the stores. As a consequence, Primo was left with a significant number of completed refill units with no customers to sell them to.

127. CW 9 stated that by approximately October 2011, the Eagan, Minnesota facility had an 18,000 square foot warehouse, plus trailers, and 3,000 square feet of office space filled with completed inventory that was generating no revenue because it was not being shipped out. CW 7 explained that because there were no orders for any of the completed equipment, the cabinets were "just sitting" at the Company's Eagan, Minnesota facility. CW 7 estimated that each refill cabinet cost approximately $3,000

- 51 -

to $5,000. CW 9 confirmed that the Company had approximately $2 million in outstanding inventory.

128. **Failure to Comply with Rules and Regulations Governing the Preparation of the Registration Statement.** Under applicable SEC rules and regulations governing the preparation of the Secondary Offering Registration Statement and the Secondary Offering Prospectus, the Secondary Offering Registration Statement and the Secondary Offering Prospectus were required to disclose that: (a) Primo was materially overstating by 1,500 the number of store locations offering Primo's bottle exchange machines and selling Primo bottled water; (b) Primo failed to properly promote and market its products which resulted in minimal sales, retailer dissatisfaction with Primo and the erosion of retailer relationships. As such, the Company's "significant opportunities" to increase store penetration were decreasing; (c) Primo failed to properly market and promote its products, by failing to "prominently display" the Primo logo, or ensure its products were "highly visible." In addition, Primo did not engage in promotions "regular[ly]," and was not focused on "developing and maintaining a brand identity." As a result, the Company failed to increase "customer loyalty"; (d) 40% of the locations that were selling Primo water, were performing poorly, selling only one bottle every one to two weeks; (e) Primo's water bottle exchange machines were poorly manufactured and, without retailer supervision, allowed consumers to receive Primo's recycling tickets and coupons by merely waving their hands inside the machines, without returning a bottle of water, resulting in monthly

product loss (or shrinkage) of 25%; (f) Primo's primary retail customers would not be in a position to order any of the Company's products until after those retail customers cleared out other inventory sitting on their shelves including inventory related to products sold by competitors of the Company; (g) Primo's growth projections were dependent upon the Company's two largest customers, Wal-Mart and Lowe's, agreeing to enter into massive Primo product promotions; (h) due to the need to re-engineer the patent acquired from the Omnifrio acquisition, it was not possible for Primo to launch its single-serve carbonated beverage appliance by the fourth quarter of 2011; and (i) due to Primo altering the production procedures for the building of the Culligan Refill Business's refill machines, Primo ended up with millions of dollars of unused and unsold inventory. The Secondary Offering Registration Statement failed to contain any such disclosures.

129. Pursuant to Item 11(h) of Form S-1, the Secondary Offering Registration Statement was required to furnish the information required by Item 303 of Regulation S-K. Under Item 303(a) of Regulation S-K an issuer is required to, among other things, "describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." At the time of the Secondary Offering, the following trends and uncertainties were reasonably expected to have an impact on the Company's continuing operations and therefore should have been disclosed in the Secondary Offering Registration Statement but were not, such as: (a)

- 53 -

Primo was materially overstating by 1,500 the number of store locations offering Primo's bottle exchange machines and selling Primo bottled water; (b) Primo failed to properly promote and market its products which resulted in minimal sales, retailer dissatisfaction with Primo and the erosion of retailer relationships. As such, the Company's "significant opportunities" to increase store penetration were decreasing; (c) Primo failed to properly market and promote its products, did not engage in promotions "regular[ly]," and was not focused on "developing and maintaining a brand identity." As a result, the Company failed to increase "customer loyalty"; (d) 40% of the locations that were selling Primo water, were performing poorly, and only selling one bottle every one to two weeks; (e) Primo's water bottle exchange machines were poorly manufactured and, without retailer supervision, allowed consumers to receive Primo's recycling tickets and coupons by merely waving their hand inside the machine, without returning a bottle of water and resulted in monthly product loss (or shrinkage) of 25%; (f) Primo's primary retail customers would not be in a position to order any of the Company's products until after those retail customers cleared out other inventory sitting on their shelves including inventory related to products sold by competitors of the Company; (g) Primo was dependent upon the Company's two largest customers, Wal-Mart and Lowe's agreeing enter massive Primo product promotions; (h) due to the need to re-engineer the patent acquired from the Omnifrio acquisition, it was not possible for Primo to launch its single-serve carbonated beverage appliance by the fourth quarter of 2011; and (i) due to Primo altering the production procedures for the building of

- 54 -

Culligan Refill Business's refill machines, Primo ended up with millions of dollars of inventory.

130. Pursuant to Item 3 of Form S-1, the Secondary Offering Registration Statement was required to furnish the information required by Item 503 of Regulation 503. Under Item 503(c) of Regulation S-K, an issuer is required to, among other things, provide a "discussion of the most significant factors that make the offering risky or speculative." The Secondary Offering Registration Statement included a "Risk Factors" section. None of these so-called risk disclosures were meaningful or advised investors in the Secondary Offering that the Company's overstatement of store locations, insufficient marketing practices, decreasing or non-existent growth opportunities, poor sales performance in 40% of its selling locations, poorly manufactured water exchange machines, dependence upon retail customers getting rid of competitor inventory and entering into promotions, inability to timely launch its single-serve carbonated beverage and growing inventory were then negatively impacting the Company's operations. Accordingly, the Company's overstatement of store locations, insufficient marketing practices, decreasing or non-existent growth opportunities, poor sales performance in 40% of its selling locations, poorly manufactured water exchange machines, dependence upon retail customers getting rid of competitor inventory and entering into promotions, inability to timely launch its single-serve carbonated beverage and growing inventory were each a "significant factor" that made the Secondary Offering "risky or speculative" and were required to be disclosed in the IPO Registration Statement but were not.

- 55 -

D. **Counts Arising from the Company's IPO and Secondary Offering**

**COUNT I**

**FOR VIOLATIONS OF SECTION 11 OF THE 1933 ACT ARISING FROM THE COMPANY'S IPO AND SECONDARY OFFERING AGAINST ALL DEFENDANTS**

131.  Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

132.  This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, and is asserted against Primo, the Primo Individual Defendants, and the Underwriter Defendants.

133.  The Registration Statements for the IPO and the Secondary Offering were inaccurate and misleading, contained untrue statements of material facts, omitted facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

134.  Primo is the registrant for the Offerings.  As issuer of the shares, Primo is strictly liable for the materially inaccurate statements contained in the Registration Statements and the Prospectuses and the failure of the Registration Statements and Prospectuses to be complete and accurate.

135.  The Primo Individual Defendants each signed the Registration Statements either personally or through an Attorney-in-Fact and/or caused their issuance.  The Primo Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the

- 56 -

Registration Statements. They had a duty to ensure that such statements were true and accurate, that there were no omissions of material fact that would make the statements misleading, and that the documents contained all facts required to be stated therein. In the exercise of reasonable care, the Primo Individual Defendants should have known of the material misstatements and omissions contained in the Registration Statements and also should have known of the omissions of material fact that were necessary to make the statements made therein not misleading. As such, the Primo Individual Defendants are liable to Plaintiffs and the Class.

136. The Underwriter Defendants were each underwriters, as that term is used in Section 11(a)(5) of the Securities Act, with respect to the Offerings and the Company's common stock sold through the Registration Statements. The Underwriter Defendants were required to investigate with due diligence the representations contained therein to confirm that they did not contain materially misleading statements or omit material facts. None of the Underwriter Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements described herein, which were contained in the Registration Statements and Prospectuses, were true, were without omission of any material facts, and/or were not misleading.

137. By reasons of the conduct herein alleged, Primo, the Primo Individual Defendants and the Underwriter Defendants violated Section 11 of the Securities Act.

138. Plaintiffs and putative Class members acquired Primo common stock in the Offerings, and in reliance on the Registration Statements and without knowledge of the

- 57 -

untruths and/or omissions alleged herein. Plaintiffs and the Class sustained damages when the price of Primo common stock declined substantially subsequent to and due to Defendants' violations.

**COUNT II**

**VIOLATIONS OF SECTION 12(a)(2) OF THE SECURITIES ACT
AGAINST ALL DEFENDANTS**

139. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

140. This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l, on behalf of Plaintiffs and the Class, against all Defendants.

141. Defendants were sellers and offerors and/or solicitors of purchasers of the common stock offered pursuant to the IPO Prospectus and the Secondary Offering Prospectus. Defendants issued, caused to be issued, and/or signed the Registration Statements issued in connection with the IPO and the Secondary Offering. The Registration Statements each contained a Prospectus, which was used to induce investors, such as Plaintiffs and the other members of the Class, to purchase Primo common stock.

142. The Prospectuses contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted material facts required to be stated therein. The Primo Individual Defendants' actions of solicitation included participating in the preparation of the false and misleading Prospectuses and in "Road Shows" to promote the Offerings. Defendants, individually

and/or acting through their employees, agents and others, solicited such purchases for their personal financial gain through the preparation and dissemination of the Prospectuses.

143. The Underwriter Defendants participated in the preparation and dissemination of the false and misleading Prospectuses for their own financial benefit. But for their participation in the Offerings, including their solicitation as set forth herein, those Offerings could not and would not have been accomplished. Specifically, the Underwriter Defendants:

(a) Made the decision to conduct the Offerings and at the price set forth in the offering documents. The Underwriter Defendants drafted, revised and/or approved the Prospectuses. The Prospectuses were calculated to create interest in Primo common stock and were widely distributed by or on behalf of these Defendants for that purpose;

(b) Finalized the Prospectuses and caused them to become effective; and

(c) Conceived and planned the Offerings and orchestrated all activities necessary to affect the sale of the common stock to the investing public, by issuing common stock, promoting the common stock and supervising their distribution and ultimate sale to the investing public.

144. As set forth more specifically above, the Prospectuses contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

145. Plaintiffs and the other Class members did not know, nor could they have known, of the untruths or omissions contained in the Prospectuses.

146. The Defendants named in this Count were obligated to make a reasonable and diligent investigation of the statements contained in the Prospectuses to ensure that such statements were true and that there was no omission of material fact required to be stated in order to make the statements contained therein not misleading. None of the Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Prospectuses were accurate and complete in all material respects. Had they done so, these Defendants would have known of the material misstatements and omissions alleged herein.

147. By reason of the conduct alleged herein, these Defendants violated Section 12(a)(2) of the Securities Act. Accordingly, members of the Class who hold Primo common stock purchased in the Offerings have the right to rescind and recover the consideration paid for their Primo common stock and hereby elect to rescind and tender their Primo common stock to the Defendants sued herein. Plaintiffs and Class members who have sold their Primo common stock are entitled to damages.

**COUNT III**

**FOR VIOLATIONS OF SECTION 15 OF THE 1933 ACT ARISING FROM THE COMPANY'S IPO AND SECONDARY OFFERING AGAINST THE PRIMO INDIVIDUAL DEFENDANTS**

148. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

149.  This Count is brought pursuant to Section 15 of the Securities Act against the Primo Individual Defendants.

150.  Each of the Primo Individual Defendants acted as a controlling person of Primo within the meaning of Section 15 of the Securities Act by virtue of his position as a director and/or senior officer of Primo.  By reason of their senior management positions and/or directorships at the Company, as alleged above, these Individual Defendants, individually and acting pursuant to a common plan, had the power to influence and exercised the same to cause Primo to engage in the conduct complained of herein.  By reason of such conduct, the Primo Individual Defendants are liable pursuant to Section 15 of the Securities Act.

151.  Each of the Primo Individual Defendants was a culpable participant in the violations of Sections 11 and 12(a)(2) of the Securities Act alleged in Counts I and II above, based on their having signed the Registration Statements and/or having otherwise participated in the process which allowed the Offerings to be successfully completed.

## VII.  THE EXCHANGE ACT CLAIMS

### A.    Additional Information Related to Defendants' Scienter

152.  During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Primo, were privy to confidential and proprietary information concerning the Company, its operations, finances, financial condition, and present and future business prospects.  The Individual Defendants also had access to material adverse non-public information concerning Primo, as discussed in detail below.

Because of their positions with Primo, the Individual Defendants had access to non-public information about the Company's business, finances, products, markets, and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

153. The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Primo's business.

154. The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance

and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

155. As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Primo's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Primo's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

156. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Primo's common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The Individual Defendants deceived the investing public regarding Primo's business, operations and management, the intrinsic value of Primo's securities, and caused Plaintiffs and members of the Class to purchase Primo's common stock at artificially inflated prices.

### 1. Defendants' Attendance at Various Meetings Made Them Aware of the Falsity of Defendants' Class Period Statements

157.  CW 5 explained that while she/he was at the Company, from January 2010 through April 2011, Prim attended "Executive Team Meetings" every two weeks in a conference room on the second floor outside of Prim's office.  The meetings were held on Monday afternoons when CW 5 first joined the Company in January of 2010, and later they were moved to Monday mornings.  In addition to Prim, attendees at the Executive Team Meetings included Alan Left, Belmont, Gunter, Boydston, Goodwin and Head of Human Resources Mike Reeves.  On the alternating Mondays, when there was not an Executive Team Meeting, there were "Senior Executive Meetings" attended by Prim, Castaneda, Goodwin, Gunter and CW5.  She/he recalled that Prim attended Senior Executive Meetings "from January 2010 to April 2011" and as a result Prim was fully aware of all operational issues occurring at Primo.  For example, CW 5 stated that both Prim and Castaneda were present for, and participated in conversations about the lack of sales at the Company's retailers.  CW 5 explained that the fact that 40% of the Company's store locations were selling only one bottle of water every week or two weeks was discussed numerous times.  In addition, CW 5 recalled that Prim reviewed photos of Primo's water bottles covered in dust at retailer locations where they were not selling and commented that to Gunter, that they needed to "push sales."

158.  In addition to the Monday meetings, every Friday there was an "All Hands on Deck" meeting, which everyone in the Company attended, including Prim.  CW 2

- 64 -

explained that at these meetings, all the details of day-to-day operations were discussed, including successes and failures of the previous week, and that the expanding sales to new stores were key to the success and survival of Primo.

159.  CW 2 and many others talked during the meetings about the logistical and approval challenges of getting into new stores.  According to CW 2, Prim responded to these issues by saying that while at Blue Rhino he had succeeded in getting stores to stock and sell propane in the front of stores, and that, as a result, Primo sales people needed to do the same for Primo's products.

160.  In addition, CW 2 explained that Prim talked every week about how many stores Primo needed to reach in order to distribute fast enough to cover its "burn rate," or the rate at which the Company was using its capital.  CW 2 stated that the numbers of sales and new distributors they had to achieve were very aggressive and the time frame for that expansion was not realistic.

## 2.  Primo's Internal Data Shark Reporting System

161.  As mentioned above, at all relevant times, Primo operated on an internal reporting system called Data Shark.  CW 1 explained that Data Shark was available through Primo's internal web portal, and it provided detailed records on how much bulk water was being sold and delivered to each store and was sortable by vendor and month.

162.  Data Shark had many uses in Primo's business.  For example, CW 1 explained that the Company's ULW reports (*see supra*, at ¶54,) were automatically available through Data Shark.  In addition, any RO could track when each store that RO

was responsible for needed to get a new delivery of water as well as the pace of sales at a particular store. According to CW 1, the ULW reports made it clear that 1,500 of the Company's stores were not selling any Primo product. Indeed, both CW 1 and CW 4 independently stated that when a store was not selling any product, the Data Shark system reported a zero for that store location.

163. According to CW 5, MIS Director Dana Warren created and circulated sales reports every Monday using Data Shark. These reports showed "every" delivery to every retailer. CW 5 confirmed that Prim and Castaneda received print outs of Data Shark reports on a weekly basis.

### 3. Primo Assured the Market of Its Hands-On Management of the Company's Customers and Business Through its Management Information Systems

164. Throughout the Class Period, the Company discussed its hands-on management style, including constant access and monitoring of the Company's business through "real-time" sales data, and Company's integrated "reporting and financial databases." For example, the Company's IPO Registration Statement stated, in pertinent part, as follows:

> We have made a substantial investment in MIS tools which enhance our ability to process orders, manage inventory and accounts receivable, maintain distributor and customer information, maintain cost-efficient operations and assist distributors in delivering products and services on a timely basis. Our technology utilizes highly integrated, scalable software applications that cost-effectively support our growing retail network. Our MIS tools also allow us to analyze historical trends and data to further enhance the execution, service and identification of new markets and marketing opportunities. The primary components of our systems include the following:

- 66 -

Sales and Marketing Support Systems.

We operate a single customer relationship management database that integrates all financial and transaction-based data with respect to each retail account. Our MIS tools provide our account managers and customer service representatives access to crucial data to effectively manage each bottler, distributor and retail relationship.

Bottler and Distributor Level Technology.

Our distribution process is highly automated and scalable. Our technology allows bottlers and distributors timely access to information for customer support needs and provides access to real-time data to enhance decisions. In addition, each distributor is electronically linked to our systems with our proprietary PrimoLink software. PrimoLink enables distributors to review delivery quantities and tentative scheduling requirements across our entire bottling and distribution network. In addition, our MIS tools allow drivers to update delivery, inventory and invoicing information through handheld devices. This technology provides retailers with accurate and timely inventory and invoices and assists each distributor in managing its responsibilities.

Financial Integration.

We utilize Microsoft's Dynamics GP software as our core platform which interfaces with all of our systems. Each handheld device is based on Microsoft's operating system and ensures integration within our reporting and financial databases. All delivery transactions are validated and data is imported into our database tables and mapped to corresponding accounting ledgers.

165. Moreover, an April 12, 2011 article entitled, *Water Distribution Start-up Uses Microsoft Dynamic® to Manage Growth and Drive* discussed Microsoft Dynamics GP 2010 system in further detail, explaining how Primo's internal systems provided executives with "instant and easy access" to the Company's operations, including sales and inventory, stating:

Dynamics GP 2010 provides executives and managers at Primo Water with instant and easy access to information anytime they need. Using

- 67 -

SmartLists and out-of-box reporting capabilities, users are now able to generate metrics and reports quickly and on their own. . . . Operationally, Primo Water now has better visibility into inventory positions. Employees can now pull reports, verify inventory, dollars, transfers, and other information more easily. Primo Water has been able to analyze inventory turns and route metrics to drive improved asset utilization.[5]

**B.    The False and Misleading Class Period Statements**

166. In addition to the false and misleading statements identified below, Plaintiffs incorporate by reference the statements referenced above in ¶¶50-51, 59-62, 86-88, from the IPO Registration Statement and Prospectus.

167. Following completion of the Company's IPO, and prior to the market opening on December 2, 2010, Primo issued a press release reporting its financial results for the third quarter ended September 30, 2010. The press release highlighted that the Company had added "***700 Exchange locations . . . bringing total Exchange locations to 7,900 at September 30, 2010***." The Company also confirmed its long-term strategies to increase retail locations to "40,000-50,000 in the next five years" and to increase "same-store sales." In addition, the December 2, 2010 press release went on to state, in pertinent part, as follows:

As expected, Product net sales for the third quarter of 2010 decreased 57.1% to $3.4 million compared to $7.9 million in the third quarter of 2009. ***This decline resulted from a reduction in retailers' inventories of Primo's water dispensers in anticipation of newer lower-priced Primo water dispenser models.***

---

[5] http://www.docstoc.com/docs/76265448/Impact-of-the-Quality-of-Erp-Implementations-on-Business-Value (last visited June 11, 2012)

- 68 -

168. Defendant Prim commented on the results, stating, in pertinent part, as follows:

> We are very satisfied with the results of our IPO, which allowed us to complete the acquisition of the Culligan Refill Business, strengthen our balance sheet, and have access to capital to execute our growth plan. . . . During the third quarter, we delivered excellent results on key financial performance metrics in our Exchange business, including record revenue, **location growth**, and an increase in same-store unit sales. However, we did see a significant sales decline in our Product business, which we anticipated, ***as retailers continued to reduce their inventories of our water dispensers to make room for our new product line.***

169. Prim also announced the Company's outlook for the fourth quarter 2010, emphasizing the Company's growth, stating, in pertinent part, as follows:

> . . . Including the impact of the Culligan Refill Business, we expect net sales for the fourth quarter of 2010 will increase between 55% — 65% compared to the fourth quarter of 2009. In addition, ***we are targeting to end 2010 with 13,000 — 13,500 retail Exchange and refill locations***.

170. Also on December 2, 2010, Primo hosted a conference call to discuss the Company's third quarter 2010 financial results. Prim and Castaneda participated in the call on behalf of the Company. During the call, numerous false and misleading statements were made that were designed to artificially inflate the Company's stock price. Prim began the call discussing the Company's goals and business model, discussing the Company's strategy to "increase retail locations to 40,000 to 50,000 locations in the next five years" and, "in keeping with [the] razor and razorblade business model [is] to increase same-store sales of water by selling innovative water dispensers into the market." Prim stated, in pertinent part, as follows:

- 69 -

We delivered a record revenue in our Exchange business. In the quarter, we added 700 new locations, including the first Wal-Mart locations, which we believe will be pivotal to our growth prospects. ***Primo had a total of 7,900 retail exchange locations at the end of September.***

Turning to our water dispenser product sales for the third quarter, ***it is important to note that over the past several months our retailers have been reducing inventories of Primo's water dispensers in anticipation of our new line of water dispensers at lower cost.*** As expected, our product sales decreased by 57.1% to 3.4 million. However, product unit sell-through to consumers continued to be robust increasing 15% year-to-date. We see this as confirmation that ***Primo's water dispenser products continue to be very much in demand.***

171. Later in the call, Castaneda further clarified Primo's inventory statements, saying "[t]he reason we'll have more inventory in the channel for next year is we expect to have more locations."

172. In addition, when addressing whether Primo had seen any "cannibalization in the markets" where it already has locations, Prim stated:

. . . ***the answer is no***, we haven't seen that. In fact as we continue to put water dispensers into the market, we are seeing nice same-store sales. So we are just creating new customers and we're very early in that. . . . As far as areas like the West Coast where we're less penetrated, we're looking forward to penetrating those areas. ***We're seeing nice growth in those areas and nice demand from consumers.***

173. Prim also touted the Company's retailer relationship and upcoming rollout promotion with Wal-Mart, stating he was "very comfortable with our rollout of Wal-Mart" and confirmed the rollout was "in line with expectations."

174. Further, when Prim was asked by an analyst to discuss the Company's anticipated store growth of between 600 and 1,100 new stores for the upcoming quarter,

the following conversation took place, in which Prim confirmed that the Company's

stores were not facing a capacity issue:

> Analyst: So that pace at the low end that's like seven a day is that okay pace? Do you feel good about that?

> Prim: We hope to meet or exceed people's expectations.

> Analyst: Okay. And then if you look at next year, you're looking at total locations, look like of between 5,000 and 6,000 stores?

> Prim: **Correct**.

> Analyst: Yeah, that's a pick up, that's a pace that increases a little bit. How does that have – are more people, more people installing – how does that pick up physically?

> Prim: Yeah, I understand. ***You're highlighting is there a capacity issue? And the answer is no.*** You got to remember that that we're including a new business in there and that's the refill business of which we also have a lot of new operators in the field.  So we have two products to roll out new locations with that will very much help accelerate the location growth, as well as we have a lot of capacity in our exchange system, and have demonstrated that before.

    175.  Discussing the Company's inventory of "higher cost products still in the

channel," Prim stated:

> So we think ***there will be more inventory in the channel next year***, that's first item. But as far as the ramp on the product's business, we haven't given the forecast up, but as we talked about this year, we've sold less into the channel. ***So we expect a conservative doubling of that business into next year.*** There will be some seasonality to that sell-in, with the bulk of it in quarters two and three.

    176.  On December 7, 2010, Primo filed its quarterly report on Form 10-Q for the

third quarter ended September 30, 2010, which confirmed the Company's previously

announced financial results and was signed by Prim and Castaneda (the "Third Quarter

- 71 -

2010 10-Q"). The Third Quarter 2010 10-Q also contained Sarbanes-Oxley certifications signed by Prim and Castaneda stating the Form 10-Q did not include any material misrepresentations. Nevertheless, the Third Quarter 2010 10-Q did contain several false and misleading statements regarding Primo's locations growth as well as the "minimal" supervision required to use Primo's water bottle exchange machines. For example, the Third Quarter 2010 stated, in pertinent part, as follows:

> We have created a nationwide single-vendor water bottle exchange service for our retail customers that requires **minimal customer management supervision and store-based labor** and provides centralized billing and detailed performance reports. We deliver this service utilizing our current relationships with 55 independent bottlers and 27 independent distributors and our two Company-owned distribution operations covering portions of four states, which we refer to collectively as our "national network". **As of September 30, 2010, our water bottle exchange service and water dispensers were offered** in each of the contiguous United States **and located in approximately 7,900 and 5,500 retail locations, respectively**.
>
> *     *     *
>
> Our Exchange segment sells three- and five-gallon purified bottled water through retailers in each of the contiguous United States. **As of September 30, 2010, we offered our exchange service at approximately 7,900 locations** through point of purchase display racks and recycling centers that are prominently located at major retailers in space that is often underutilized. We service these retail locations through our national network of primarily independent bottlers and distributors.
>
> *     *     *
>
> **The increase in units sold was driven by an increase in selling locations to approximately 7,900 at September 30, 2010** as well as an increase in same store units of 7.7% and 5.2%, respectively, for the three and nine months ended September 30, 2010.

177. The statements referenced in ¶¶167-76 were each materially false and misleading when made for the reasons set forth in ¶¶51, 62, 88, 108 and the factual

- 72 -

2010 10-Q"). The Third Quarter 2010 10-Q also contained Sarbanes-Oxley certifications signed by Prim and Castaneda stating the Form 10-Q did not include any material misrepresentations. Nevertheless, the Third Quarter 2010 10-Q did contain several false and misleading statements regarding Primo's locations growth as well as the "minimal" supervision required to use Primo's water bottle exchange machines. For example, the Third Quarter 2010 stated, in pertinent part, as follows:

> We have created a nationwide single-vendor water bottle exchange service for our retail customers that requires **minimal customer management supervision and store-based labor** and provides centralized billing and detailed performance reports. We deliver this service utilizing our current relationships with 55 independent bottlers and 27 independent distributors and our two Company-owned distribution operations covering portions of four states, which we refer to collectively as our "national network". **As of September 30, 2010, our water bottle exchange service and water dispensers were offered** in each of the contiguous United States **and located in approximately 7,900 and 5,500 retail locations, respectively**.
>
> *     *     *
>
> Our Exchange segment sells three- and five-gallon purified bottled water through retailers in each of the contiguous United States. **As of September 30, 2010, we offered our exchange service at approximately 7,900 locations** through point of purchase display racks and recycling centers that are prominently located at major retailers in space that is often underutilized. We service these retail locations through our national network of primarily independent bottlers and distributors.
>
> *     *     *
>
> **The increase in units sold was driven by an increase in selling locations to approximately 7,900 at September 30, 2010** as well as an increase in same store units of 7.7% and 5.2%, respectively, for the three and nine months ended September 30, 2010.

177. The statements referenced in ¶¶167-76 were each materially false and misleading when made for the reasons set forth in ¶¶51, 62, 88, 108 and the factual

- 72 -

detail contained throughout this Complaint. In addition, the statements referenced in ¶¶167-76 were materially false and misleading when made because they represented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading. The true facts, which were known to or recklessly disregarded by each of the Defendants, were:

(a) The number of Primo's locations were overstated by at least 1,500 stores that were not selling Primo's water bottle exchange machines or selling Primo bottled water;

(b) Demand for and sales of Primo's products were diminishing materially because Primo was failing to properly promote and market its products, if at all, resulting in minimal sales, retailer dissatisfaction with Primo and the erosion of retailer relationships. As such the Company's ability to increase store penetration did not exist or were decreasing;

(c) Contrary to Defendants' statements, Primo was not seeing a "nice demand from consumers for its products." Indeed CW 6 and CW 5 both stated that approximately 40% of the Company's retail locations were hardly selling any products;

(d) Moreover, Defendants' statements predicting their retail customers' future demand and future inventory were misleading because Defendants failed to inform investors that orders for this future inventory were dependent upon Primo's major retailers first selling inventory from competitors, before they would order Primo's products. In addition, this demand was dependent upon two of Primo's retail customers

- 73 -

agreeing to engage in national promotions of Primo's products. Moreover, as disclosed later in the Class Period, on an August 10, 2011 conference call, Defendants have "no control" over, and no knowledge of what their retail customers will order until the day the order is placed;

(e) Prim misleadingly confirmed to the market that there was not a "capacity issue" that would inhibit Primo's growth. The truth, however, was that Primo cared more about increasing store locations than whether those stores were successfully selling Primo's products; and

(f) Primo's statements that its "water bottle exchange service for our retail customers that requires minimal customer management supervision and store-based labor" were false. Primo's water exchange machines were poorly manufactured and, without retailer supervision, people were able to steal water bottles from the water bottle exchange machines without purchasing them, and to obtain discount coupons from the machines without returning a water bottle, resulting in monthly product loss of up to 25%.

178. In response to Defendants' false and misleading statements in the December 2, 2010 press release and conference call, the price of Primo common stock traded relatively flat, increasing $0.12 per share to close at $12.12 on December 1, 2010, and then increasing an additional $0.10 to close at a price of $12.24 on December 2, 2010. But for the false and misleading statements identified herein, the price of Primo common stock would have decreased.

- 74 -

179. On December 15, 2010, three of the Underwriter Defendants, BB&T, Janney and Stifel Nicolaus all initiated coverage for Primo with "Buy" ratings. To that end, BB&T cited the Company's "favorable market positioning, innovative product offerings, and strong management team" in issuing a 12-month price target of $20. BB&T went on to state:

> **Consumers and retailers responding favorably.** Primo is bringing innovation to the bottled water category not just in its novel purified water exchange and acquired refill systems, but also via the introduction of water dispensers with enhanced features. Together, these form the basis of its highly productive "razor-razorblade" business model. **Consumers have responded positively to Primo's brand offerings as demand for its purified water has grown in lockstep with the rapid expansion of its exchange locations to 7,900 retail stores.** Brand marketing includes point of sale awareness using its exchange bottle and recycling centers for advertising and education, tie-in promotions offering a free water bottle with the purchase of a dispenser, sampling of Primo water at retail outlets, and advertising in print and electronic media. **Our proprietary channel checks confirm that retailers and consumers have responded enthusiastically to Primo's offerings.**

180. Likewise, Janney initiated coverage with a "Buy" rating and a fair value estimate of $19. Pointing to the Company's previous statements regarding its retailers and opportunity for expansion, Janney's positive report on Primo stated:

> Primo has created a nationwide single-vendor water bottle exchange solution for retail customers, addressing a market demand that it believes was previously unmet. The company believes the water bottle exchange solution is beneficial to retailers, as it **requires minimal management supervision**, optimizes typically unused retail space, and drives recurring customer traffic.
>
> *     *     *
>
> Currently, the company's water bottle exchange service and water dispensers are available in several major retailers, including Lowe's, Sam's

- 75 -

Club, Costco, Wal-Mart, Target, Kroger, Albertsons, and Walgreens. **As of September 30, Primo's water bottle exchange service was offered in approximately 7,900 retail locations (from 6,772 last year); as of June 30, it was offered at 5,600 of its top ten retailers' locations,** and management believes that within those retailers there is opportunity expand into an additional 13,900 doors

181. In response to the positive analyst reports reiterating Defendants' false and misleading statements, the price of Primo common stock increased 8.28%, or $.99, to close at $12.94 on December 15, 2010, up from a closing price of $11.95 on December 14, 2010, on a 154% increase on trading volume.

182. On March 9, 2011, after the market closed, the Company issued a press release entitled *Primo Water Announces Two Strategic Acquisitions; Enters the Rapidly Growing Carbonated Home Beverage Market and Expands Retail Exchange Business into Canada* stating:

> Single-Serve Cold Carbonated Beverage Acquisition Is Expected To Expand Household Product Adoption & Penetration; Bottled Water Exchange Acquisition Will Expand Service to Over 600 Retail Exchange Locations in Canada; Company Provides Preliminary Fourth Quarter Results and Introduces First Quarter and Full Year 2011 Guidance; and **Company Increases 2011 Expected Retail Location Growth of 5,700 to 6,700**.
>
> \*      \*      \*
>
> The acquisition of Omnifrio positions Primo Water in the $39 billion U.S. market for carbonated beverages. ***The Company plans to integrate the Omnifrio carbonation and single-serve cold-beverage technology into certain of its water dispenser appliances to develop multi-beverage hydration stations for both household and office use.*** Omnifrio has several patent applications pending for its carbonated beverage makers. ***Omnifrio has developed about 30 flavors of single-serve packs or S-cups for 8 or 16 ounce beverages with three carbonation levels.*** The appliances utilize a $CO_2$ cylinder that must be refilled periodically. Primo intends to

- 76 -

leverage its existing distribution infrastructure and offer retailers a CO2 exchange program. ***Primo expects to begin selling cold carbonated beverage appliances and flavor cups to specialty and catalog retailers in the U.S. in the fourth quarter of 2011.*** The Company expects to sell the appliance at higher gross margins than its existing appliance business and to sell the S-cup and CO2 cylinder consumables at higher gross margins than its existing margins on water.

    183. The press release also discussed the Company's preliminary fourth quarter 2010 results and revealed Primo's first quarter and full year 2011 guidance. The press release stated in relevant part:

> For the fourth quarter of 2010, the Company expects to report a net sales increase of approximately 61% to $12.7 million, consistent with prior guidance. . . . The Company expects to achieve fourth quarter 2010 GAAP loss per share of ($0.95) to ($1.00), non-GAAP pro forma fully-taxed loss per share of ($0.12) to ($0.15), GAAP loss from operations of ($3.9) to ($4.2) million and Non-GAAP pro forma EBITDA in the range of break-even to $0.2 million.

>           \*       \*       \*

> The Company ended the year with ***approximately 12,600 combined exchange and refill locations***, excluding the 600 locations acquired from Culligan Canada as described above. The Company had a major mass merchandise retailer that originally planned a slow regional rollout of exchange locations beginning in the fourth quarter of 2010; however, the retailer requested an aggressive national installation schedule in two phases beginning in the first quarter of 2011. This caused a substantial number of installations to move from the fourth quarter of 2010 to the first quarter of 2011. In addition, the Company expects to have substantially more mass merchant locations by the end of the first quarter of 2011 than originally planned and expects to end the quarter with total locations installed at or above plan. The shift in timing of installs from the fourth quarter of 2010 to the first quarter of 2011 is expected to reduce expected revenue growth for the first and second quarters of 2011. The larger number of mass merchant locations installed at the end of the first quarter is expected to have a positive impact on anticipated revenue growth in the second half of 2011. ***As a result, Primo expects full year 2011 revenues, income from operations, non-GAAP pro forma EBITDA, net income and pro forma***

*earnings will be in line with expectations,* excluding the impact of the acquisitions. [DH still looking into info related to retailer change]

184. Prim concluded the press release, stating, in pertinent part, as follows:

We achieved record sales for the fourth quarter and are *on track to deliver strong results in 2011.* **We are also accelerating exchange installations at high volume mass merchants, which gives us confidence in our ability to continue to gain share in the purified water market, execute on our growth plan and increase long-term profitability**.

185. Also on March 9, 2011, the Company held a conference call to discuss the March 9, 2011 press release. Prim and Castaneda participated in the call on behalf of the Company. During the call, numerous false and misleading statements were made that were designed to artificially inflate the Company's stock price. For example, Castaneda stated, in pertinent part, as follows:

Next looking to locations, **we ended the year with approximately 12,600 locations between refill and exchange**, excluding the 600 locations acquired from Culligan Canada, which Billy will provide more detail in a few moments. Another point on locations, **our locations additions are a key measure for our future growth and the type of location is very important as well**, as 1,000 mass merchants equal approximately 3,000 grocery stores. So you can see the magnitude of certain types of retailers have, or certain channels have, on our growth rates.

As described in our press release, we had a major mass merchant retailer that originally planned a slow regional roll-out of exchange locations beginning in the fourth quarter of 2010. That had a shift in timing and the retailer requested an aggressive national installation schedule in two phases beginning in the first quarter of 2011. This caused a substantial number of installations to move from the fourth quarter of 2010 to the first quarter of 2011. In addition, we expect to have substantially more mass merchant locations at the end of the first quarter than originally planned and expect to end the quarter with total locations installed at or above plan.

- 78 -

186. Discussing the Omnifrio acquisition, Prim stated, in pertinent part, as follows:

> [W]e're extremely pleased to announce this acquisition, as it serves as an entry point into the rapidly growing beverage appliance and provides an additional re-occurring revenue source that combines two fast-growing categories, carbonating systems and single-serve beverages. The acquisition of Omnifrio positions Primo Water in the $39 billion U.S. market for carbonated beverages. ***This product will allow us to expand our household adoption and penetration. . . In addition, we will use Omnifrio's innovative technology to introduce a new modular dispenser line that will integrate hot and cold beverage systems with our bottom-loading water dispenser***.
>
> We expect the bottom-load coffee module will begin to ship in the third quarter of 2011. ***The counter-top Omnifrio appliance will began shipping in the fourth quarter of 2011.*** This introduction will expand our mass merchant and specialty relationships for appliances.

187. In addition, Prim touted the Omnifrio acquisition stating:

> . . . this is something that we have been looking at for some time. As you know, carbonated water is one of the fastest growing components of the water business in the U.S. and as we began to work with our factories on trying to figure out carbonation for our water dispensers, we started bumping up against patents and started researching different companies and different ways to add carbonation and other beverages to our water dispensers. ***As we found Omnifrio, we saw that we could make giant leaps forward in that process by acquiring them.***
>
> Although the company does not have sales today, they do have orders and for placement this year. They have domestic production that we believe is ample to justify – to fill all of the orders that they have this year. We have already begun working with our factories in Asia about producing the product for delivery in Q1 of 2012. They believe that can be accomplished and accomplished in a way that we can make it a module that also attaches to our bottom-load dispenser.
>
> ***This gives a large opportunity for us to increase our appliance business and to increase our household penetration of water dispensers***. That's what drives same-store sales. We have talked with our retailers about this.

- 79 -

*We have talked to our factories and we feel confident and that's the reason we gave a little glimpse of what it would do in 2012.*

188.  As the conference call continued, Prim confirmed that Omnifrio's counter-top model was in production and would be available for sale in the fourth quarter of 2011, stating, in pertinent part, as follows:

Yeah, *the counter-top model that Omnifrio currently has in production will be in the market in the fourth quarter.*

189.  The statements referenced in ¶¶179-88 were each materially false and misleading when made for the reasons set forth in ¶¶116, 177 and the factual detail contained throughout this Complaint.  In addition, the statements referenced in ¶¶179-88 were materially false and misleading when made because they represented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading.  The true facts, which were known to or recklessly disregarded by each of the Defendants, were in stark contrast with the Company's positive statements regarding the "innovative technology" and how the Company was able to make "giant leaps" forward by acquiring Omnifrio.  The patents the Defendants purchased in the Omnifrio acquisition were unworkable and needed to be re-engineered, and therefore it was not possible for Primo to begin selling its single-serve carbonated beverage appliances by the fourth quarter of 2011.

190.  In response to Defendants' false and misleading statements in the March 9, 2011 press release and conference call the price of Primo common stock increased 7.87%, or $0.81, from a closing price of $10.29 on March 9, 2011, to closing price of

- 80 -

$11.10 on March 10, 2011. The following day, the price of Primo common stock soared, increasing an additional **26.5%**, or $2.94, to a close at $14.04 per share on March 11, 2011.

191. On March 24, 2011, Primo issued a press release reporting its financial results for the fourth quarter and year ended December 31, 2010. The press release touted Primo's growth in retail locations to 12,600 locations at year end, stating, in pertinent part, as follows:

> *At December 31, 2010, the Exchange and Refill services were offered in* the United States and in Canada at approximately *a combined 12,600 retail locations.*

192. The press release also discussed financial results for the fiscal year stating:

> Exchange sales increased by 10% in 2010 compared to 2009, which was the result of an 11% increase in water bottle units sold to approximately 4.3 million units. *The increase in units sold was driven by a 14% increase in Exchange selling locations to approximately 8,000* at December 31, 2010 as well as an increase in same store units of approximately 5% for 2010. In addition, sales for Refill accounted for $3.3 million since the acquisition on November 10, 2010 *from approximately 4,600 locations.* Product sales decreased $8.1 million or 35.4% to $14.7 million, representing 33.0% of total net sales for 2010. *We believe the decrease in sales is primarily the result of retailers continuing to manage their inventory levels in anticipation of the new product line, which the Company began shipping in the fourth quarter of 2010.* Product sales in the fourth quarter of 2010 increased 38.3% compared to prior year. Product sales at retail to end consumers increased 14% in 2010 compared to 2009.

193. In the press release, the Company also provided financial guidance for the first quarter and full year 2011, and stated, in pertinent part, as follows:

> *The Company ended 2010 with approximately 12,600 combined Exchange and Refill locations*, excluding the 600 Exchange locations acquired from Culligan Canada in March, 2011. The Company continues

- 81 -

to expect sales to increase 80% to 85%, or in the range of $15.9 to $16.3 million, in the first quarter of 2011 compared to the same period last year. *Primo expects to end the first quarter with between 14,500 to 14,900 combined Exchange and Refill locations*.

For 2011, the Company continues to expect sales to increase 260% to 275%, or in the range of $116 to $123 million, which includes the impact of the previously announced acquisitions. *Primo expects to end the year with between 18,700 to 19,700 retail locations, which is the result of adding between 5,700 to 6,700 retail locations for the year*. *The Company also expects to achieve full year 2011 GAAP earnings per diluted share of $0.06 to $0.15, non-GAAP pro forma fully-taxed earnings per diluted share of $0.16 to $0.24, GAAP income from operations in the range of $5.3 to $7.5 million and Non-GAAP pro forma EBITDA in the range of $16.5 to $19.5 million*.

194. Also on March 24, 2011, Primo hosted a conference call to discuss its fourth quarter 2010 financial results. Prim and Castaneda participated in the call on behalf of the Company. During the call numerous false and misleading statements were made that were designed to artificially inflate the Company's stock price. For example, Prim began the call stating:

*Our consistent, positive operational and financial execution reflects the strength of our business model* and the ability of our entire Primo Water team to focus on adding high-quality accounts and locations. We have created a nationwide exchange solution for retail customers addressing a market demand that we believe was previously unmet. Our water exchange solution is *easy for retailers to implement, requires minimum store labor,* and provides centralized billing and a detailed performance report.

195. Moreover, Prim commented on the Company's growth stating:

*We ended the year with approximately 12,600 locations selling water*, and that does not include the 600 locations acquired from Culligan Canada.

- 82 -

196. Castaneda explained that as of December 31, 2010, the Company had "**8000 exchange locations**," and confirmed guidance. In addition, Castaneda discussed its major retailer's decision to shift the timing of a major promotion, stating:

> As we released earlier this month, we had a major mass merchant retailer that originally planned to slow regional rollout of exchange locations beginning in the fourth quarter. That timing had shifted and the retailer requested an aggressive national rollout in two phases beginning in the first quarter of 2011. This caused locations to move from Q4 to Q1. In addition, we expect to have substantially more mass merchants or higher-quality locations at the end of the first quarter than originally planned.
>
>       *          *          *
>
> For fiscal 2011, we continue to expect net sales to increase 260% to 275%, or in the range of $116 million to $123 million, which does include the impact of the two acquisitions. ***We plan to end the year with between 18,700 and 19,700 retail locations, which is a result of adding 5700 or 6700 locations this year***. We also expect to achieve full 2011 GAAP earnings per diluted share between $0.06 and $0.15 per share on a non-GAAP fully taxed basis of $0.16 to $0.24, and a non-GAAP EBITDA in the range of $16.5 million to $19.5 million.

197. Prim also touted the Omnifrio acquisition and the technology Primo gained from its acquisition, and explained how Omnifrio had already developed 30 flavors, stating, in pertinent part, as follows:

> For those of you that were not able to listen to our last conference call, Omnifrio will provide single serve cold beverage appliances and related products to retailers in the US, including high-end specialty stores and retail catalogs. ***Omnifrio provides us with a complementary razor/razorblade business model as we plan to integrate the Omnifrio carbonation and single serve technology into our next-generation water dispenser appliance to develop a multi-beverage hydration station for both residential and office use.*** In addition, their products build on our existing platform of reducing the amount of bottle waste in landfills. We believe Omnifrio technology is extremely unique and it currently has several patents pending for the process of carbonating single serve beverages.

- 83 -

Furthermore, we have two additional consumables, single serve S-cup flavors and CO2 cylinders. ***Omnifrio has developed about 30 flavors of single serve S-cups with three different carbonation levels***. The units will also include a CO2 cylinder which we can leverage our existing distribution infrastructure in order to offer retailers an exchange program for this product. We expect to sell the appliance at higher gross margins than the existing appliance business that Primo has and to sell the S-cups and CO2 cylinders at a higher gross margin than our existing margins on water. In addition, we will use Omnifrio's ***innovative technology*** to introduce a new modular dispenser line that will integrate hot and cold beverage systems with our bottom-load water dispenser.

198. On March 30, 2011, Primo filed its annual report on form 10-K for the year ended December 31, 2010, which confirmed the Company's previously announced financial results and was signed by Prim and Castaneda (the "2010 10-K"). The 2010 10-K also contained Sarbanes-Oxley certifications signed by Prim and Castaneda stating the Form 10-K did not include any material misrepresentations. Nevertheless, the 2010 10-K did contain several false and misleading statements regarding the Company's growth.

199. Among other things, the 2010 10-K stated:

***As of December 31, 2010, our exchange and refill services were offered in each of the contiguous United States and in Canada at approximately a combined 12,600 retail locations***, including Lowe's Home Improvement, Wal-Mart, Kroger, Safeway, Albertsons and Walgreens.

We provide major retailers throughout the United States and Canada with single-vendor solutions for water bottle exchange services and refill vending services, addressing a market demand that we believe was previously unmet. ***Our solutions are easy for retailers to implement, require minimal management supervision and store-based labor*** and provide centralized billing and detailed performance reports. ***Additionally, due to the recurring nature of water consumption, retailers benefit from year-round customer traffic and highly predictable revenue***.

- 84 -

200. Discussing its growth strategy, Primo stated:

*Growth Strategy*

We seek to increase our market share and drive further growth in our business by pursuing the following strategies:

*Increase Penetration with Existing Retail Relationships and Develop New Retail Relationships*. We believe we have significant opportunities to increase store penetration with our existing retail relationships. ***As of December 31, 2010, our water bottle exchange service and our refill vending service were offered at a combined total of 9,300 of our top ten retailers' locations.***

*Drive Consumer Adoption Through Innovative Water Dispenser Models*. In addition, ***the acquisition of the Omnifrio Single-Serve Beverage Business will enhance our ability to add innovative beverage and hydration solutions to our line of water dispensers. At December 31, 2010, we offered our water dispensers at approximately 5,500 locations*** in the United States, including Wal-Mart, Target, Kmart, Sam's Club, Costco, and Lowes Home Improvement.

201. In addition, the Company discussed its ongoing marking efforts, stating:

Our marketing efforts focus primarily on ***developing and maintaining a brand identity*** synonymous with an environmentally friendly, economical, convenient and healthy solution for bottled water consumption. We direct our marketing efforts as close as possible to the point of sale to strengthen our brand and promote consumer awareness of our water bottle exchange and refill vending services. We believe our water bottle exchange service promotes consumer loyalty through the use of our recycling tickets, while our refill vending service promotes consumer loyalty through preferred pricing. Our marketing efforts include the following initiatives: (i) prominent display of our Primo logo and distinctive four-bubble design on water bottles, sales and recycling displays and water dispensers; (ii) highly visible sales and recycling center displays; and (iii) ***regular cross marketing promotions.***

202. The 2010 10-K further discussed the Company's Eagan, Minnesota facility which is responsible for assembling, refurbishing and repairing the Company's refill vending machines, stating:

- 85 -

We employ an operations team *which assembles, refurbishes and repairs the refill vending machines.* This team is located at our Eagan, Minnesota facility, where it routinely refurbishes equipment that has been in service for several years or when a customer requests a refreshed system. The operations team also procures new filtration systems component parts and assembles the units and ships them to locations for installation by distributors. The component parts are generally sourced from multiple suppliers.

203. The 2010 10-K further discussed Primo's "Product Design and Development," including its Omnifrio carbonated beverage dispenser, stating:

We introduced a new water dispenser product line in the fourth quarter of 2010. In the third quarter of 2011, we plan to ship the first model in our 3rd dimension line, which will include a 12-cup drip coffee maker. With our purchase of the Omnifrio Single-Serve Beverage Business, *we expect to introduce an appliance that dispenses single-serve cold carbonated beverages in the fourth quarter of 2011.* In addition, we are developing a water dispenser product that provides consumers the ability to dispense multiple purified water-based beverages, including traditional coffee and single-serve cold carbonated beverages.

204. The statements referenced in ¶¶191-203 were each materially false and misleading when made for the reasons set forth in ¶¶177, 189 and the factual detail contained throughout this Complaint. In addition, the statements referenced in ¶¶191-203 were materially false and misleading when made because they represented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading. The true facts, which were known to or recklessly disregarded by each of the Defendants, were:

(a)      Defendants' statements that the Omnifrio acquisition provided Primo with "a complementary razor-razorblade business model" were misleading because

- 86 -

Omnifrio's technology was unworkable and could not be utilized to manufacture products at a cost that would permit Primo to sell them at a profit;

(b)     The Company's statements that its retailers benefit from "year round customer traffic" were false because 40% of the locations that were selling Primo water, were performing poorly, and selling only one bottle every one to two weeks. In addition, Primo's water bottle exchange machines were poorly manufactured which resulted in high levels of product loss;

(c)     When discussing its marketing, Primo stated that the Company was focused on "developing and maintaining a brand" and participating in "regular cross marketing promotions." The truth, however, was that Primo failed to market and promote its products resulting in a failure to increase demand and retailer unhappiness with the Company overall;

(d)     Defendants' statements regarding the Eagan, Minnesota facility were false and misleading because, in January 2011 Primo altered the previous production policies associated with making the Culligan Refill Business's refill machines. Instead of making the machines on a per-order basis, as in the past, Primo directed the Eagan, Minnesota facility to manufacture refill machines on a continuous basis, even though there were no orders for the machines, which was resulting in millions of dollars of excess inventory; and

(e)     The Company's statements regarding its future demand were false and misleading because the Company's primary retail customers would not be in a

position to order any of the Company's products until after those retail customers cleared out other inventory sitting on their shelves including inventory related to products sold by competitors of the Company and the Company was dependent upon the Company's two largest customers, Wal-Mart and Lowe's, agreeing to start massive Primo product promotions.

205. In response to Defendants' false and misleading statements in the March 24, 2011 press release and conference call, Primo common stock increased 4.25% or $0.53, from a closing price of $12.48 on March 23, 2011, to close at a price of $13.01 on March 24, 2011.

206. On April 8, 2011, Primo stock reached its Class Period high of $16.06 per share.

207. On April 11, 2011, Primo issued a press release announcing that the Company completed its acquisition of Omnifrio.

208. On May 10, 2011, Primo issued a press release announcing its financial results for the first quarter of 2011, for the period ended March 31, 2011. For the quarter, the Company reported a "[r]ecord number of installations, *resulting in 14,600 locations for the Water segment*." The May 10, 2011 press release stated, in pertinent part, as follows:

> *At March 31, 2011, Water services were offered in the United States and Canada at approximately 14,600 retail locations*, representing a record number of locations installed in a quarter as well as exchange locations acquired as part of the Canada Bulk Water Exchange Business.

- 88 -

209.  In the press release, the Company also provided financial guidance for the second quarter and full year of 2011, and stated, in pertinent part, as follows:

*The Company expects total sales in the second quarter of 2011 to double compared to the second quarter of 2010, or result in the range of $24.0 to $25.5 million.  The Company expects to end the second quarter of 2011 with between 15,600 and 16,100 retail locations for its Water segment.*

*For 2011, the Company continues to expect sales to increase 260% to 275% compared to 2010, or in the range of $116 to $123 million, which includes the impact of acquisitions.  Primo expects to end the year with between 18,700 and 19,700 retail locations for its Water segment.*

210.  On May 10, 2011, Primo hosted a conference call to discuss its first quarter 2011 financial results.  Prim and Castaneda participated in the call on behalf of the Company.  During the call numerous false and misleading statements were made that were designed to artificially inflate the Company's stock price. During the call, Prim spoke positively about the Company's business and growth prospects, and stated, in pertinent part, the following:

*We ended the first quarter with a record number of installs to end the quarter with 14,600 retail locations in our Water segment.  As a result, I'm pleased to say our base exchange services is in better position at this point than we planned. This is due to having higher quality accounts at this point in time.*

211.  Castaneda commented:

*At March of 2011, our water exchange and refill services were available in United States and Canada at approximately 14,600 retail locations, compared to the 12,600 locations at December of 2010.  This increase represents a record number of locations added in the quarter. We installed more locations in Q1 than we did for all of 2010.*

212. In regard to the status of the production of Omnifrio's products, Prim confirmed that "*we have prototypes this month, so we feel like those we will begin shipping in late Q3 or early Q4.* So that's the lead times."

213. On May 13, 2011, Primo filed its quarterly report on Form 10-Q for the first quarter ended March 31, 2011, which confirmed the Company's previously announced financial results and was signed by Prim and Castaneda (the "First Quarter 2011 10-Q"). The First Quarter 2011 10-Q also contained Sarbanes-Oxley certifications signed by Prim and Castaneda stating the Form 10-Q did not include any material misrepresentations. Nevertheless, the First Quarter 2011 10-Q did contain several false and misleading statements regarding the Company's growth.

> Our solutions are *easy for retailers to implement, require minimal customer management supervision and store-based labor* and provide centralized billing and detailed performance reports. *As of March 31, 2011, our water services were offered in each of the contiguous United States and Canada at approximately 14,600 retail locations,* including Lowe's Home Improvement, Wal-Mart, Kroger, Safeway, Albertsons and Walgreens.

214. The statements referenced in ¶¶208-213 were each materially false and misleading when made for the reasons set forth in ¶¶177, 189 and the factual detail contained throughout this Complaint. In addition, the statements referenced in ¶¶208-213 were materially false and misleading when made because they represented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading. The true facts, which were known to or recklessly disregarded by each of the Defendants, included that Defendants' statements

about having "prototypes" this month, and the Company's predictions of starting to sell its carbonated beverage products in late Q3 or Q4 of 2011 were misleading because the patents Defendants purchased in the Omnifrio acquisition were unworkable and needed to be re-engineered, and therefore it was not possible for Primo to begin selling its single-serve carbonated beverage appliances by the fourth quarter of 2011.

215. In response to Defendants' false and misleading statements in the press release and conference call, the price of Primo common stock remained relatively flat, increasing 1.5% or $0.22 cents, from a closing price of $14.67 on May 9, 2011, to close at a price of $14.89 on May 10, 2011. Defendants' false and misleading statements maintained the artificial inflation in the Company's stock price. If not for Defendants' false and misleading statements, the price of Primo's common stock would have declined.

216. On June 17, 2011 Primo filed its form 424(b)(1) with the SEC, which contained Primo's Prospectus and Registration Statement. The Secondary Prospectus and Registration Statement contained false and materially misleading statements as referenced above in ¶¶104-08, 115-16, 121-22, and are incorporated herein by reference.

217. In response to the false and misleading statements in the Secondary Offering Registration Statement, the price of Primo common stock increased 15.19% or $1.71 from a closing price of $11.26 on June 16, 2011 to a closing price of $12.97 per share on June 17, 2011.

218. On June 29, 2011, Prim and Castaneda attended the Oppenheimer Consumer Conference and made many false and misleading statements about the Company. For example, Prim discussed ongoing business with the Company's numerous retailers, stating, in pertinent part, as follows:

> We talked about those retailers, who are they? We divide them into six categories, home centers, mass merchants, grocery, the clubs, drug and office. **Now, we're at 14,600 locations today because just in the top 10 retailers you see listed here. And, we're doing business with each and every one of them just to roll out the rest of their locations adds an additional 28,000 plus locations to that count. So, you can see how over the next couple of years we'll quickly get to that 40 or 50,000 number.**

219. Discussing the Company's big drivers, Prim stated:

> **One of those big drivers is Wal-Mart. We are the category captain for this category, we call it 3003 and what we mean by that all three products in all 3,000 Wal-Mart super center locations in the U.S. this year. We announced at the end of Q1 that we will more than half finished with expanding our locations of exchange throughout Wal-Mart. We will finish that roll out sometime in mid Q3. That will also include rolling out dispensers and our refill product to all 3,000 Wal-Marts this year.**

220. Prim also discussed management's experiences with Blue Rhino, and the Company's emphasis on MIS technology, stating:

> I was in a previous company, I've founded a company called Blue Rhino. At Blue Rhino, we identified consumer need and developed a razor and razor blade strategy to satisfy that need. Mark and I took the company public in 1998, and grew it to more than 40,000 locations. We did have a very successful sale of that company to fuel gas back in 2004. We're doing very much the same thing here at Primo. In fact we've put many much as a bay and back together. And, we've identified a need in a much larger market, in applying many of the same business strategies to that. This razor and razor blade business model, we did in November. **Today we are at 14,600 locations at the end of Q1 and growing more and more each day** toward that 40 or 50,000 gallon where we believe you'll be convenient to the masses. We're using the same MIS proprietary technology, to manage

- 92 -

this business and we have a management team its been doing it for sometime.

*    *    *

We have a management team that's done it before and we have a credibility.

221. Discussing Omnifrio and its vast flavors, Prim confirmed that Primo had already developed 30 flavors, stating, "***We have more than 30 flavors today***."

222. Further, Castaneda discussed the Company's "highly visible water business" and assured investors that the Company does not "take a lot of risk" in regard to its Products business:

> If you look at our water business, again our razorblade business that's refill on exchange that drives our economics. That's a reoccurring revenue business highly visible business that's the business we really like.

> But the products business, we like as well because that drives more sales on our razorblades or on the water business. That business is primarily direct import business, ***we don't take a lot of risk. We usually get[] six to nine months advanced notice from retailers as far as our orders go.***

223. The statements referenced in ¶¶218-222 were each materially false and misleading when made for the reasons set forth in ¶¶177, 189 and the factual detail contained throughout this Complaint. In addition, the statements referenced in ¶¶218-222 were materially false and misleading when made because they represented and/or omitted adverse facts which then existed and disclosure of which was necessary to make

- 93 -

the statements not false and/or misleading. The true facts, which were known to or recklessly disregarded by each of the Defendants, were:

(a)    Contrary to Defendants' predictions that they would eventually roll out into all of their top 10 retailers' stores, approximately 40% of the Company's locations were hardly selling any product;

(b)    Despite touting future business with Wal-Mart, the Company failed to disclose that Wal-Mart would not be in a position to order any of Primo's products until it cleared out competitors' inventory first;

(c)    Defendants' statements that they "have more than 30 flavors today" for the Company's cold carbonated beverages were false. Indeed, just five months later the Company announced that it was not going to timely launch its Flavor Station because it was still developing flavors; and

(d)    While Defendants told the market that they "usually get[] six to nine months advanced notice from retailers as far as orders go" the truth, as disclosed two months later, was that the Company had "no control" or advanced notice of its retailers' orders.

224.  Following the statements made in the June 29, 2011 conference, the price of Primo common stock decreased 2.12% or $0.31 cents, from a closing price of $14.63 on June 28, 2011 to close at a price of $14.32 on June 29, 2011. But for Defendants' false and misleading statements, the price of Primo common stock would have declined even further.

- 94 -

225.  On July 5, 2011, BB&T issued a report entitled *2011 on Solid Footing;*

*Trimming PT to $19 (from $20) on Stock Offering* stating:

> 2011 on solid footing with good Q1, Wal-Mart progress and share offering.
> Primo recently reported Q1 sales of $17.1M, which beat our $16.1M
> estimate and consensus, and was above the top-end of guidance of $16.3M.
> Exchange and refill sales of $13.1M climbed 122% yr/yr, partly driven by a
> 12% increase in exchange units sold with the remainder coming from the
> acquired refill line. Adjusted-EBITDA of $2M was slightly below our
> $2.1M estimate but beat consensus. Core (excluding non-recurring items)
> adjusted EPS was flat for the quarter.
>
> **Rollout at Wal-Mart drove Q1 location growth, likely to continue in
> 2011**. During Q1, Primo added 2,000 new stores (55% from Wal-Mart) to
> reach 14,600 total outlets selling at least one of its two water lines
> (Exchange or Refill). By the end of June, PRMW was halfway through its
> planned installation of Exchange at 3,000 Wal-Mart domestic supercenters,
> with the remainder to be completed by year-end.
>
> \*       \*       \*
>
> • 2011 guidance unchanged. On its Q1 call, management provided Q2'11
> sales, core adjusted EBITDA and EPS guidance at $24M–$25.5M, $3.7M–
> $4.7M, and $0.04–$0.08, respectively. Primo expects to end Q2 with
> 15,600–16,100 locations. For 2011, the company projects sales of $116M–
> $123M from 18,700–19,700 locations, as well as core adjusted EBITDA
> and EPS of $16.5M–$19.5M, and $0.16–$0.24, respectively.

**The Truth Begins to Emerge**

226.  Approximately two months after the Secondary Offering, on August 10,
2011, before the stock market opened, the Company issued a press release announcing
its financial results for the second quarter of 2011, the period ended June 30, 2011,
which provided a partial disclosure of Primo's true financials and future business
prospects.  For the quarter, **the Company reported a net loss of $2.0 million or loss of
$0.10 per share, compared to Company's projections in May 2011 of earnings**

- 95 -

**ranging from a loss of $0.03 to a gain of $0.02 per share and analyst projections of a gain of $0.07 per share**.  The Company attributed this loss to, "lower water dispenser and corresponding water sales."

227.  The Company also **revised downward** its financial projections for the third and fourth quarters of 2011 and provided guidance for the full year of 2012.  The press release stated, in pertinent part, as follows:

> Primo continued its retail rollout strategy with *1,300 locations installed in the second quarter of 2011, for a total of 3,300 installations year-to-date, or an increase of 26% from the number of locations at the end of 2010*. Most of the locations added in the quarter were in the large mass merchant and office channels of trade.  The Company believes the office channel represents a significant opportunity, particularly in light of the planned rollout of the Company's new commercial combination coffee and water dispenser appliance in the fourth quarter of 2011.  *Water services were offered in the United States and Canada at approximately 15,900 retail locations as of June 30, 2011.*

228. Prim also revealed to the market that two of Primo's major retailers, Lowe's and Wal-Mart, would not be launching their scheduled national promotions, and stated, in pertinent part, as follows:

> Two of our major retailers were scheduled to launch a national water and dispenser promotions during the second quarter; **however; due to their inventory constraints and other circumstances beyond our control, neither were completed in the second quarter as we expected**.  The positive news is that both retailers are committed to the program and have started rolling out the national promotion of water and dispensers in the third quarter.  *The Company expects these major mass retail partners to continue to roll out the national promotion during the remainder of the third quarter and in the fourth quarter of 2011*.

- 96 -

229.  Lowering the Company's guidance, the August 10, 2011 press release stated:

Updated Guidance

The Company has updated its guidance to reflect the launch of the new carbonating appliances as well as the change in the national promotion and rollout schedules of certain major retailer partners.

|  | Q3 | Q4 | Full Year 2012 |
|---|---|---|---|
| Locations (in thousands) | 17.0 to 17.5 | 18.7 to 19.7 | 23.7 to 25.7 |
| Sales ($ in millions) | 24.0 to 26.0 | 27.0 to 29.5 | 177.0 to 187.0 |
| GAAP EPS | ($0.11) to ($0.16) | ($0.21) to ($0.15) | $0.82 to $0.96 |
| Pro forma EPS | ($0.06) to ($0.03) | ($0.09) to ($0.05) | $0.63 to $0.72 |

230.  Prim, however, continued to ensure investors that the Company was positioned for "revenue and earnings growth," stating, in pertinent part, as follows:

We have made adjustments in our financial guidance to reflect changes in the timing of water dispenser promotions at our largest retailers.  *We continue to be in [a] great position for strong long-term revenue and earnings growth* as we take advantage of the increasing consumer preference to make great tasting beverages from Primo purified water in their home and office.  We expect to increase the number of households that enjoy a Primo appliance and the related consumables as we continue to add retail locations with the right product mix and capitalize on the growing healthy, sustainable and value-conscious consumer lifestyle trends.

231.  As a means to distract from its negative news announcement, Primo also announced to the market that Omnifrio's "Flavor Station™," Omnifrio's line of carbonating appliances with related $CO_2$ and flavors, would be ready for sale for 2011 holiday season.  The August 10, 2011 press release touted that the Primo Flavor Station 100 would "retail for less than $100" and the Flavor Station 500 would "retail for less

- 97 -

than $300." The Company's August 10, 2011 press release went on to state, in pertinent part, as follows:

> In the first quarter of 2011 the Company announced that it had purchased the assets of Omnifrio Beverage Company, LLC, a company that was developing a single-serve carbonated beverage system, and as a result the Company would begin a strategic brand and competitive base positioning project. The Company completed that project in the second quarter and determined that the new single-serve carbonated beverage systems will be branded "Primo Flavor Station." There will be two models, the Primo Flavor Station 500 that uses the Company's patented Flavor-Cups and CO2 cylinders, or "Primo Carbonators," and the Flavor Station 100 that is expected to retail for less than $100. ***Each device will be offered as a tabletop model for the 2011 holiday season.*** In 2012, the Company expects to launch a version of the Primo Flavor Station 500 as a module that will attach to Primo's bottom load dispensers.

> \*      \*      \*

> The Flavor Station products represent an extension of the Company's overall razor/razorblade strategy. ***The introduction of the Flavor Station products will provide the Company with numerous high margin "razorblades" for the consumer headed into the holiday season and fiscal year 2012.*** Consumers who have purchased the "razors" can then be expected to purchase our "razorblades" – water, flavors, CO2 and other beverage accessories. The Company expects that these appliances and consumable products will positively impact its long-term growth prospects.

232. The Company also unveiled a "new direct-to-consumer marketing campaign to increase exposure and raise awareness of its full product offering and to drive sales of appliances and consumables."

233. Also on August 10, 2011, the Company held a conference call, and provided additional details about the information contained in the earnings release. Prim and Castaneda participated in the call on behalf of the Company. During the call numerous false and misleading statements were made that were designed to negate the

- 98 -

impact of the negative news that revealed some of the truth behind Primo's financials and future business prospects to artificially inflate the Company's stock price.  During the call, Prim continued to speak positively about the Company's business and growth prospects, despite the Company's "surprise[]" regarding its delayed promotions, and stated, in pertinent part, as follows:

> Now starting with the second quarter highlights; first, **_we installed 1,300 locations for a total of 15,900 locations for the Water segmen_**t in line with our expectations which reflects our ability to focus on adding high-quality accounts and locations in the U. S. and Canada.

*       *       *

> However, **sales were below our expectations due to the delay of a promotion of dispensers and waters, which were expected in June at our two largest customers. This impacted water dispenser sales as well as the corresponding water sales and have caused our results to be below our initial product – our initial target.**

> **This delay was due to high levels of inventory at retail, which did not allow us to start our promotions as planned. _We were surprised by this delay and still expected the orders up until the end of the quarter_**.

234.   Castaneda continued to discuss the Company's shortfall and the fact that it was rooted in a delay due to the addition of dispenser selling locations, stating, in pertinent part, as follows:

> Turning to the next slide, slide seven provides more details of what happened on the top line. Starting from the last, we had again over 70% of growth during the quarter.  The revenue shortfall was primarily in our dispenser appliances and resulting water sales.

> First, as Billy indicated, **we had a delay in the addition of dispenser selling locations and delay in promotions of our products, _which was due to higher than expected general merchandise inventory in our two largest retailers_**.

- 99 -

The inventory levels were not specific to our products but were to general inventory. **This delay impacted dispenser sales and will also have an impact on water sales for the balance of the year.** We originally expected the number of locations selling dispensers to increase 40% in Q2 from 5,500 locations to over 8,000.

Based on discussions with retailers, we expect to ship dispensers before the end of the quarter and out of factory build and shipped product into inventory in anticipation of the roll out. **We were carrying additional inventory in our balance sheet at June 30 that we do expect to sell through in Q3. Due to the delays we did not start shipping the dispensers to our new water locations until July. This also – we also did receive updates from retailers regarding support of the dispenser promotions and our updated guidance reflects the roll out of dispenser locations over the balance of the year**.

235. Moreover, Prim touted the upcoming release of the Company's Flavor Station products, stating:

Next, as we previously indicated, we have completed a branding review related to our Omnifrio acquisition. We completed this initiative and we'll market under the umbrella Primo brand for all products and services going forward. ***We are very excited to announce the launch of our new Primo Flavor Station appliances that will be available this holiday season.***

236. Prim further told investors that the Company was on schedule and producing numerous Flavor Station flavors, stating:

Now turning to slide 11, the new Flavor Station products allow us to enter the full beverage market, which is 4.5 times larger than the bottled water market alone. We believe that providing an appliance that can satisfy more consumer needs will result in penetration of more households than a water dispenser alone.

\* \* \*

***We expect to have over 20 flavors available for this holiday season***. We expect the 500 unit to retail for under $300 and will be produced domestically this year. We will market this product directly to consumers and plan to have it available in specialty stores and specialty catalog on a limited basis this year. We are working to lower price points of the 500

- 100 -

unit by producing offshore for broader retail distribution and household penetration in 2012.

Now turning to slide 13, we are very excited to announce **the launch of our Flavor Station 100 product for this holiday season**, which we believe will have broad consumer appeal. This product will retail for under $100 and include a single-serve size refillable bottle, the Primo Carbonator and Primo Flavors. This product does not require electricity and delivers carbonation at the press of a button.

237. Castaneda informed investors that although the Company reduced its guidance by 25%, Primo was dramatically increasing its estimate for Flavor Station sales, stating, in pertinent part, as follows:

First focusing on the guidance. **For the third quarter of 2011, we expect total sales to increase 120% to 138% over 2010 or to be in the range of $24 million to $26 million. We expect to end the third quarter with between 17,000 and 17,500 retail locations in our water segment.** We expect the third quarter GAAP loss per diluted share in the range of $0.11 to $0.16 and a non-GAAP pro forma fully tax loss per diluted share of $0.03 to $0.06.

**For the fourth quarter, we expect total sales to increase to 113% to 132% or in the range of $27 million to $29.5 million. We expect to end the fourth quarter with between 18,007 and 19,007 retail locations.** We anticipate third quarter GAAP loss per diluted share in the range of $0.15 to $0.21 and non-GAAP pro forma fully diluted loss per share of $0.05 to $0.09

\*     \*     \*

We lowered our second half revenue guidance by about 25% due to the delay in the roll out of dispenser locations as well as related promotions for water. **We increased our estimate for Flavor Station sales for 2011 from $2 million to $4 million to $5 million to $7 million with the launch of our Flavor Station 100 product**. Additionally, we expect water dispensers to represent around 25% to 30% of our total full year sales. **For 2012, we expect our sales growth of 94% to 105% on a range of $177 million to $187 million. We plan to add between 5,000 and 6,000 water locations. We anticipate the full year 2012 GAAP earnings per diluted share of $0.82 to $0.96 and non-GAAP pro forma fully taxed of $0.63 to $0.72**.

- 101 -

The primary adjustment of GAAP to non-GAAP is the effect of full taxation.

238. Moreover, contrary to Primo's previous statements on June 29, 2011, that the Company does not "take a lot of risk" in its Products business (selling dispensers) and "has six to nine months advanced notice as far as orders go" Prim revealed to the market that, Primo inexplicably was not aware of the lack of major retailers dispenser orders until the last day of the quarter:

> Analyst: I'm not sure I understand the explanation on the 2Q shortfall. Why would inventory levels at retail and in other categories preclude you from starting up promotion?

> Prim: Yeah. Good question, Jim. It's really two fold and you need to understand how retailers work for the broader audience. We deal with the merchandising department that looks at an item portfolio and what they want to promote and how they want to promote it.

> **They then put that in place. We build the product and ready to ship it. We're waiting on a logistics group who manages inventory in that store to issue that [purchase order ("PO")] so we can ship it. We expect it every day up until the last day of the quarter to get those POs and ship that inventory for promotion and Action Alley and on-the-shelf.**

> Unfortunately, there is something else sitting in Action Alley until that sells through. It's hard to get our products through this system. In one case, we were replacing a national retailer in Whirlpool at a home improvement retailer nationwide. The Whirlpool item should have been sold through long ago and we expect them to start rolling out late May. ***But they have not rolled out. We sit down with them and they will be rolling this out. But it will be as they sell through and as reflected in our new guidance. The good news is all these retailers love what they're doing, they want to promote the products, and they're going to promote it. It's just a timing issue***.

> Analyst: Billy, you've got two customers, which are so important to your revenue. Why wouldn't you have better dialog with them such that you knew about this sooner?

- 102 -

Prim: **We do try to have regular dialog with them Jim. And unfortunately, sales at some of those retailers didn't move as fast as any of us expected**.

Analyst: Okay. So when did you learn about all this?

Prim: **We actually – we actually were expecting and had the inventory ready to ship the last day. Until the last day of the quarter, we actually thought we would have 4 to 5 more million in sales.**

239. Later in the call, Castaneda was questioned about the market's confusion over Primo's missed guidance because the Company had met its forecasted location growth numbers. It was at this time, that Castaneda revealed to the market that dispenser growth – **not previously touted location growth** – is the driving force behind the Company's long term growth and success:

Analyst: Okay. Hey, Mark, looking at the locations number for '11, it seems to be generally in line with previous expectations. I'm not sure I understand the big disconnect in the guidance on the water categories versus the previous outlook?

Castaneda: Sure. The locations – again, locations are locations where consumers can pick up the product. We need to make sure we have more consumers and more households that are buying the product. **So we need to sell dispensers that will create more demand for those locations. Just by adding locations without adding any more consumers, you're just cannibalizing your existing locations**.

240. When prompted to discuss "the assumptions behind the steep ramp in the guidance of '12" Castaneda responded:

**The growth is actually split among water dispensers as well as the new Flavor Station products. The Flavor Station products also bring appliances as well as consumables. So, the growth rate actually on 2012 is actually lower than our original estimates that we internally had just because of the timing of the roll out of locations and dispenser locations**.

- 103 -

241. Moreover, despite the Company's June 29, 2011 statements regarding the predictability and low risk of its dispenser sales, when questioned about the Company's increased inventory for the second quarter of 2011, Prim revealed to the market that the Company had **no control** regarding the "timing of retailers" sales:

> I would show you all our results are really growing very fast. **However, the timing of retailers, sometimes we don't have control of**. So what we're doing is we're taking control of some things that we can't control. We know consumers are passionate about our products and want our products. So we're starting this direct-to-consumer campaign with some of the leading marketers in that space. That will give us more control in trying to sell our products to consumers and add new households, which in effect sells more consumables in the future. So, we're taking that into effect. **We also have had some hard talks with our retailers as to the timing and how it affects us to get more detailed guidance of what and when timing will be.**

242. When discussing the Company's unit dispenser growth, Castaneda stated that the Company had added 3,300 retail locations, stating:

> . . . the same-store sales were down from the prior quarter. But that's primarily because *we added 3,300 new locations*. So we still added home dispenser users. But now we're selling those over 3,300 more locations this year. That's what brought down some of the same-store sales. We still had same-store sales growth despite a 40% increase in locations of exchange.

243. Moreover, when Prim was asked directly about the Company's $4 million dollar sales miss resulting from a lack of sales in the Products business, the following exchange took place:

> Analyst: A couple follow-ups on the guidance. First, I mean, it was about $4 million sales miss or a little more and as you said, most of it was in the products. Could you just kind of build the bridge in basic terms to the guidance for the year coming down substantially more, especially since it sounds like the retailers are clearing through the other inventory issues and the exchange products are – I mean the products are going to get into their

- 104 -

stores, are there sell through issues, or is it – are there sell through questions causing conservatism or are there other units or other segments of your business that are also not performing to expectation?

Prim: **Yeah. The business, again, because of the timing of the promotions of the dispensers and the additional dispenser locations, adding households is very important to selling water. So, as we're unable or delayed to sell dispensers in that household, we're going to be delayed in selling water. But also Andy, kind of given the backdrop of the current situation of the retail environment, we wanted to make sure we're very conservative with our numbers. We don't want to do this again. So this is our kind of one chance to reset and with the backdrop of uncertainty at retail in general, we wanted to make sure we were very conservative.**

\*      \*      \*

Analyst: But to what extent do you feel like the purchase orders just might not come in, especially if the economy were to double dip into another recession for new product orders or they cancelled? I mean, how solid do you feel that it's a delay and not a cancellation on the [ph] product side?

Castaneda: Yeah. We actually just got purchase orders for kind of the balance of the year from one of the retailers and the other retailer is again continuing to make orders, it's just at a slower pace than what they originally had indicated. So, we haven't seen retailers cancel purchase orders before. It's possible if the world gets really bad, the overall environment gets bad, yes they could. But we haven't seen it ever.

244. On August 11, 2011, BB&T lowered its 12 month price target for Primo

common stock from $19 to $9, citing to the promotional delays on dispensers at both

Wal-Mart and Lowe's, stating:

Promotional delays at Wal-Mart and Lowe's on dispensers. During Q2, Primo added 1,300 new stores (3,300 year-to-date) to reach 15,900 total outlets selling at least one of its two water lines (Exchange or Refill). But, according to management, **delays in major promotions of dispensers at Wal-Mart and Lowes** resulted in the bulk of the Q2 sales and earnings miss, as well as the cut in guidance for 2011. Currently, some 850 Wal-Mart supercenters are featuring the cross promotion of dispensers and water Exchange, but this is still well below management's expectation of 2,000.

- 105 -

245. Also on August 11, 2011, Janney issued an analyst report entitled *Stock Soaked, But Don't Throw In the Towel - Reiterate Buy*. In the report, Janney acknowledged how management had lost credibility with the market, stating:

> The disappointing second quarter and new 2011 guidance, particularly immediately after the recent follow-on offering, is a near-term problem for the stock as **it will take a while for management to re-establish credibility.**
>
>          *       *       *
>
> **• Disappointing 2Q11 and lower 2011 guidance hurts credibility: The disappointing 2Q11 and 2011 guidance, particularly immediately after the recent follow-on offering, is a near-term problem for the stock, as it will take a while for management to re-establish credibility.**
>
> • Delayed new retail store door launches the primary issue: New door growth and promotional event delays due to customer (Wal-Mart and Lowes) inventory management tactics drive the lower revenue expectations in 2H11.
>
>          *       *       *
>
> Primo Flavor Station launch ahead of expectations: For the 2011 holiday season, PRMW will launch the Primo Flavor Station (water carbonator and syrups), well ahead of our expectations. We believe this new product line should prove to be a positive revenue and margin catalyst in 2012 and could drive renewed interest in the name as we learn more about retailer and consumer acceptance.
>
>          *       *       *
>
> **Management credibility: Disappointing 2011 revenue guidance, particularly on the heels of a follow-on offering, will be a credibility issue for a while. The only way to restore confidence in guidance and execution will be through positive quarterly progress and better-than-expected performance - this will take several quarters to overcome.**

246. On August 12, 2011, Primo filed its quarterly report on Form 10-Q for the second quarter ended June 30, 2011, which confirmed the Company's previously

- 106 -

announced financial results and was signed by Prim and Castaneda (the "Second Quarter 2011 10-Q"). The Second Quarter 2011 10-Q also contained Sarbanes-Oxley certifications signed by Prim and Castaneda stating the Form 10-Q did not include any material misrepresentations. Nevertheless, the Second Quarter 2011 10-Q did contain several false and misleading statements regarding the Company's financial growth and its Flavor Station launch. For example, the Second Quarter 2011 10-Q stated, in pertinent part, as follows:

> We provide major retailers throughout the United States and Canada with single-vendor solutions for exchange services and refill services. Our solutions are easy for retailers to implement, ***require minimal customer management supervision and store-based labor and*** provide centralized billing and detailed performance reports. ***As of June 30, 2011, our water services were offered in each of the contiguous United States and Canada at approximately 15,900 retail locations***, including Lowe's Home Improvement, Wal-Mart, Kroger, Safeway, Albertsons and Walgreens.
>
> *     *     *
>
> Our Water segment sales consist of the sale of multi-gallon purified bottled water (exchange services) and our self-serve filtered drinking water vending service (refill services) through retailers in each of the contiguous United States and Canada. Our Water services are offered through point of purchase display racks or self-serve filtered water vending displays and recycling centers that are prominently located at major retailers in space that is often underutilized. ***As of June 30, 2011, we offered our Water services at approximately 15,900 locations***.

247. The Second Quarter 10-Q, further went on to discuss the Omnifrio acquisition as follows:

> The Omnifrio Single-Serve Beverage Business primarily consists of technology related to single-serve cold carbonated beverage appliances and consumable flavor cups and CO2 cylinders used with the appliances to make a variety of cold beverages. The acquisition of the Omnifrio Single-

- 107 -

Serve Beverage Business serves as an entry point into the U.S. market for carbonated beverages and the rapidly growing self-carbonating appliance and single-serve beverage segments.

248. The statements referenced in ¶¶226-43, 246-47 were each materially false and misleading when made for the reasons set forth in ¶¶177, 189 and the factual detail contained throughout this Complaint. In addition, the statements referenced in ¶¶226-43, 246-47 were materially false and misleading when made because they represented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading. The true facts, which were known to or recklessly disregarded by each of the Defendants, were:

      (a)     Despite focusing the market on the importance of its location growth throughout the Class Period, Defendants finally disclosed to the market, that the most important measure of growth for their business was growth in the sale of water dispensers, not the number of store locations;

      (b)     The Company was not in a "great position for strong long-term revenue and earnings growth" or "better positioned than ever before" but to the contrary was facing decreased demand in its products;

      (c)     Although the Company continually confirmed that its carbonated beverage products would be delivered for the 2011 holiday season, the truth was the patents Defendants purchased in the Omnifrio acquisition were unworkable and needed to be re-engineered, and therefore it was not possible for Primo to begin selling its single-serve carbonated beverage appliances by the fourth quarter of 2011;

- 108 -

(d)     The Company revealed that, despite its statements about the low risk of its product sales, as well as the Company's knowledge of sales six to nine months in advance, Primo was "surprised" that its two largest retailers were not engaging in predicted national product promotions.  In fact, the Company did not know "until the last day of the quarter" that its two largest retailers would not be ordering products; and

(e)     The Company also revealed, contrary to its previous statements on December 2, 2011 that the Company was "cannibalizing" its "existing locations."

249.  Following the Company's announcements on August 10, 2011, the price of Primo common stock collapsed from $13.92 per share on August 9, 2011, to close at $5.40 per share on August 10, 2011 – a one day decline of $8.52 per share, or **61.2%** – an over 1,000% increase on trading volume.  The following day, the price of Primo common stock declined another 5.2% or $0.28, to close at $5.20 per share on August 11, 2011.  On August 12, 2011, the Company's stock declined an additional 3.7% or $.19 to close at $4.93 per share.  But for the Company's false and misleading statements, designed to minimize the impact of Primo's partial revelation of its true financials and future business prospects the price of Primo common stock would have declined even further.

250.  On November 8, 2011, the Company issued a press release announcing its financial results for the third quarter of 2011, for the period ended September 30, 2011.  For the quarter, **the Company reported a net loss of $3.3 million, or a loss of $0.13 per share, compared to analyst expectations of a loss of $0.06 per share**.  **The**

**Company also revised downward its financial projections for fourth quarter sales to be $22.0 to $24.0 million compared to prior guidance of $27.0 to $29.5 million and fourth quarter net loss per share to be ($0.16) to ($0.22) compared to prior guidance of ($0.15) to ($0.21).** The press release stated, in pertinent part, as follows:

The Company's water appliance sales for the third quarter of 2011 increased approximately 116% to $7.3 million compared to $3.4 million in the third quarter of 2010. ***The increase was due primarily to the addition of 700 locations that offer appliances as well as increased sell-thru growth at existing locations which benefited from promotions during the quarter. Dispenser unit sales to end consumers grew approximately 31%*** for the third quarter of 2011 compared to 2010, which reflects an acceleration of growth from the first half of 2011.

\*       \*       \*

The following table sets forth information regarding locations where our products and water are sold as well as certain sales information.

| | | | |
|---|---|---|---|
| Total Locations (in thousands) | *22.6* | *13.4* | *69%* |
| Appliance Locations (in thousands) | *6.2* | *5.5* | *13%* |
| Appliance Units (sell-in) (in thousands) | *111.0* | *45.0* | *147%* |
| Appliance Units (sell-thru) (in thousands) | *87.8* | *67.0* | *31%* |
| Water Locations (in thousands) | *16.4* | *7.9* | *108%* |

***During the third quarter of 2011, the Company continued its retail rollout strategy by adding 1,200 total locations. Primo added 700 new appliance locations and 500 new water locations during the quarter. The Company is now reporting appliance and total locations to provide increased transparency into appliance location growth***. The Company believes that expanded points of distribution for its appliances will lead to an increase in new users of its consumables. . .

251. Elaborating on its updated guidance the Company revealed to the market that contrary to its previous assertions just three months earlier, the Company's Flavor

- 110 -

Station products would not be ready for sale by the 2011 holiday season due to "delays in formulating flavors":

> The Company continues to expect rapid growth in both its Product and Water (exchange and refill) segments. For the fourth quarter of 2011 the Company believes water dispenser sales will increase over 80% and Water segment sales will increase over 50% compared to the prior year. ***The Company expects to have limited sales of Flavor Station appliances during the fourth quarter due to delays in reformulating its flavors, which resulted in the launch of the Flavorstation appliances being delayed***. The Company believes that flavors are a critical factor to consumer attachment. The reformulation of the flavors is now complete and the Company uses all natural flavoring. ***Due to the delayed launch of its Flavorstation appliance, the Company now expects fourth quarter sales to be limited to $1 - $2 million compared to the $5 - $7 million previously expected***.

252. The Company also held a conference call on November 8, 2011 and provided additional details about the information contained in the earnings release. Prim and Castaneda participated in the call on behalf of the Company. During the call numerous revelations were made, which continued to remove the artificial inflation out of the Company's stock price. During the call, Prim spoke positively about the Company's business and growth prospects, and stated, in pertinent part, as follows:

> ***In terms of locations, we installed 1,200 total locations which includes 700 water appliance and 500 exchange and refill locations.*** We want to provide a little more color around our locations reporting for the quarter and going forward. We adjusted our location growth strategy to focus on both appliance and water locations as opposed to just water locations.
>
> We believe that adding appliance locations is critical to developing our installed base of users that will drive future purchases of our higher margin water business. **We believe it is important for us to now report total locations to provide you with increased transparency around our dispenser location growth.**

- 111 -

> Additionally, we count [a] location selling appliance, exchange or refill as a separate location to provide transparency of a number of separate merchandising areas where consumers can purchase our products.

253. Moreover, Castaneda went on to discuss the "acceleration" in the sales of the Company's dispensers, and for the first time disclosed that the Company had been discounting its dispenser products, stating:

> Consumers purchased 88,000 water dispensers during the quarter, which represents an acceleration from the first half, as well as beating our quarterly -- prior quarterly record for appliance units purchased by consumers by 25%.

>       \*      \*      \*

> **Also it is important to note that we did give up some dispenser margins for the unit growth volumes through promotional discounts.** But we believe that the recurring revenue related to the high margin of water sales will payoff for a long time.

>       \*      \*      \*

> **We gave up around 160 basis points in our products business to share in promotions to accelerate water dispenser sales during the quarter.** Additionally, we had about 170 basis points or about 400,000 in pro forma effective acquisition synergies related to our water segment during the quarter, which is reflected in our adjusted EBITDA and not reflected in our GAAP gross margin.

254. Castaneda commented: "Yeah, we think that in the near-term that **we'd gladly give our margin on the dispenser business for adding new dispensers consumers.**"

255. Moreover, further discussing the importance of dispenser sales, the following exchange took place:

> Prim: **By adding a location, you really don't add any water business, but by adding water dispensers in homes, that's what builds the long-**

- 112 -

**term value of the business**. So what we are trying to do is give people visibility. Here is how many locations we are selling dispensers in, here is how many locations we are selling water in and the real numbers, the folks – how many – what is the rate of growth of total water sales. Well, exchange grew at 29% last quarter. Dispensers to retailers grew at 31%. Well, that bodes really well for what's going to happen to exchange in future quarters as we continue to penetrate more households and I think that's a number that we want people to focus on is the growth of the revenue in exchange, the growth in number of dispensers that we put in people's homes.

Analyst: Okay. That makes a lot of sense Billy. So does that – I guess does that reconcile what seems to be a shortfall in water locations in Q3 and Q4, yet your '12 guidance for water contribution seems to be the same? That seems to presume higher location productivity; is that because of the incremental dispensers in the market?

Prim: **You're exactly right. As I said, a dispenser is going to produce new water sales, a location don't. Now we will continue to expand locations to be accessible as we get more household penetration.** And I think you will see a nice growth in number of both dispenser locations and water locations next quarter and next year.

   256.  Discussing margins for dispensers in further detail, Castaneda explained:

So, in the quarter it was about 1% or about flat, or about no margin. We do expect that to expand to be between 2% and 5% going forward. **We just gave some promotional dollars away for this quarter to get – to kind of juice some sales.** We probably will do that quarterly in different times of the year going forward.

   257.  In addition, Prim addressed the delay in the Flavor Station roll out as

follows:

   *We updated the launch of the Flavor Station to retail in order to reformulate our flavor mixes* to ensure that we have the best taste, quality and value necessary for consumers to make the switch to at-home carbonation creations.

- 113 -

Today we are using all natural flavors and no high-fructose corn syrup and worked with consumer focus groups to make sure the flavors are bringing to market – that we are bringing to market, meet our brand standards and provide us with a competitive advantage in the at-home carbonated soft drink marketplace.

After several rounds of taste testing, I believe our flavored line-up is among the best carbonated flavors available which can be used with any at-home carbonation appliance.

258.  Castaneda also went on to discuss the negative impact of the Flavor Station

delay on the Company's guidance, stating:

Now focusing on guidance.  ***We updated our Q4 guidance to reflect a delay in our flavor mix reformulation as Billy mentioned.  The changing guidance from Q4 is related to the Flavor Station.***  Although, it is an impact on revenues for Q4, it has a limited impact on per share results.

We reduced our Flavor Station revenue down by $5 million which resulted in a $0.01 per share impact on earnings, as we were able to reduce some Flavor Station marketing cost.  This reduction to revenue estimates for Flavor Station should not overshadow the strong core business for growth of 80% in water dispensers for Q4, which is all organic growth.  We also expect over 50% growth in our water segment, which is a mix of around 70% acquisition and 30% organic growth.

\*        \*        \*

For 2012, our outlook on our core Water and Products business has not changed.  We continue to expect strong growth from our core water business as we've previously guided.  However, we do not have complete – we have not completed our discussions with retailers regarding the timing and locations for our Flavor Station appliances and related consumables. We continue to expect strong growth from our core water business as we've previously guided.  However, we do not have complete – we have not completed our discussions with retailers regarding the timing and locations for our Flavor Station appliances and related consumables.

259.  Prim also confirmed that the Company had been offering discounts on its

dispenser products.

- 114 -

260. Also on the call, an Analyst acknowledged Primo had changed its tune, stating "All right. And I know you've kind of suspended guidance, but last quarter you put out 2012 guidance and clearly expected the business to be profitable . . ."

261. Following the call, on November 9, 2011, BB&T lowered its rating of Primo stock from a "Buy" to "Hold" and adjusted its EPS estimate to a loss of $.12 from a loss of $.10 previously. In support of its downgrade, BB&T cited the delay in the Company's Flavor Station, stating:

> We anticipate Primo to be solidly profitable in 2012 based on the robust scalability of the core business model. But our best judgment at this time is that the profit ramp for Primo will be more deliberate than previously anticipated, **unless the Flavor Station franchise was to rapidly take off.** Although we view Flavor Station as a very promising new product idea, we believe it is prudent to wait and see how it is received in the market at this juncture.

262. On November 9, 2011, the *Winston-Salem Journal* published an article titled, *Primo Water reports quarterly loss*. The article made clear that Primo's perceived value was largely based on its aggressive growth strategy, as the Company had never turned a fiscal year profit. The article stated, in relevant part:

> Missed earnings have spooked investors in recent months because **a major part of Primo's perceived value has been its aggressive growth strategy.** It has not turned a fiscal-year profit since being founded in 2004.
>
> For example, **its share price has moved sideways since plummeting 61 percent in August to $5.40 after Primo came up short on its second-quarter earnings performance and cut back on future projections.**

263. On November 10, 2011, Primo filed its quarterly report on Form 10-Q for the third quarter ended September 30, 2011, which confirmed the Company's previously

announced financial results and was signed by Prim and Castaneda (the "Third Quarter 2011 10-Q"). The Third Quarter 2011 10-Q also contained Sarbanes-Oxley certifications signed by Prim and Castaneda stating the Form 10-Q did not include any material misrepresentations. Nevertheless, the Third Quarter 2011 10-Q did contain several false and misleading statements. For example,

> ***As of September 30, 2011, we offered our Water services at approximately 16,400 locations.***

> Our Products sales are primarily generated through major U.S. retailers and ***are available in approximately 6,200 retailers as of September 30, 2011***.

264. In response to the November 8, 2011 press release which disclosed to the market that the Company would be unable to timely launch the Flavor Station, that Primo was discounting the price of its dispenser products, and discussing the overlap in store locations the Company's stock decreased **17.77%** from a closing price of $5.57 on November 8, 2011, to a closing price of $4.58 on November 9, 2011. After the issuing of the 3rd Quarter From 10-Q, the price of Primo common stock declined an additional **33.19%**, or $1.52, to close at $3.06 on November 10, 2011. By the end of the Class Period, the price of Primo common stock had been completely eviscerated, having declined an astonishing **80.9%** from its Class Period high of $16.06.

## C. Additional Scienter Allegations

265. As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents

- 116 -

would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

266. Both Prim and Castaneda held senior-level position with Primo and were personally involved in Primo's core operations, including the Company's rapid growth, marketing, store promotions, acquisitions and products. They communicated directly with and were decision makers with respect to Primo's rapid growth, marketing, store promotions, acquisitions and products, all of which evidence scienter. For instance:

- Prim and Castaneda personally attended Executive Meetings that were held every other Monday, where detailed Data Shark reports were circulated, which reported the weekly sales by region, retail chain and individual retail store;

- The fact that 40% of Primo's stores were barely selling any Primo product was discussed numerous times at these Executive Meetings. In addition Prim and Castaneda were both shown photos at these meetings of pictures taken of Primo's water bottles and racks at retail customer's stores with no logos on them, hidden behind larger structures (such as law furniture) and covered in dust, because they were not selling. Prim asked questions about these pictures and about how to increase sales;

- In addition, the problems with Primo's water bottle exchange machines leading to high amounts of shrinkage or product loss were also discussed during the Executive Meetings. Indeed, in mid-2010, CW 5 was told that a task force had been created to deal with these problems;

- Prim was present for and participated in "All Hands on Deck" meetings which took place every Friday, where Primo's employees discussed the difficulty of getting Primo's products into new stores. Prim commented in these meetings;

- Both Prim and Castaneda had access to Data Shark, the Company's internal reporting system that provided detailed records on how much bulk water was being sold and delivered to each store and was sortable by vendor and

- 117 -

month.  When a store was not selling any product, the Data Shark system reported a zero;

- Likewise, Castaneda was personally involved in the Company's operations, and was responsible for the Company's internal controls, financial reporting, and compliance with Sarbanes-Oxley;

- The Company operates through a very hands-on management style as evidenced in its MIS procedures and Microsoft Dynamics GP 2010 software system; and

- Prim and Castaneda repeatedly spoke on behalf of the Company concerning its rapid growth, marketing, upcoming promotions, acquisitions and products.

### D. Applicability of the Presumption of Reliance:  Fraud on the Market Doctrine

267. At all relevant times, the market for Primo common stock was an efficient market for the following reasons, among other things:

(a)    Primo's common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Primo filed periodic public reports with the SEC; and

(c)    Primo regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

268. As a result, the market for Primo common stock promptly digested the current information regarding Primo from all publicly-available sources and reflected such information in the price of Primo's common stock. Under these circumstances, all purchasers of Primo common stock during the Class Period suffered similar injury through their purchase of Primo's equity securities at artificially inflated prices and a presumption of reliance applies.

E.    **Loss Causation**

269. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the value of Primo common stock and operated as a fraud or deceit on Class Period purchasers of Primo common stock by misrepresenting the Company's business success and future business prospects, including but not limited to misrepresentations regarding the number of its retail locations, the demand and sales of the Company's products, the Company's arrangements with its largest retail customers, the dependence of the Company's growth and business prospects on the sale of dispensers to the Company's two largest customers, the Company's slowed growth rate for 2011 and 2012, the ability of the Company to launch its Flavor Station products and the inability of the Company to meet the financial guidance it provided to investors.

270. As a result of Defendants' fraudulent conduct as alleged herein, the prices at which Primo common stock traded were artificially inflated, at varying levels, throughout the Class Period. When Plaintiffs and other members of the Class purchased

Primo common stock, the true value of such common stock was substantially lower than the prices actually paid by Plaintiffs and the other members of the Class.

271. During the Class Period, Defendants improperly concealed Primo's actual financial performance and future business prospects. Consequently, the price of its common stock was artificially inflated throughout the Class Period. Later, however, when the truth regarding Primo's true financial circumstances was finally revealed, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market; and the prices of Primo common stock fell as the prior artificial inflation was removed from their share price. As a result of their purchases of Primo common stock during the Class Period at artificially inflated prices, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws, when such artificial inflation dissipated.

272. By misrepresenting the success of the Company's business and concealing its improprieties, Defendants presented a misleading picture of Primo's business and future prospects. For example, Defendants' false and misleading statements regarding the Company's continued growth (while simultaneously failing to disclose that Primo's demand projections throughout the Class Period were contingent upon retailers getting rid of competitors' inventory and engaging in massive promotions of Primo's products) caused and maintained the artificial inflation in the prices of Primo common stock throughout the Class Period, even as negative news reached the market, until the truth was finally revealed towards the end of the Class Period.

- 120 -

273. As a result of Defendants' materially false and misleading statements and documents, as well as the adverse, undisclosed information known to the Defendants, Plaintiffs and other members of the Class relied, to their detriment on such statements and documents, and/or the integrity of the market, in purchasing Primo common stock at artificially inflated prices during the Class Period. Had Plaintiffs and the other members of the Class known the truth, they would not have taken such actions.

274. As explained herein, these false statements directly or proximately caused, or were a substantial contributing cause, of the damages and economic loss suffered by Plaintiffs and other members of the Class, and maintained the artificial inflation in the prices of Primo common stock throughout the Class Period and until the truth was partially revealed to the market, at which time the prior inflation came out of those equity securities.

275. Defendants' false and misleading statements had the intended effect and directly and proximately caused, or were a substantial contributing cause, of Primo common stock trading at artificially inflated levels throughout the Class Period.

276. Through a series of partial disclosure events regarding the Company's financial outlook and future business prospects, the artificial inflation came out of the prices of Primo's equity securities in fits and spurts. These events and disclosures, set forth more specifically above, include the revelations on August 10, 2011, when the Company issued a press release announcing its financial results for the second quarter of 2011, the period ended June 30, 2011. For the quarter, the Company reported a net loss

of $2.0 million, or loss of $0.10 per share, compared to Company's projections in May 2011 of earnings ranging from a loss of $0.03 to a gain of $0.02 per share and analyst projections of a gain of $0.07 per share. The Company also revised downward its financial projections for the third and fourth quarters of 2011 and provided guidance for the full year of 2012. The price of Primo stock plunged 61% on August 10, 2011. Defendants, however, combated and mitigated the impact of these partial revelations in a further attempt to mislead the market's expectations for the Company, by, among other things, touting the arrival of Primo's Flavor Station appliances.

277. Nevertheless, the market's expectations were ultimately corrected after the market closed on November 8, 2011, when the Company issued a press release announcing its financial results for the third quarter of 2011, the period ended September 30, 2011. The Company reported that it expected only limited sales of $1-$2 million, compared to the $5-$7 million previously expected for Flavor Station appliances in the fourth quarter of 2011 due to delays in launching the product. The Company also, among other things, again lowered its guidance for the fourth quarter in light of the Flavor Station launch delay, and disclosed it was discounting its dispensers. As a result, the price of Primo common stock declined 17.7%, or $0.99 per share, from a closing price of $5.57 on November 8, 2011, to a closing price of $4.48 on November 9, 2011. In addition, the following day, Primo's common stock price fell an additional 33%, or $1.52 per share, to a closing price of $3.06 on November 10, 2011. The cumulative impact of these declines was the price of Primo common stock fell **81%**

from its Class Period high, causing substantial harm to investors who suffered losses as the artificial inflation generated by Defendants' fraud was removed.

278. The timing and magnitude of the declines in the price of Primo common stock negates any inference that the loss suffered by Plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiffs and other members of the Class was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Primo common stock and the subsequent decline in value as Defendants' prior misrepresentations and other ongoing fraudulent conduct were revealed, market expectations were corrected, and the artificial inflation came out of Primo common stock.

279. In addition, the price of Primo common stock was a natural and probable consequence of Defendants' fraud and should have been foreseen by Defendants in light of the attending circumstances. The market reactions to the disclosure of Primo's true financial condition and future business prospects were foreseeable to Defendants and well within the "zone of risk" concealed by Defendants' fraudulent conduct.

F.    No Safe Harbor

280. The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not

identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Primo who knew that those statements were false when made. Moreover, to the extent that Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were also false and misleading since they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material adverse facts undermining such disclosures.

### G. Counts Arising from the Exchange Act

#### COUNT IV

#### FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST PRIMO, PRIM, AND CASTANEDA

281. Plaintiffs repeat and re-allege each and every allegation contained in ¶¶1-280, as if fully set forth herein.

282.  During the Class Period, Primo, Prim, and Castaneda carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein regarding Primo's business; (ii) artificially inflate the market prices of Primo's publicly traded securities; and (iii) cause Plaintiffs and other members of the Class to purchase Primo's publicly traded securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Primo, Prim, and Castaneda individually and collectively acted as set forth herein.

283.  Primo, Prim, and Castaneda: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon purchasers of the Company's securities in an effort to maintain artificially high market prices for Primo's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. Primo, Prim, and Castaneda are sued as primary participants in the wrongful and illegal conduct charged herein.

284.  In addition to the duties of full disclosure imposed on Primo, Prim, and Castaneda as a result of making affirmative statements and reports, or participation in the making of those statements and reports to the investing public, Primo, Prim, and Castaneda had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of SEC

- 125 -

Regulation (17 C.F.R. §210.01 *et seq.*) and S-K (17 C.F.R. §229.10 *et seq.*) and other SEC regulations, including accurate and truthful information about the Company's operations, financial condition, and performance, so that the market prices of the Company's publicly traded securities would be truthful, complete, and accurate information.

285. Primo, Prim, and Castaneda, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, practices, performances, operations, and future prospects of Primo as specified herein.

286. Primo, Prim, and Castaneda employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Primo's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Primo and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Primo's securities during the Class Period.

- 126 -

287. Each of Prim and Castaneda's primary liability, and controlling person liability, arises from the following facts: (i) Prim and Castaneda were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of Prim and Castaneda, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development, and reporting of the Company's internal budgets, plans, projections, and/or reports; (iii) Prim and Castaneda enjoyed significant personal contact and familiarity with each other and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition, performance, and operations at all relevant times; and (iv) Prim and Castaneda were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

288. Primo, Prim, and Castaneda had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Primo's operating condition and business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Primo, Prim, and Castaneda's omissions and misstatements of the

Company's business, operations, and future prospects throughout the Class Period, Primo, Prim and Castaneda, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

289. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of Primo's securities were artificially inflated during the Class Period. Unaware that market prices of Primo' publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Primo, Prim, and Castaneda, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Primo, Prim, and Castaneda but not disclosed in public statements by Primo, Prim, and Castaneda during the Class Period, Plaintiffs and the other members of the Class acquired Primo's securities during the Class Period at artificially high prices and were damaged thereby.

290. At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known of the true performance, business practices, prospects, and intrinsic value of Primo, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have

- 128 -

purchased or otherwise acquired their Primo shares, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

291. By virtue of the foregoing, Primo, Prim, and Castaneda have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

292. As a direct and proximate result of Primo, Prim, and Castaneda's wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**COUNT V**

**FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST PRIM AND CASTANEDA**

293. Plaintiffs repeat and re-allege each and every allegation contained in ¶¶1-292, as if fully set forth herein.

294. Prim and Castaneda acted as controlling persons of Primo within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Prim and Castaneda had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false

- 129 -

and misleading. Prim and Castaneda were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

295. In particular, each of Prim and Castaneda had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

296. As set forth above, Primo, Prim, and Castaneda each violated Section 10(b) and Rule 10b-5 by their actions and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, Prim and Castaneda are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Primo, Prim, and Castaneda's wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE,** Plaintiffs pray for relief and judgment, as follows:

A. Determining that this action is a proper class action and designating Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

- 130 -

B.    Awarding compensatory damages in favor of Plaintiffs and the other

Class members against all Defendants, jointly and severally, for all damages

sustained as a result of Defendants' wrongdoing, in an amount to be proven at

trial, including interest thereon;

C.    Awarding rescission or rescissory measures of damages;

D.    Awarding Plaintiffs and the Class their reasonable costs and

expenses incurred in this action, including counsel fees and expert fees; and

E.    Such other and further relief as the Court may deem just and proper.

## VIII.  JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.


DATED:  June 22, 2012                    ROBBINS GELLER RUDMAN
                                                          & DOWD LLP
                                               DAVID J. GEORGE
                                               ROBERT J. ROBBINS
                                               KATHLEEN L. BARBER


*/s/ Robert J. Robbins*
_____
Robert J. Robbins

120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone: 561/750-3000
561/750-3364 (fax)
dgeorge@rgrdlaw.com
rrobbins@rgrdlaw.com
kbarber@rgrdlaw.com

- 131 -

McDANIEL & ANDERSON, L.L.P.
L. BRUCE McDANIEL (NC State Bar No. 5025)
P.O. Box 58186
Raleigh, NC  27658
Telephone: 919/872-3000
919/790-9273 (fax)
mcdas@mcdas.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
EVAN J. KAUFMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
ekaufman@rgrdlaw.com

***Attorneys for Plaintiffs***

- 132 -

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 22, 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system.  The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this notice as service of this document by electronic means.

*/s/ Robert J. Robbins*
ROBERT J. ROBBINS