IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

PLYMOUTH COUNTY RETIREMENT )
ASSOCIATION, et al.,          )
                              )
            Plaintiffs,       )
                              )
        v.                    )         1:11-cv-1068
                              )
PRIMO WATER CORPORATION, et   )
al.,                          )
                              )
            Defendants.       )


**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, District Judge.

        This is a federal securities class action on behalf of a

class consisting of all persons,[1] other than Defendants, who

acquired the common stock of a start-up company, Primo Water

Corporation ("Primo" or "the company"), between November 4,

2010, and November 10, 2011 (the "Class Period"), including the

company's initial public offering on November 4, 2010 (the

"IPO") and its common stock offering on June 17, 2011

("Secondary Offering") (collectively, the "Offerings").    In

their 131-page amended complaint (Doc. 52), Plaintiffs seek

recovery for stock losses under Sections 11, 12(a)(2), and 15 of

---

[1] The lead Plaintiffs are Employees' Retirement System of the
Government of the Virgin Islands and Plymouth County Retirement
Association.  However, the entire Plaintiff class (including the lead
Plaintiffs) will be referred to simply as "Plaintiffs" throughout this
opinion.

the Securities Act of 1933 ("1933 Act") and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule 10-b5 promulgated thereunder, 17 C.F.R. § 240.10b-5. The Defendants in this case can be divided into two categories: (1) the "Primo Defendants," composed of Primo and its executives[2]; and (2) the "Underwriter Defendants," who served as underwriters for Primo's Offerings.[3] Together, the Primo Defendants and Underwriter Defendants will be referred to simply as "Defendants."

This action was filed on December 2, 2011 (Doc. 1), and an amended complaint was filed June 22, 2012 (Doc. 52). The matter is currently before the court on motions to dismiss by the Primo Defendants (Doc. 58) and the Underwriter Defendants (Doc. 56). Also before the court is Plaintiffs' motion to strike certain pages of the Primo Defendants' appendix of documents filed in

---

[2] Specifically, the Primo Defendants are: Primo; Billy D. Prim (founder, President, Chairman of the Board of Directors ("Board"), and Chief Executive Officer of Primo); Mark Castaneda (Chief Financial Officer, Secretary, and Assistant Treasurer of Primo); David J. Mills (Vice President-Finance and Treasurer of Primo); Richard A. Brenner (Board member); David W. Dupree (Board member); Malcolm McQuilkin (Board member); and David L. Warnock (Board member). (Doc. 52 at ¶¶ 8-17.)

[3] The Underwriter Defendants are: Stifel, Nicolaus & Company, Inc. (underwriter and sole-book running manager and representative for the Offerings who helped draft and disseminate the prospectuses for the Offerings); BB&T Capital Markets (underwriter for the Offerings); Janney Montgomery Scott LLC (underwriter for the Offerings); and Signal Hill Capital Group LLC (underwriter for the Offerings). (Doc. 52 at ¶¶ 19-22.)

2

support of their motion to dismiss. (Doc. 64.) The court heard arguments on Defendants' motions on May 16, 2013. For the reasons set forth below, the motion to strike will be granted in part and denied in part, Defendants' motions to dismiss will be granted, and the case will be dismissed.

## I.    FACTUAL BACKGROUND[4]

### A.    Primo, Its Products, and Business Model

Primo is a Delaware corporation headquartered in Winston-Salem, North Carolina, that provides three and five gallon containers of purified bottled water, self-serve filtered drinking water, and water dispensers. (Doc. 52 at ¶ 8.) Primo's water dispensers are designed to dispense Primo and other dispenser-compatible bottled water. (Id. at ¶ 40.) The company is founded on a "razor-razorblade" business model, whereby the initial sale of Primo water dispensers (the razor) then creates a base of users who frequently purchase bottles of Primo water or refill their bottles at refill stations (the razorblades). (Id. at ¶ 43.) Under Primo's business strategy, the company would sell its water dispensers and bottled water at major retail locations, such as Lowe's Home Improvement

---

[4]    At the motion to dismiss stage, the amended complaint, and all reasonable inferences therefrom, are viewed in the light most favorable to Plaintiffs. E. Shore Mkts., Inc. v. J.D. Assocs., Ltd. P'ship, 213 F.3d 175, 180 (4th Cir. 2000).

("Lowe's) and Wal-Mart, among others. (Id. at ¶ 44.)[5] If a customer at one of these retailers buys a Primo water dispenser and Primo bottled water, the empty water bottle can either be recycled and exchanged at Primo's bottle exchange displays or refilled at Primo's refill vending machines. (Id.) If a customer exchanges a water bottle at Primo's bottle exchange display, the display provides the customer with a discount coupon toward the purchase of a full bottle of Primo water. (Id.) Alternatively, a customer has the option of refilling his water bottle at Primo's refill vending station, as the bottle can be sanitized and reused up to 40 times. (Id.) This business model ostensibly creates a recurring and constant demand for the company's products. (Id. at ¶ 43.)

**B. The Offerings**

Primo made its IPO on November 4, 2010, by offering 8.33 million shares to the public at $12.00 per share, with an overallotment option for the Underwriter Defendants of 1,250,000 shares, raising approximately $114.96 million. (Id. at ¶¶ 45-47.) In connection with the IPO, Primo filed a Registration Statement, which incorporated the IPO prospectus. (Id. at

---

[5] Primo's SEC filings make clear that Primo was dependent on a small number of major retailers for its success. (Appendix to Doc. 59 at 428.) For example, Primo noted in its 2010 Form 10-K that "Lowe's Home Improvement and Wal-Mart represented approximately 37% and 21% of our consolidated net sales." (Id.)

4

¶ 45.)[6]  In the IPO Registration Statement, Primo made statements about, among other things, the number of locations selling its products, the company's marketing efforts, and the demand for Primo products.  (See generally Appendix to Doc. 59 ("App.") at 1-228.)  Many of these statements are now challenged by Plaintiffs as material misrepresentations or omissions and will be discussed in more detail in the analysis to follow.

On June 17, 2011, Primo made its Secondary Offering of common stock.  (Doc. 52 at ¶ 102.)[7]  This Secondary Offering raised $42.2 million for the company.  (Id. at ¶ 103.)  In the Secondary Offering Registration Statement, which incorporated the Secondary Offering prospectus, Primo again made statements about, among other things, the number of locations at which Primo's products were offered, marketing and promotion efforts, and retailer demand for Primo products.  (Id. at ¶¶ 104-07.) Additionally, the Secondary Offering Registration Statement announced that due to technology acquired as a result of Primo's acquisition of the Omnifrio Single-Serve Beverage Business ("Omnifrio"), Primo would launch a single-serve carbonated

---

[6]  The IPO Registration Statement is 228 pages and, as a general matter, contains a robust discussion of the company's business and risk factors that could affect its performance and revenues, as well as cautions on forward-looking statements.

[7]  The Secondary Offering Registration Statement is 180 pages and, like its IPO counterpart, also contains a robust discussion of Primo's business, risk factors, and forward-looking statements.

beverage appliance, known as the "Flavor Station," in the "fourth quarter of 2011." (Id. at ¶¶ 114-15, 118.)[8] As with the statements made in the IPO Registration Statement, Plaintiffs challenge statements made in connection with the Secondary Offering as materially false and misleading.

**C. Guidance Statements, Press Releases, and Conference Calls**

Primo also released guidance documents throughout the Class Period that contained statements Plaintiffs challenge as false and/or misleading. These statements were made in guidance documents and press releases and during conference calls with Primo executives.

For example, on March 24, 2011, Primo issued a press release ("March 2011 press release") reporting its financial results for the fourth quarter and year ended December 31, 2010. (Id. at ¶ 191.) The company stated that it had approximately 12,600 combined Exchange and Refill locations. (Id. at ¶ 193.) It also stated that it expected to end the first quarter of 2011 with between 14,500 and 14,900 combined Exchange and Refill

---

[8] According to the amended complaint, the Omnifrio Single-Serve Beverage Business "primarily consists of technology related to single-serve cold carbonated beverage appliances and consumable flavor cups, or 'S-cups,' and $CO_2$ cylinders used with the appliances to make a variety of cold beverages." (Doc. 52 at ¶ 115.) Using the technology developed by Omnifrio, Primo conceptualized an appliance that dispenses single-serve cold carbonated beverages -- the so-called Flavor Station. (Id. at ¶¶ 115, 118.)

6

locations. (Id.) During an accompanying conference call, Billy
D. Prim ("Prim"), Primo's founder and Chief Executive Officer,
also stated that Primo had plans to integrate Omnifrio
carbonation technology into Primo's water dispenser appliances.[9]
(Id. at ¶ 197.) Prim also stated that Omnifrio had already
developed 30 flavors with three different carbonation levels.
(Id.) In Primo's 2010 Form 10-K, which was filed approximately
a week after the March 2011 press release, Primo confirmed that
it had 12,600 combined retail locations and that the company was
expecting to introduce Omnifrio technology. (Id. at ¶¶ 199-200,
203.) In the Form 10-K, Primo also made statements about its
marketing and promotion efforts, including that it was engaging
in "regular cross marketing promotions" and was focused on
"developing and maintaining a brand identity." (Id. at ¶ 201.)

On May 10, 2011, Primo issued a press release ("May 2011
press release") that announced its financial results for the
first quarter of 2011. (Id. at ¶ 208.) In this press release,
Primo stated that it "expects total sales in the second quarter
of 2011 to double" and "continues to expect sales to increase
260% to 275% compared to 2010." (Id. at ¶ 209.)

Despite Primo's predictions about its 2011 growth, lower
than expected sales later forced the company to revise its

---

[9] Primo went on to complete the acquisition of Omnifrio by April 11,
2011. (Doc. 52 at ¶ 207.)

7

expectations downward.  On August 10, 2011 ("August 2011 press release"), approximately two months after the Secondary Offering, Primo announced that it had failed to meet earlier earnings projections due to lower than anticipated sales.  (<u>Id.</u> at ¶ 226.)  Primo disclosed that Lowe's and Wal-Mart, two major Primo retailers, did not launch scheduled national promotions for Primo products during the second quarter.  (<u>Id.</u> at ¶ 226-28.)  Primo reported that "both retailers are committed to the program and have started rolling out the national promotion of water and dispensers in the third quarter.  The Company expects these major mass retail partners to continue to roll out the national promotion during the remainder of the third quarter and in the fourth quarter of 2011."[10]  (<u>Id.</u> at ¶ 228.)  Primo also stated that the company "continue[s] to be in [a] great position for strong long-term revenue and earnings growth" (<u>id.</u> at ¶ 230) and announced that its Flavor Station water carbonation appliance would be ready for sale during the 2011 holiday season (<u>id.</u> at ¶ 231).

In a conference call later that same day, Primo executives identified the source of low sales as a delay in the addition of

---

[10]  Plaintiffs' allegations are slightly misleading on this point. Plaintiffs allege that Primo revealed that Wal-Mart and Lowe's "would not be launching their scheduled national promotions." (Doc. 52 ¶ 228.)  But in quoting Primo's August 2011 press release, it is apparent that Plaintiffs do not contend that these promotions never reached fruition, but only that they did not do so until the third quarter of 2011. (<u>Id.</u>)

water dispenser selling locations and a delay in the national promotions scheduled by major retailers. (Id. at ¶ 234-35.) Further, Primo executives made additional statements about the upcoming launch of the Flavor Station appliance and increased the estimate for Flavor Station sales for 2011. (Id. at ¶ 236-37.) Despite this announcement, analysts concluded that Primo's disappointing second quarter and lower 2011 guidance hurt the company's credibility. (Id. at ¶ 245.) Primo's common stock price collapsed from $13.92 per share on August 9, 2011, to $5.40 per share at closing on August 10, 2011. (Id. at ¶ 248.)

On November 8, 2011, Primo issued another press release ("November 2011 press release") announcing results for the third quarter of 2011. (Id. at ¶ 250.) Again, Primo reported a net loss and revised downward its financial projections for fourth quarter sales to be $22.0 to $24.0 million compared to prior guidance of $27.0 to $29.5 million. (Id.) Primo also announced that it expected to have "limited sales of Flavor Station appliances during the fourth quarter due to delays in reformulating [] flavors." (Id. at ¶ 251.) Following this press release, Primo's stock again declined in value from a closing price of $5.57 on November 8, 2011, to a closing price of $4.58 on November 9, 2011. (Id. at ¶ 264.) After Primo issued its third quarter Form 10-Q, the price of Primo common stock fell again to close at $3.06 on November 10, 2011. (Id.)

9

This represented an approximately 80.95% decrease in common stock price from Primo's Class Period high of $16.06 per share. (See id.)

Other specific facts will be discussed below, as relevant to the legal analysis.

## II. MOTION TO STRIKE

Preliminary to consideration of the merits of Defendants' motions, Plaintiffs have moved to strike four separate exhibits contained in the appendix that the Primo Defendants submitted in support of their motion to dismiss. The exhibits at issue are as follows:

> (1) Appendix pp. 687-90: Graham Bowley, Wall Street, the Home of the Vanishing I.P.O., N.Y. TIMES, November 17, 2010.
>
> (2) Appendix pp. 772-73: "Data Shark Store Location/Delivery Query and Results" dated July 1, 2010.
>
> (3) Appendix pp. 774-80: Spreadsheet detailing Prim's holdings during the Class Period, with related Form 4s.
>
> (4) Appendix pp. 781-92: Spreadsheet detailing Primo insider stock purchases during the Class Period, with related Form 4s.

Courts may consider documents attached to a motion to dismiss "so long as they are integral to the complaint and authentic." Sec'y of State for Def. v. Trimble Navig. Ltd., 484 F.3d 700, 705 (4th Cir. 2007). As such, the court can consider "documents attached to the complaint, documents incorporated by

10

reference in the complaint, or matters of judicial notice"
without converting a motion to dismiss into one for summary
judgment. <u>Sun Chem. Trading Corp. v. CBP Res., Inc.</u>, No.
1:01CV00425, 2004 WL 1777582, at *3 (M.D.N.C. July 29, 2004)
(internal quotations and citation omitted). Further, in a
securities fraud case, the court may consider "public documents
quoted by, relied upon, incorporated by reference or otherwise
integral to the complaint." <u>In re Royal Ahold N.V. Secs. &
ERISA Litig.</u>, 351 F. Supp. 2d 334, 349 (D. Md. 2004) (internal
quotations and citations omitted).

The first exhibit (Appendix pages 687-90) is a <u>N.Y. Times</u>
newspaper article that provides a general discussion of IPOs,
their inherently risky nature, and their decline in U.S. stock
markets. Courts may take judicial notice of newspaper articles
(particularly in cases such as this that allege fraud on the
market) when they specifically discuss the subject of the case.
<u>See, e.g.</u>, <u>Quaak v. Dexia, S.A.</u>, 357 F. Supp. 2d 330, 339 (D.
Mass. 2005). However, the article at issue never mentions Primo
or the bottled water industry, but rather is offered only to
demonstrate that IPOs can be risky ventures. Accordingly, the
Plaintiffs' motion to strike will be granted with respect to
this exhibit. <u>Id.</u> (granting motion to strike newspaper
articles).

11

The second exhibit (Appendix pages 772-73) is represented to be a printout of Primo customer deliveries according to the company's "Data Shark" computer program, a database that tracks the company's sales. The Data Shark database is referenced multiple times in the amended complaint in connection with Plaintiff's allegations that Primo overstated its sales. (See, e.g., Doc. 52 at ¶¶ 53-54, 76, 161-63, 266.) For example, the amended complaint alleges that when Confidential Witness 1 ("CW1") left the company in late 2010, the Data Shark program revealed that 1,500 of the company's 5,000 retailers had not had a delivery in 18 months or more. (Id. at ¶¶ 53-54.) The exhibit, in contrast, purports to show that as of June 30, 2010, 6,926 Primo customers had received a delivery within the past thirty days. (App. at 773.) The Primo Defendants contend that the exhibit demonstrates that Plaintiffs' allegations are false.

It is true that on a motion under Federal Rule of Civil Procedure 12(b)(6) the court can look to documents that are cited in the complaint. Greenhouse v. MCG Capital Corp., 392 F.3d 650, 656 (4th Cir. 2004). The problem here is that it is not clear that the proposed exhibit is in fact one of the documents cited in the amended complaint. Moreover, the exhibit does not speak for itself, and it is not clear exactly what the figures on it mean. Plaintiffs' reference to the Data Shark computer system does not permit the court's consideration of any

12

and every document that the system is capable of producing, particularly if it is not a report specifically mentioned in the amended complaint. Accordingly, the court will grant the motion to strike this document.

Finally, the third and fourth exhibits (Appendix pages 774-92) detail stock holdings and purchases by Prim, Primo's founder, and are offered to show that Plaintiffs fail to allege a strong inference of scienter to defraud where public documents show that Prim himself continued to purchase shares of the company during the Class Period. Because the presence or absence of scienter is not a basis for the court's ultimate resolution of the motions to dismiss (and even if it were, the court need not rely on these exhibits), the court will not consider these exhibits, and the motion to strike them is moot. See United States v. Ebert, 178 F.3d 1287, at *34 n.15 (4th Cir. 1999) (unpublished table decision) (finding motion to strike newspaper article that was not considered moot).

### III. MOTIONS TO DISMISS

Both the Primo Defendants and the Underwriter Defendants have moved to dismiss the amended complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). (Docs. 56 & 58.)

Federal Rule of Civil Procedure 8(a)(2) provides that a complaint must contain a "short and plain statement of the claim

13

showing that the pleader is entitled to relief." While the complaint need only "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," the plaintiff's pleading obligation "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal quotations omitted).

The purpose of a Rule 12(b)(6) motion is to "test[] the sufficiency of a complaint" and not to "resolve contests surrounding the facts [or] the merits of a claim." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). The court "must accept as true all of the factual allegations contained in the complaint," Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam), and all reasonable inferences must be drawn in the plaintiff's favor, Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997). However, Rule 12(b)(6) protects against meritless litigation by requiring sufficient factual allegations "to raise a right to relief above the speculative level," Twombly, 550 U.S. at 555, so as to "nudge[] the[] claims across the line from conceivable to plausible," id. at 570; see Ashcroft v. Iqbal, 556 U.S. 662, 680 (2009). As explained by the United States Supreme Court:

> A claim has facial plausibility when the plaintiff
> pleads factual content that allows the court to draw
> the reasonable inference that the defendant is liable

14

> for the misconduct alleged. The plausibility standard
> is not akin to a probability requirement, but it asks
> for more than a sheer possibility that a defendant has
> acted unlawfully.

Iqbal, 556 U.S. at 678 (internal quotations and citations
omitted). Although the truth of the facts alleged is assumed,
courts are not bound by the "legal conclusions drawn from the
facts" and "need not accept as true unwarranted inferences,
unreasonable conclusions, or arguments." Giarratano v. Johnson,
521 F.3d 298, 302 (4th Cir. 2008) (internal quotations and
citations omitted).

While these standards govern the consideration of a Rule
12(b)(6) motion generally, there are additional pleading
standards under the PSLRA that apply to a securities class
action such as this. These heightened pleading standards exist
because Congress recognized the potential for abuse in the
securities fraud context, including "nuisance filings, targeting
of deep-pocket defendants, vexatious discovery requests and
manipulation by class action lawyers." Merrill Lynch, Pierce,
Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 81 (2006). The
requirement of heightened pleading reflects Congress' view that
courts should "be vigilant in preventing meritless securities
fraud claims from reaching the discovery phase of litigation."
Cozzarelli v. Inspire Pharm. Inc., 549 F.3d 618, 623 (4th Cir.

2008). Accordingly, where appropriate, heightened pleading requirements will be discussed below.

### A. The 1934 Act Claims

The court turns first to Plaintiffs' claims under the 1934 Act. There are two claims: violation of Section 10(b) and violation of Section 20(a) (collectively, "1934 Act claims").

#### 1. Pleading Standards

The parties agree that the 1934 Act claims must be analyzed pursuant to Federal Rule of Civil Procedure 9(b). (_See_ Doc. 59 at 26 (stating that Rule 9(b) applies to the 1934 Act claims); Doc. 66 at 29 (same)); _see also City of Ann Arbor Emp. Ret. Sys. v. Sonoco Prods. Co._, 4:08-cv-2348-TLW-TER, 2009 WL 2487045, at *1 (D.S.C. Aug. 14, 2009) (Rule 9(b) applies when assessing a motion to dismiss a claim under the 1934 Act). As such, Plaintiffs' claims must be "stated with particularity." Fed. R. Civ. P. 9(b). This means that Plaintiffs must establish the "who, what, when, where, and how" of the alleged fraud that underlies their claims. _United States ex rel. Wilson v. Kellogg Brown & Root, Inc._, 525 F.3d 370, 379 (4th Cir. 2008) (internal quotations and citations omitted).

Additionally, the PSLRA requires heightened pleading as to (1) scienter and (2) misrepresentation. _Katyle v. Penn Nat. Gaming, Inc._, 637 F.3d 462, 471 n.5 (4th Cir. 2011). First, "Congress [has] required that plaintiffs make specific

16

allegations of false statements or else face dismissal. And
Congress instructed courts to dismiss any securities fraud
complaint that does not state with particularity facts giving
rise to a strong inference that the defendant acted with
scienter." Cozzarelli, 549 F.3d at 623 (internal quotations and
citations omitted). The Supreme Court has counseled that "[a]
complaint will survive [under the PSLRA's heightened pleading
standards] only if a reasonable person would deem the inference
of scienter cogent and at least as compelling as any opposing
inference one could draw from the facts alleged." Tellabs, Inc.
v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007).

    Next, if a plaintiff alleges that a defendant made false or
misleading statements, the PSLRA requires that the plaintiff
"specify each statement alleged to have been misleading, the
reason or reasons why the statement is misleading, and, if an
allegation regarding the statement or omission is made on
information and belief, the complaint shall state with
particularity all facts on which that belief is formed." 15
U.S.C. § 78u-4(b)(1). Thus, the PSLRA modifies past practice
"(1) by requiring a plaintiff to plead facts to state a claim
and (2) by authorizing the court to assume that the plaintiff
has indeed stated all of the facts upon which he bases his
allegation of a misrepresentation or omission." Teachers' Ret.
Sys. of La. v. Hunter, 477 F.3d 162, 172 (4th Cir. 2007) (citing

15 U.S.C. § 78u-4(b)(1)). In determining if the complaint satisfies the pleading standards of the PSLRA, the court will assess the complaint as a whole. As such, the court will evaluate the number and level of detail of the facts, the plausibility and coherency of the facts, the sources of the facts and the reliability of those sources, and any other criteria that can be used to inform how well the facts support Plaintiffs' allegations. <u>Hunter</u>, 477 F.3d at 174.

### 2. Section 10(b) Claim

Section 10(b) and SEC Rule 10b-5 (collectively referred to as the "Section 10(b) claim"[11]) make it unlawful for any person to commit fraud in connection with the purchase or sale of securities. 15 U.S.C. §78j(b); 17 C.F.R. § 240.10b-5. To succeed on a Section 10(b) claim, a plaintiff must show "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." <u>Matrixx Initiatives, Inc. v. Siracusano</u>, 131 S. Ct. 1309, 1317 (2011).

---

[11] SEC Rule 10b-5 is Section 10(b)'s implementing regulation. However, the scope of Rule 10b-5 is coextensive with the coverage of Section 10(b), and it is therefore appropriate to refer to both the statute and rule together as the "Section 10(b) claim." <u>See</u> <u>S.E.C. v. Pirate Investor LLC</u>, 580 F.3d 233, 237 n.1 (4th Cir. 2009).

In this case, Defendants have moved to dismiss Plaintiffs'
Section 10(b) claim based principally on four grounds: (1) a
lack of loss causation,[12] (2) the PSLRA's safe harbor provision
for forward-looking statements, (3) Plaintiffs' failure to plead
that any of the challenged statements was false/misleading or
material, and (4) Plaintiffs' failure to allege facts
establishing a strong inference of scienter. (<u>See generally</u>
Docs. 57 & 59.) After careful consideration, the court finds
that dismissal is warranted based on Plaintiffs' failure to
plead that any of the challenged statements were a material
misrepresentation or omission and, additionally, on the PSLRA's
safe harbor provisions. Accordingly, those grounds are
addressed below, and the court need not reach the issues of loss
causation and scienter with respect to the 1934 Act claims. <u>See</u>
<u>Nolte v. Capital One Fin. Corp.</u>, 390 F.3d 311, 317 (4th Cir.
2004).

---

[12] Defendants' loss causation argument is based on the contention that
the amended complaint fails to establish a sufficient nexus between
the fall in stock price and the alleged misrepresentations and
omissions. In short, Defendants contend that the amended complaint
makes clear that Plaintiffs' losses resulted from the publication of
negative company performance, not from any misstatement or omission.

### a. Failure to Plead any Statement was a Material Misrepresentation or Omission Pursuant to Section 10(b)[13]

The basis of a Section 10(b) claim is that the defendant made "a public misrepresentation for which it may be found primarily liable." <u>Gariety v. Grant Thornton, LLP</u>, 368 F.3d 356, 369 (4th Cir. 2004). The statement challenged must either be (1) false or (2) an omission that renders the statement misleading. <u>Longman v. Food Lion, Inc.</u>, 197 F.3d 675, 682 (4th Cir. 1999). Additionally, the statement, whether a falsity or an omission, must also be material. <u>Siracusano</u>, 131 S. Ct. at 1317. The Fourth Circuit has stated that Section 10(b) and Rule 10b-5 "decidedly do not prohibit any misrepresentation – no matter how willful, objectionable, or flatly false – of immaterial facts, even if it induces reactions from investors that, in hindsight or otherwise, might make the misrepresentation appear material." <u>Greenhouse</u>, 392 F.3d at 656 (emphasis removed). "[A] fact stated or omitted is material if there is a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be

---

[13] Even if not specifically addressed below, the court has reviewed all of the challenged statements in the amended complaint. The court finds that none of these statements constitutes a material misrepresentation or omission as required by Section 10(b).

20

significantly altered by disclosure of the fact." <u>Longman</u>, 197
F.3d at 683; <u>see also</u> <u>Isquith v. Middle South Utilities, Inc.</u>,
847 F.2d 186, 207-08 (5th Cir. 1988); <u>In re Gentiva Sec. Litig.</u>,
No. 10-cv-5064, 2013 WL 1200334, at *10 (E.D.N.Y. Mar. 25, 2013)
("At the pleading stage, a plaintiff satisfies the materiality
requirement of Rule 10b-5 by alleging a statement or omission
that a reasonable investor would have considered significant in
making investment decisions" (internal quotations and citation
omitted)).

Plaintiffs' amended complaint identifies numerous allegedly
false and/or misleading statements. The parties have grouped
the challenged statements into general categories for
convenience, and the court will do the same. These categories
are: (1) statements regarding the number of retail locations at
which Primo products were offered; (2) statements regarding
marketing and promotion efforts; (3) statements regarding
retailer demand; (4) statements regarding retailer unhappiness
and shrinkage; and (5) statements relating to the release of the
Flavor Station. Each will be addressed in turn.

### i. Statements Regarding the Number of Retail Locations

The first set of statements challenged by Plaintiffs
concerns the number of retail locations at which Primo's
products were being offered. Specifically, Plaintiffs allege

that at the time of the IPO Primo "materially overstated the number of locations where Primo's water bottle exchange services were offered, and where Primo was selling water" by including approximately 1,500 store locations in its reported 7,200 water bottle exchange service locations that did not have water bottle exchange machines and did not sell Primo water. (Doc. 52 at ¶ 49.)

> In its IPO Registration Statement, Primo stated:
>
> As of June 30, 2010, our bottle water exchange service and water dispensers were offered in each of the contiguous United States and located in approximately 7,200 and 5,500 retail locations respectively . . . In addition, we added approximately 700 exchange locations during the quarter ended September 30, 2010, bringing the total number of our exchange locations as of September 30, 2010 to approximately 7,900.

(Doc. 52 at ¶ 50.) Plaintiffs contend that these statements (and others relating to the number of retail locations in the Secondary Offering (see, e.g., id. at ¶ 104), press releases/conference calls (see, e.g., id. at ¶ 167, 170, 183), and other SEC filings (see, e.g., id. at ¶ 176)) were materially inaccurate. Specifically, Plaintiffs contend that Primo was over-reporting the number of locations at which it sold its products because 1,500 stores in the Western region of the United States "had not had a delivery of water in 18 months or more." (Id. at ¶ 53.) Plaintiffs also state that there were "stores that sold less than five bottles a year that Primo still

22

counted within the purported total number of stores. Other stores listed as actively selling Primo bulk water had only two or three new bottles delivered in a year's time." (Id.)

Plaintiffs' falsity argument is premised on the allegation that Primo "materially overstated the number of stores it reported as *selling* Primo products" and the proposition that underperforming stores could not be considered as "offering" the product. (Id. at ¶ 56 (emphasis added).) Plaintiffs argue that sales were lagging in many stores and therefore the report of the number of locations was misleading. However, Plaintiffs' claims that Defendants' statements are materially false and/or misleading fail.

There is no evidence that Primo ever made any statement regarding the number of locations at which it was actually *selling* its products; instead, Primo's IPO Registration Statement, Secondary Offering, and press releases state only that "[Primo's] bottle water exchange service and water dispensers were *offered*" at a certain number of locations. (See, e.g., id. at ¶ 49, 60, 104-05.) Even if 1,500 locations reported by Primo had not received deliveries in eighteen months, Plaintiffs fail to identify a material misrepresentation

or omission[14] that contradicts Primo's assertion that its products were being *offered*, even if not robustly, at every reported location. Plaintiffs have not articulated any authority for the proposition that Defendants had a duty to identify the relative success of each of its retail locations, and the court cannot conceive of one on these facts.

Moreover, in light of the information Primo disclosed, there is no substantial likelihood that a reasonable purchaser or seller would have considered the alleged fact important in deciding whether to buy or sell, or would have viewed the total mix of information made available to him to be significantly altered by its disclosure. Longman, 197 F.3d at 682-83. Primo's various offerings and 10-Qs and 10-Ks (see App. at 409-502 (Form 10-K for Year Ended December 31, 2010) and 503-530

---

[14] In the amended complaint, Plaintiffs do allege that "multiple Kmart stores no longer stocked any of Primo's water products." (Doc. 52 at ¶ 52.) This is the only allegation that relates to whether Primo falsely reported the number of locations at which its products were being offered. However, simply alleging that "multiple Kmart stores" no longer stocked Primo products is not enough for Plaintiffs to survive a motion to dismiss. An element of a claim under Section 10(b) is that a challenged misrepresentation or omission be "material." Siracusano, 131 S. Ct. at 1317. Plaintiffs have not alleged with any particularity that the number of Kmart stores no longer offering Primo's products is material. "Multiple" means only more than one. Merriam-Webster Online Dictionary, http://www.m-w.com (last visited May 21, 2013) (defining multiple as "involving more than one"). This allegation fails to establish materiality in light of the thousands of stores to which Primo supplied products. As such, because materiality is not sufficiently pleaded, this allegation will not help Plaintiffs escape dismissal. See Greenhouse, 392 F.3d at 656 (stating that Section 10(b) does "not prohibit any misrepresentation — no matter how willful, objectionable, or flatly false — of immaterial facts").

(Form 10-Q for Quarter Ended June 30, 2011)), disclosed the company's total sales revenues as a result of its retail operations. The reasonable investor was easily able to determine averages of those figures based on the company's public statements. (See, e.g., id. at 769 for an analyst calculation of average per location sales and exchange revenue per bottle.)

Primo also clearly disclosed as early as the IPO that a substantial portion of its sales were attributable to a small number of large retailers. (See id. at 14 ("We depend on a small number of large retailers for most of our consumer sales.") & 20 ("Certain retailers make up a significant percentage of our retail sales volume, such that if one of more of these retailers were to materially reduce or terminate its business with us, our sales would suffer.").) Moreover, as the company's reported retail locations grew over the Class Period, from 7,200 (exchange service)/5,500 (dispensers) locations reported in the IPO (id. at 6), to "approximately 14,600 combined retail locations" in the Secondary Offering (id. at 233), to 22,600 locations by September 30, 2011, as noted in the November 8, 2011 press release (id. at 631), and as the company's sales continued to increase significantly, the impact of the alleged 1,500 underperforming stores cannot be said to have been material.

25

Accordingly, Plaintiffs' claims as to challenged statements regarding the number of retail locations will be dismissed.

### ii. Statements Regarding Marketing and Promotion Efforts

Plaintiffs next challenge Primo's statements about its marketing and promotion efforts. Though Plaintiffs make numerous allegations on this point, their ultimate contention is that Primo was "failing to properly promote and market its products, if at all." (Doc. 52 at ¶ 62.) In the amended complaint, Plaintiffs identify several statements by Primo in the IPO Registration Statement about marketing and promotion efforts, exemplified by the following:

> We direct our marketing efforts as close as possible to the point of sale to strengthen our brand and promote consumer awareness of our water bottle exchange service . . . Our displays include Primo graphics, slogans and instructions on the exchange process that simply attach to the displays . . . In addition, we work with retailers to customize in-store solutions to best promote our brand . . . We plan to increase our promotional activity as we expand our business . . . We are also increasing our public relations initiatives associated with new market launches, developing additional cooperative advertising programs with retail distribution partners and increasing our field marketing activities.

(Id. at ¶ 61.) Further, Plaintiffs attack statements made in the Secondary Offering and 2010 Form 10-K about marketing efforts. (Id. at ¶¶ 107, 201 (which identify Primo displays and cross marketing promotion efforts as efforts to "develop[] and maintain[] a brand identity").) Plaintiffs also identify

26

statements in the August 2011 press release about direct-to-consumer marketing plans as false and misleading. (Id. at ¶ 232 (challenging Primo's statement in the August 2011 press release that it plans to implement a "new direct-to-consumer marketing campaign to increase exposure and raise awareness of its full product offering and to drive sales of appliances and consumables").)

Plaintiffs contend that all of these statements about marketing and promotion efforts are materially inaccurate statements of fact. Specifically, they assert that, leading up to the IPO, Primo was failing to properly promote and market its products, thus leading to retailer dissatisfaction, and that at the time of the IPO Primo was not planning to increase its promotional activities, public relations initiatives, or its field marketing activities. (Id. at ¶ 62.) Plaintiffs base this assertion on information obtained from former Primo employees serving as confidential witnesses. Confidential Witness 6 ("CW6") reported that Primo "did not value sales or marketing," "had literally no consumer based marketing," and "wouldn't put money into marketing." (Id. at ¶ 66.) Confidential Witness 4 ("CW4") also reported that "Primo did not have the finances to properly 'promote the product.'" (Id. at ¶ 70.) Other confidential witnesses (Confidential Witness 5 ("CW5") and Confidential Witness 3 ("CW3")) reported that Primo

27

was not updating its graphic displays (Id. at ¶ 72) and not offering price promotions (Id. at ¶ 73). CW5 also reported that Primo cut its marketing budget by $130,000 and fired its outside marketing company. (Id. at ¶ 84.)

None of these statements can serve as the basis of a Section 10(b) claim. First, as noted by the Primo Defendants, the amended complaint itself calls into doubt Plaintiffs' assertions that Primo was "failing to properly promote and market its products, if at all." (Id. at ¶ 62.) The amended complaint contains multiple allegations that Primo was in fact carrying on marketing and promotional activities. For example, paragraph 112 contains CW5's recounting of an April 2011 negotiation with Lowe's for a "dispenser promotion"; paragraph 113 contains CW5's statements that "just two months before the Secondary Offering . . . Primo tried to convince Target to run a promotion"; paragraph 118 recounts how Primo "spent money to market . . . the Flavor Station"; paragraph 235 recounts how Primo "completed a branding review related to [the] Omnifrio acquisition"; and paragraph 256 notes that Primo "just gave some promotional dollars away for this quarter to get – to kind of juice some sales." These statements flatly contradict Plaintiffs' assertions that Primo failed to engage in marketing or promotional activity.

28

Additionally, the court cannot credit the evidence provided by several of the confidential witnesses that reported on Primo's plans for marketing and promotion efforts. If a "complaint chooses to rely on facts provided by confidential sources, it must describe the sources with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged or in the alternative provide other evidence to support their allegations." <u>Hunter</u>, 477 F.3d at 174. Plaintiffs fail to satisfy this standard because multiple confidential witnesses that made allegations about Primo's marketing and promotion plans left Primo's employment before the Class Period began. Both CW3 and CW4 left Primo's employment in July 2010 (Doc. 52 at ¶ 33-34), well before November 4, 2010, the date of the IPO and the first day of the Class Period. As such, statements by these confidential witnesses that Primo was not offering product promotions *before the IPO and start of the Class Period* (<u>see</u> Doc. 52 at ¶¶ 70 & 73) do not support Plaintiffs' allegations that Primo made materially false or misleading statements *during the Class Period*. CW3 and CW4 simply could not have had personal knowledge of marketing and promotional activities or plans conducted after the IPO that would have made Primo's statements about marketing plans false or misleading. <u>See</u> <u>In re Trex Co., Inc. Sec. Litig.</u>, 454 F. Supp. 2d 560, 573 (W.D. Va.

2006) (stating that "[a] confidential witness' testimony can be used in pleading under the PSLRA so long as the testimony involves facts of which the witnesses had personal knowledge," and then finding that confidential witness statements did not meet this standard because the witnesses had left employment during the relevant class period).

Further, Primo's statements about marketing and promotions constitute immaterial puffery. "[S]tatements that consist of nothing more than indefinite statements of corporate optimism, also known as 'puffery,' are immaterial as a matter of law." In re Lab. Corp. of Am. Holdings Sec. Litig., No. 1:03CV591, 2006 WL 1367428, at *9 (M.D.N.C. May 18, 2006) (citing Raab v. General Physics Corp., 4 F.3d 286, 289 (4th Cir. 1993)); see also In re Cable & Wireless, PLC, Sec. Litig., 332 F. Supp. 2d 896, 900 (E.D. Va. 2004) (defining an immaterial statement as "a certain kind of rosy affirmative commonly heard from corporate managers and familiar to the marketplace - loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available").

Here, Primo's statements merely parrot corporate optimism that would not be deemed important to a reasonable investor when making a decision about purchasing securities. For example,

Primo's statements that marketing efforts are "direct[ed] . . . as close as possible to the point of sale to strengthen our brand" (Doc. 52 at ¶ 201), that the company was "plan[ning] to increase our promotional activity" (id. at ¶ 61), and that the company was "increasing our public relations initiatives associated with new market launches" (id.) are nothing more than amorphous, optimistic statements that cannot form the basis of a Section 10(b) claim. See, e.g., Longman, 197 F.3d at 685 (holding that company's statement that it "believe[s] that Food Lion's Extra Low Prices and its clean and conveniently located stores are especially well suited to the demands of our customers" was immaterial puffery and could not form the basis of a Section 10(b) claim); Raab, 4 F.3d at 289 (holding that a statement that a company's business unit was "poised to carry the growth and success of 1991 well into the future" was immaterial puffery).

Finally, any remaining statements that do not constitute immaterial puffery are simply not false or misleading. For example, Plaintiffs challenge Primo's statement that its "displays include Primo graphics, slogans and instructions on the exchange process" (Doc. 52 at ¶ 61). However, at no point in the amended complaint do Plaintiffs actually contradict this assertion. Rather, Plaintiffs allege that display graphics for bulk water shelving were "starting to age" and that even though

31

funds were reallocated from sales to redesign to update them, the graphics were not redesigned. (Id. at ¶ 72.) Plaintiffs also allege that CW1, who helped install graphic displays before the IPO, "was only provided with '50 percent' of the materials needed to do the job." (Id. at ¶ 80.) However, the only example provided in the amended complaint is an instance (again, before the IPO and Class Period) where CW1 was told to use display products already "in the field" even though those displays did not match newer graphics used on Primo products. (Id. at ¶ 82.)

In the end, Plaintiffs' attack on Primo's marketing and promotion representations devolves into a disagreement as to the quality and execution of the effort. For example, while Plaintiffs allege that Primo discharged its outside marketing firm, the August 2011 press release reveals that the company hired an internal head of marketing to oversee the company's efforts. (App. at 625.) Plaintiffs' criticisms do not rise to the level of a Section 10-b claim under the PSLRA. Accordingly, the court finds that none of the challenged statements relating to marketing and promotion efforts can serve as a basis for the Plaintiffs' Section 10(b) claim.

32

### iii. Statements Regarding Shrinkage, Retailer Unhappiness, and Retailer Demand

Plaintiffs next challenge Primo's statements that relate to shrinkage (high rate of product loss), retailer unhappiness, and retailer demand.

The specific statements in the IPO Registration Statement relating to shrinkage and retailer unhappiness are as follows:

> Our water bottle exchange solution is easy for retailers to implement, requires minimal management supervision and store based labor and provides centralized billing and detailed performance reports. Our solution offers retailers attractive financial margins and the ability to optimize typically unused retail space with our displays. Additionally, due to the recurring nature of water consumption and water bottle exchange, retailers benefit from year-round customer traffic and highly predictable revenue . . .

> Our water bottle exchange service provides retailers with a year-round consumer product and an opportunity to increase sales and profits with minimal labor and financial investment . . . Retailers benefit from our water bottle exchange service that offers high margin and generates productivity from often underutilized interior and exterior retail space . . .

> [E]mpty bottles are exchanged at our recycling center displays where consumers receive a recycling ticket that offers a discount toward the purchase of a full bottle of Primo purified water . . .

> We acquire new consumers . . . by accepting most dispenser-compatible water bottles in exchange for a recycle ticket discount toward the purchase of a full bottle of Primo purified water . . .

> We sell our water dispensers at minimal margin and provide a coupon for a free three- or five-gallon bottle of water with the sale of various water

33

dispensers at certain retailers to drive consumer
demand for our water bottle exchange[.]

(Doc. 52 at ¶¶ 86-87.) Additionally, Plaintiffs challenge
statements in the Secondary Offering and various press releases
regarding the opportunity for the company's future growth and
the company's ability to increase market penetration. (See,
e.g., id. at ¶ 60 ("Such retailers present us an opportunity of
approximately 13,900 additional nationwide locations") & ¶ 105
("We believe we have significant opportunities to increase store
penetration with our existing retail relationships").)

Plaintiffs argue that these statements are actionable under
Section 10(b). Specifically, Plaintiffs allege that Primo's
water bottle machines were poorly manufactured and allowed
consumers to steal water bottles and discount coupons, thus
failing to result in positive financial results or high margins
for retailers, as claimed. (Id. at ¶ 88.) According to CW1 and
CW3 (both of whom left the company before the Class Period), the
ability of consumers to illicitly remove returned water bottles
and activate the water dispenser's sensor to acquire a discount
ticket without actually having returned a water bottle meant
that Primo's shrinkage numbers reached as high as 15% to 25% in
some months. (Id. at ¶¶ 90-92.) Plaintiffs also generally
challenge statements in the IPO Registration Statement and
Secondary Offering by alleging that Primo's products were not

34

selling, thus aggravating retailers and limiting market expansion opportunities. (Id. at ¶¶ 97-98, 62(a).)

Plaintiffs allege that Primo's statements that its products had high margins for retailers are contradicted by the statements of the confidential witnesses that customers could illegitimately obtain returned water bottles and discount coupons from Primo's machines. However, statements about products having high margins are nothing more than "'[s]oft,' 'puffing'" statements that have previously been found to be immaterial as a matter of law. See Raab, 4 F.3d at 289 (statement that "[r]egulatory changes . . . have created a marketplace for the DOE Services Group with an expected annual growth rate of 10% to 30% over the next several years" was immaterial); Lasker v. N.Y. State Elec. & Gas Corp., 85 F.3d 55, 59 (2d Cir. 1996) (statements that the defendant's business strategies would lead to "continued prosperity" immaterial); Pipefitters Local No. 636 Defined Ben. Plan v. Tekelec, No. 5:11-CV-4-D, 2013 WL 1192004, at *8 (E.D.N.C. Mar. 22, 2013) (finding statements that Tekelec "expected growth to come from EAGLE XG" and that "business has been very strong" not actionable); Palladin Partners v. Gaon, No. 05-CV-3305, 2006 WL 2460650, at *9 (D.N.J. Aug. 22, 2006) (finding that the defendant's statement that it "expects to achieve improvements to gross margins" was not actionable); cf. Newman v. Rothschild,

35

662 F. Supp. 957, 959 (S.D.N.Y. 1987) (statement by defendant that investment would yield twenty to thirty percent profit was beyond mere puffery because it provided a specific percentage).

Additionally, even if this were not the case, Plaintiffs' allegations about shrinkage would still fail. Although Plaintiffs allege that shrinkage costs rendered Primo's statements about their products having a "high margin" for retailers false, the amended complaint itself undermines this assertion. In the amended complaint, Plaintiffs reveal that Primo sold its products to Kmart, Lowe's, and Kroger on consignment. (Doc. 52 at ¶ 94.) This meant that "it was Primo's responsibility to make up for the presence of any short fall between deliveries and sales," and thus the cost of shrinkage was born by Primo, not the retailers. (Id. at ¶ 95 n.4.) As such, for several of Primo's largest accounts,[15] any amount of shrinkage would not have affected the margins on Primo products from the retailers' point of view.

Plaintiffs' next set of allegations relate to retailer unhappiness and retailer demand. Plaintiffs challenge Primo's statements that its products were a benefit to retailers and that it had significant expansion opportunities, citing the

---

[15] Kmart, Lowe's, and Kroger account for Primo's top retailers. For example, Lowe's alone represented 37% of Primo's consolidated net sales for calendar year 2010. (Doc. 52 at ¶ 110.) As such, the court (and a reasonable investor) can safely conclude that a large number of Primo's products were purchased on consignment.

36

company's sales results.  Again, Primo's statements in the IPO Registration Statement, Secondary Offering, and press releases on these points consist of nothing more than innocuous corporate optimism about the growth of the company and the effect of Primo products on retailers.  See Longman, 197 F.3d at 685 (holding that company's statements that it "believe[s] that Food Lion's Extra Low Prices and its clean and conveniently located stores are especially well suited to the demands of our customers" and that the company "will continue to pay close attention to service levels and cleanliness in our stores and believe we will achieve high marks from customers in these areas" were immaterial puffery); Raab, 4 F.3d at 289 (statement that a business unit was "poised to carry the growth and success of 1991 well into the future" was immaterial); In re Computer Scis. Corp. Sec. Litig., 890 F. Supp. 2d 650, 668 (E.D. Va. 2012) (statements that the company "steadily made progress in delivering on our commitments" and the company was "pleased with [its] progress" were immaterial); In re First Union Corp. Sec. Litig., 128 F. Supp. 2d 871, 892 (W.D.N.C. 2001) (holding that statements that "1998 will continue to be a very active year" and that "we expect further improvements in efficiency" were immaterial); see also Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004) (noting that companies must be permitted to operate with a "hopeful outlook").  Additionally, regarding Plaintiffs'

37

allegations that retailers were dissatisfied with Primo's products, the amended complaint and confidential witnesses fail to identify a single dissatisfied retailer. This makes Plaintiffs' allegations conclusory and vague, and the pleading standards of the PSLRA are not satisfied. In re Trex, 454 F. Supp. 2d at 579 (finding that confidential witness statements did not meet the particularity requirement of the PSLRA when the confidential witness did not name any distributors that were actually dissatisfied with the company's business agreement).

Accordingly, a Section 10(b) claim will not lie based on the challenged statements about shrinkage, retailer unhappiness, and retailer demand.

### iv. Statements Relating to the Release of the Flavor Station

The last set of statements challenged by Plaintiffs relates to the Omnifrio acquisition and release of the Flavor Station appliances. Specifically, the amended complaint challenges two of Primo's statements relating to the acquisition of Omnifrio: a March and June 2011 statement that Omnifrio had developed 30 flavors (see, e.g., Doc. 52 at ¶¶ 221, 223(c)) and Primo's forecast that sales of a Flavor Station device would begin in the fourth quarter of 2011 (see, e.g., id. at ¶¶ 115, 182, 186-88, 203, 212, 231, 235-36).

38

With regard to Primo's statement that "[w]e have more than 30 flavors today" (id. at ¶ 221), Plaintiffs allege that this statement is false because approximately five months later Primo announced that it had "limited sales of Flavor Station appliances during the fourth quarter due to delays in reformulating its flavors." (Id. at ¶ 251.) Plaintiffs assert that this contradicts Primo's previous statement that Omnifrio had already developed 30 flavors.

Although Plaintiffs identify these statements as inconsistent, Plaintiffs have not plausibly alleged that Primo did not in fact acquire 30 flavors from Omnifrio. Implicit in Primo's statement that it was reformulating Omnifrio flavors is the fact that Omnifrio would first have had to develop the flavors so that they could in fact be "reformulated." Thus, Plaintiffs have not met the pleading standards of the PSLRA.

Further, the statements that Primo expected the launch of the Flavor Station during the fourth quarter/holiday season of 2011 are not materially false or misleading. Specifically, under the "bespeaks caution" doctrine, the statements at issue are not material. In determining whether an alleged misrepresentation or omission is material, the court must consider the statement in the full context in which it was made. Gasner v. Bd. of Supervisors of the Cnty. of Dinwiddie, Va., 103 F.3d 351, 358 (4th Cir. 1996). Moreover, cautionary language in

39

a document may negate the materiality of an alleged
misrepresentation or omission.  In re Donald J. Trump Casino
Sec. Litig., 7 F.3d 357, 371 (3d Cir. 1993), cert. denied sub
nom. Gollomp v. Trump, 510 U.S. 1178 (1994); accord In re
Coventry Healthcare, Inc. Sec. Litig., No. 08:09-CV-2337-AW,
2011 WL 1230998, at *12 (D. Md. Mar. 30, 2011).  The use of
cautionary language is usually not dispositive but instead is
relevant to the materiality inquiry.  Rubinstein v. Collins, 20
F.3d 160, 168 (5th Cir. 1994).  However, dismissals based on the
bespeaks caution doctrine are appropriate when the complaint
"attempts to turn economic forecasts or corporate goals into
actionable misrepresentations."  In re Sourcefire, Inc. Sec.
Litig., No. JFM 07-1210, 2008 WL 1827484, at *5 (D. Md. Apr. 23,
2008).  This is the case because the bespeaks caution doctrine
mirrors the securities laws' goal of regulating forward-looking
statements less so than declaratory statements of fact.  See,
e.g., Malone v. Microdyne Corp., 26 F.3d 471, 479 (4th Cir.
1994) ("Misstatements or omissions regarding actual past or
present facts are far more likely to be actionable than
statements regarding projections of future performance."
(emphasis removed)).

In the Secondary Offering, press releases, and conference
calls at issue, Primo did make forward-looking statements about
its goal to launch the Flavor Station appliance, but it

40

accompanied those statements with cautionary language. (<u>See,</u>
<u>e.g.</u>, App. at 245 (Secondary Offering) (stating that "We may not
be able to introduce or sell products to be developed by the
Omnifrio Single-Serve Beverage Business within the anticipated
timeframe or at all"; "We have not yet introduced these products
and we may never be successful in selling them"; "[A] market for
these products may never develop"; "[W]e may not realize the
full benefits of the acquisition transactions"), 428 (Form 10-K)
("We may experience difficulties in integrating . . . the
Omnifrio Single-Serve Beverage Business with our current
business and may not be able to fully realize all of the
anticipated synergies from [this] acquisition[]"), 528 (Form 10-
Q) ("Our introduction of these products into the market may also
be adversely affected by certain factors that are out of our
control"), 626 (August 2011 press release) (stating that "actual
results could differ materially from those stated here," noting
Primo's potential inability to "develop, introduce and produce
new product offerings (including the Flavor Station line of
appliances) within the anticipated time frame or at all," and
referencing the risk disclosures in the Form 10-K), 660 (Q2 2011
Earnings Call) (referencing the prior risk disclosures in the
August 2011 press release and Primo's SEC filings).)

        This cautionary language was tailored to the specific risks
Primo faced in launching the Flavor Station. <u>See</u> <u>In</u> <u>re</u>

41

_Constellation Energy Group, Inc. Sec. Litig._, 738 F. Supp. 2d
614, 625 (D. Md. 2010).  Further, the cautionary language is
particularly relevant here because Primo's statements were only
future projections, not statements of past or present fact.  _See_
_Shaw v. Digital Equip. Corp._, 82 F.3d 1194, 1206 (1st Cir.
1996), _superseded by statute on other grounds_, as noted in
_Greebel v. FTP Software, Inc._, 194 F.3d 185 (1st Cir. 1999)
("[The bespeaks caution doctrine] embodies the principle that
when statements of 'soft' information such as forecasts,
estimates, opinions, or projections are accompanied by
cautionary disclosures that adequately warn of the possibility
that actual results or events may turn out differently, the
'soft' statements may not be materially misleading under the
securities laws.").  As such, statements made by Primo about the
launch of the Flavor Station cannot serve as the basis for a
Section 10(b) claim.[16]

> **b.    The "Safe Harbor" Provision of the PSLRA
> Immunizes Some of the Challenged Statements
> from Liability**

In addition to the fact that none of the statements
challenged by Plaintiffs is a misstatement or omission of
material fact, the safe harbor provision of the PSLRA applies to

---

[16] Alternatively, as discussed below, these statements are also immune
from liability under the PSLRA safe harbor.

certain of the statements. Specifically, statements made in the Secondary Offering, in challenged guidance documents, or during conference calls with investors[17] are immune from liability if they are forward-looking statements that are accompanied by meaningful cautionary language. Under the PSLRA safe harbor, forward-looking statements are protected from liability if "they contain 'meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement[s].'" Johnson v. Pozen, Inc., No. 1:07CV599, 2009 WL 426235, at *14 (M.D.N.C. Feb. 19, 2009) (quoting 15 U.S.C. § 78u-5(c)(1)(A)(i)). A meaningful statement need only be enough to properly warn a reasonable investor of significant risks similar to that actually realized so as to put him or her on notice. In re Lab. Corp., 2006 WL 1367428, at *5. Further, "[e]ven if a forward-looking statement is not accompanied by cautionary language, liability only attaches if the speaker had actual knowledge that it was false when made." Pozen, 2009 WL 426235, at *14 (emphasis removed). Thus, Primo's statements are protected by the safe harbor if (1) the statements were accompanied by meaningful cautionary language, or (2) Plaintiffs have failed to

---

[17] Statements made in connection with the IPO are not afforded the protection of a safe harbor, even if they were forward-looking statements accompanied by sufficient cautionary language. See 15 U.S.C. § 77z-2(b)(2)(D).

plead that the speaker had actual knowledge of the statements' falsity at the time the statements were made.

Forward-looking statements under the PSLRA are defined to include "'statement[s] containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items,' as well as '[] statement[s] of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer.'" Id. In this case, statements made by Primo in the challenged guidance statements and Secondary Offering qualify as forward-looking because they involve earnings projections or statements regarding future operations. For example, Primo's May 2011 press release, which contained an earnings prediction for the second quarter and full year 2011, stated that Primo "expects total sales . . . to double" and "continues to expect sales to increase 260% to 275%." (App. at 615.) The amended complaint establishes that Primo later missed these projections because two of its major retailers, Lowe's and Wal-Mart, had decided to postpone a national rollout of Primo's dispensers. (Doc. 52 at ¶ 110.)

Plaintiffs allege that Primo's statement in the May 2011 guidance statement was false and misleading; however, this statement was specifically identified as a forward-looking

44

statement and accompanied by meaningful cautionary language. In the May 2011 press release, Primo specifically stated:

> Certain statements contained herein (including our second quarter and full year 2011 guidance) are not based on historical fact and are 'forward-looking statements' within the meaning of the applicable securities laws and regulations . . . Owing to the uncertainties inherent in forward-looking statements, actual results could differ materially from those stated here. Factors that could cause actual results to differ materially . . . include . . . the loss of major retail customers of the Company or the reduction in volume of purchases by major retail customers . . . [or] lower than anticipated consumer and retailer acceptance[.]

(App. at 616.) Further, the May 2011 press release also referenced additional risks that were identified in Primo's 2010 Form 10-K, which was filed March 30, 2011. (Id. at 616, 411-502).

Such SEC filings incorporated by reference are sufficient to invoke the safe harbor. In re CIENA Corp. Sec. Litig., 99 F. Supp. 2d 650, 661 (D. Md. 2000). In the Form 10-K, Primo included a section on "Risks Relating to Our Business and Industry." (App. at 428.) There, Primo identified risks it faced due to its reliance on a small number of large retailers (specifically Lowe's and Wal-Mart) that were "nonexclusive and may be terminated at will." (Id. (noting that "[i]f any significant retailer materially reduces, terminates or is unwilling to expand its relationship with us, . . . our sales would suffer").) Primo noted that large retailers "continually

45

evaluate and often modify their in-store retail strategies" and "[o]ur business could suffer significant setbacks in net sales and operating income if one or more of our major retail customers modified its current retail strategy resulting in a termination or reduction of its business relationship with us." (Id.) The court finds that this cautionary language "conveys substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement" and thus is sufficient as a matter of law to activate the PSLRA's safe harbor. See In re Humphrey Hospitality Trust, Inc. Sec. Litig., 219 F. Supp. 2d 675, 683-84 (D. Md. 2002) (internal quotations removed).

In the August 2011 press release, Primo also made forward-looking statements about the launch of the Flavor Station appliance. (See App. at 624 (noting that the "Company expects to launch a version of the Primo Flavor Station"; the Flavor Station "will be offered as a tabletop model for the 2011 holiday season"; "[t]he introduction of the Flavor Station Products will provide the Company with numerous high margin 'razorblades'"; "[t]he Company expects that these appliances and consumable products will positively impact its long-term growth prospects").) This press release also contained cautionary language identifying those statements as forward-looking and noting numerous risks associated with the launch of the Flavor

46

Station.  (Id. at 626.)  For example, Primo noted that it might have the "inability to develop, introduce, and produce new product offerings (including the Flavor Station line of appliances) within the anticipated timeframe or at all." (Id.) Further, the press release also referenced the Form 10-K, which identified additional risks relating to the launch of the Flavor Station.  (Id. at 626, 428.)  In the Form 10-K, Primo noted that "[w]e may experience difficulties in integrating the . . . Omnifrio Single-Serve Beverage Business with our current business and may not be able to fully realize all of the anticipated synergies from these acquisitions." (Id. at 428.)

Similarly, forward-looking statements regarding the launch of the Flavor Station were also made in a Q2 2011 earnings call. During that telephone call, Primo executives stated that they "expect to have over 20 flavors available for this holiday season" and "will market this product directly to consumers and plan to have it available in specialty stores and specialty catalog on a limited basis this year." (Id. at 663.)  These statements were accompanied by cautionary language, as at the start of the call investors were warned that "the prepared remarks contain forward-looking statements" and "should be considered within the meaning of the applicable securities law and regulations." (Id. at 660.)  Additionally, Primo also referenced the warnings it issued in the August 2011 press

release, as well as in all documents filed with the SEC (including the Form 10-K). (Id.); see Harris v. IVAX Corp., 998 F. Supp. 1449, 1454 n.4 (S.D. Fla. 1998), aff'd, 182 F.3d 799 (11th Cir. 1999) ("Congress was explicit in stating that meaningful cautionary language could incorporate by reference information contained in documents filed with the SEC.")

This cautionary language accompanying the statements about the release of the Flavor Station appliances suffices to activate the PSLRA's safe harbor. The cautionary language provides substantive information about the risks faced by investors and identifies "meaningful and important factors that could affect future performance." Id. at 1454.

Plaintiffs object to the applicability of the safe harbor provision on the ground that Primo's cautionary language is generic boilerplate that is insufficient to implicate the safe harbor. It is true that "boilerplate warnings will not suffice as meaningful cautionary statements." H.R. Conf. Rep. No. 104-369, at 43 (1995). However, the cautionary language used by Primo is beyond mere boilerplate.

Indeed, in In re Lab. Corp., 2006 WL 1367428, this court found that even less specific language was sufficient to dismiss an action pursuant to the PSLRA safe harbor. There, plaintiffs claimed that the defendants failed to warn about the danger of losing several large contracts and the need to cut costs that

48

led to service deficiencies. The defendants in fact warned about increased competition, the failure to obtain and retain new customers, and the need to hire and retain qualified personnel as possible reasons to suspect their forecasts. The court specifically noted the defendants' cautionary statement, which it referred to as "standard":

> Each of the above forward-looking statements is subject to change based on various important factors, including without limitation, competitive actions in the marketplace and adverse actions of governmental and other third-party payors. Further information on potential factors that could affect LabCorp's financial results is included in the Company's Form 10-K . . .

Id. at *5. The court noted that this language provided potential investors adequate notice of the risks faced by the company and therefore satisfied the safe harbor. Id. ("In order to be meaningful, Defendants' cautionary language . . . should be enough to properly warn an investor of significant risks similar to that actually realized so as to put the investor on notice.").

In this case, an investor who reviewed the cautionary language would have had adequate notice of the risks faced by Primo and its business model. The disclosures in the two press releases, Form 10-K, and conference call identify Primo's reliance on Lowe's and Wal-Mart, note that Primo had no control over the actions of these big-box retailers, and clarify that

49

Primo might be unable meet the Flavor Station roll out goals. Thus, even more so than in In re Lab. Corp., the cautionary language used by Primo provides substantive information about factors that could cause results to differ from those projected in the forward-looking statements. See Asher v. Baxter Int'l Inc., 377 F.3d 727, 734 (7th Cir. 2004) (noting that cautionary language is meaningful where it identifies "the principal contingencies that could cause actual results to depart from the projection"). As such, Primo's forward-looking statements in the challenged guidance documents and conference calls are accompanied by meaningful cautionary language and are therefore protected by the PSLRA's safe harbor.[18]

### 3.   Section 20(a) Claim

In addition to the Section 10(b) claim under the 1934 Act, Plaintiffs also allege violations of Section 20(a). Section 20(a) establishes liability against "control persons," and the elements of a Section 20(a) claim are: (1) the defendant controlled another person or entity; (2) the controlled person or entity committed a primary violation of the relevant

---

[18] Because the court has found that Primo's forward-looking statements are accompanied by sufficient cautionary language, it need not consider whether Plaintiffs also failed to plead facts giving rise to a strong inference that Primo made the statements with actual knowledge that they were false. See 15 U.S.C. § 78u-5(c)(1); see also Miller v. Champion Enters., Inc., 346 F.3d 660, 672 (6th Cir. 2003); Theoharous v. Fong, 256 F.3d 1219, 1225 n.6 (11th Cir. 2001), abrogated on other grounds by Merck & Co., Inc. v. Reynolds, 559 U.S. 633 (2010).

securities laws; and (3) the defendant was a culpable participant in the fraud. <u>See</u> <u>In re Mills Corp. Sec. Litig.</u>, 257 F.R.D. 101, 105 (E.D. Va. 2009); <u>In re Solv-Ex Corp. Sec. Litig.</u>, 210 F. Supp. 2d 276, 284 (S.D.N.Y. 2000).

On a motion to dismiss, a Section 20(a) claim will stand or fall based on the court's decision regarding the Section 10(b) claim. <u>See</u> <u>In re Royal</u>, 351 F. Supp. at 407 (connecting liability under Section 20(a) with liability under Section 10(b)). This is because Section 20(a) requires a finding that there was a "primary violation of the securities laws." <u>In re Level 3 Commc'ns, Inc. Sec. Litig.</u>, 667 F.3d 1331, 1347 (10th Cir. 2012). Thus, if a court dismisses a complaint's Section 10(b) claim, then the Section 20(a) claim should be dismissed as well. <u>Svezzese v. Duratek, Inc.</u>, 67 F. App'x 169, 174 (4th Cir. 2003) (per curiam) (affirming dismissal of Section 20(a) claim when plaintiffs failed to state a claim for a primary securities fraud violation).[19]

In this case, Plaintiffs' Section 20(a) claim is entirely derivative of their Section 10(b) claim, which the court has

---

[19] Unpublished opinions of the Fourth Circuit are not precedential but are cited for their persuasive authority. <u>See</u> <u>Collins v. Pond Creek Mining Co.</u>, 468 F.3d 213, 219 (4th Cir. 2006) (recognizing that "we ordinarily do not accord precedential value to our unpublished decisions" and that such decisions "are entitled only to the weight they generate by the persuasiveness of their reasoning" (citation omitted)).

found should be dismissed.  Therefore, the Section 20(a) claim
will also be dismissed.

**B.  The 1933 Act Claims**

Having resolved Plaintiffs' claims under the 1934 Act, the
court turns to Plaintiffs' claims under the 1933 Act.
Plaintiffs bring three claims: violations of Sections 11,
12(a)(2), and 15 (collectively, "1933 Act claims").

**1.  Pleading Standards**

The initial issue to be resolved is what pleading standard
should apply to the 1933 Act claims.  Plaintiffs argue that
Sections 11 and 12(a) are subject only to the notice pleading
standards of Federal Rule of Civil Procedure 8.  They contend
that because Sections 11 and 12(a)(2) are based in negligence
and do not include a scienter requirement, Newcome v. Esrey, 862
F.2d 1099, 1106 (4th Cir. 1988), Federal Rule of Civil Procedure
9(b) should not apply.  Additionally, while Plaintiffs
acknowledge that allegations under the 1933 Act must be pleaded
with particularity pursuant to Rule 9(b) when the claims sound
in fraud, Hershey v. MNC Fin., Inc., 774 F. Supp. 367, 375-76
(D. Md. 1991) (holding that Rule 9(b) applies to Section 11 and
12 claims when these claims are essentially "averments of
fraud"), they contend that courts have applied Rule 9(b) only
when plaintiffs make *no effort* to support their claims under the
1933 Act with non-fraud or negligence allegations.  Cf. In re

52

<u>Ultrafem Inc. Sec. Litig.</u>, 91 F. Supp. 2d 678, 690–91 (S.D.N.Y. 2000) (applying Rule 9(b) where "plaintiffs make little, if any, effort to differentiate their asserted negligence claims from the fraud claims which permeate the Complaint"). Plaintiffs note that their amended complaint separately alleges the Section 11 and 12(a)(2) claims and point to paragraphs 48 ("the IPO was negligently prepared"), 62 (statements were "material inaccurate statements of fact"), and 88 (same) as a demonstration that the 1933 Act claims were drafted in terms of negligence and material inaccuracies, not fraud. They also note that the amended complaint's 1933 Act claims never allege that Defendants acted with fraudulent intent or recklessly concealed information.

In contrast, Defendants argue that the 1933 Act claims are subject to Rule 9(b)'s heightened pleading standard. Defendants rely on <u>Cozzarelli</u>, 549 F.3d 618, a Fourth Circuit case which held that the 1933 Act claims at issue had to be pleaded with particularity because they had the substance of fraud. According to the court, Rule 9(b) addresses whether fraud is alleged in the complaint, not whether it is an element of the specific claim at issue. <u>Id.</u> at 629. Thus, the court found, where a plaintiff treated the allegedly false statements in the offering documents as part of a "single, coordinated scheme to defraud investors," the "allegation [] has the substance of fraud . . . [and the plaintiff] cannot escape the requirements

53

of Rule 9(b) by adding a superficial label of negligence or strict liability." Id. It is particularly so where a plaintiff's allegations under the 1933 Act regarding the prospectuses duplicate his allegations of fraud under the 1934 Act. Id. (noting that plaintiffs cannot "claim[] that the false statements in the prospectuses support plaintiffs' [1934 Act] counts . . . with a straight face without also admitting that the complaint alleges the prospectuses to be fraudulent"). An express disclaimer to attempt to separate 1933 Act and 1934 Act claims will not save the claims, because a "conclusory disclaimer cannot alter the substance of plaintiffs' allegations, which sound in fraud." Id.

Since Cozzarelli, other courts have applied the same approach and found that 1933 Act claims sound in fraud when the complaint alleges a "single, coordinated scheme to defraud investors" and utilizes the same allegations as the basis of both the 1933 Act and 1934 Act claims. See, e.g., In re Municipal Mortg. & Equity, LLC, Sec. & Derivative Litig., 876 F. Supp. 2d 616, 652 (D. Md. 2012) ("Here as in Cozzarelli, the alleged misleading statements that formed the basis for Plaintiffs' § 10(b) claims are 'exactly the same' as Plaintiffs' §§ 11 and 12(a)(2) claims."); see also Wagner v. First Horizon Pharm. Corp., 464 F.3d 1273, 1278 (11th Cir. 2006) ("We conclude that a § 11 or § 12(a)(2) claim must be pled with particularity

54

when the facts underlying the misrepresentation at stake in the claim are said to be part of a fraud claim, as alleged elsewhere in the complaint. It is not enough to claim that alternative pleading saves the non-fraud claims from making an allegation of fraud[.]"); Shaw, 82 F.3d at 1223 ("[I]f a plaintiff were to attempt to establish violations of Sections 11 and 12[a](2) as well as the anti-fraud provisions of the [1934] Act though allegations in a single complaint of a unified course of fraudulent conduct . . . the particularity requirements of Rule 9(b) would probably apply to the Sections 11, 12[a](2), and Rule 10b-5 claims alike.").

Here, as in Cozzarelli and In re Municipal Mortg., it is inescapable that the substance of Plaintiffs' allegations sound in fraud. (See Doc. 52 at ¶¶ 48-131.) Plaintiffs incorporate wholesale the allegations used in pleading the 1933 Act claims in support of their allegations under the 1934 Act. See Wagner, 464 F.3d at 1278. Even though they reference the word "negligence" in pleading these claims (Doc. 52 at ¶ 48), the mere label is not enough to transform the substance of the claims and thus avoid the pleading requirements of Rule 9(b). See Cozzarelli, 549 F.3d at 629; Cal. Pub. Employees' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 160 & n. 24 (3d Cir. 2004). As

55

such, the proper pleading standard used to assess Plaintiffs'
1933 Act claims is that of Rule 9(b).[20]

### 2. Section 11 and 12(a)(2) Claims

The elements of a securities fraud claim under Sections 11
and 12 of the 1933 Act are: (1) an omission or
misrepresentation, (2) of a material fact required to be stated
or necessary to make other statements made not misleading. Krim
v. BancTexas Group, Inc., 989 F.2d 1435, 1445 (5th Cir. 1993).
"To state a claim under [S]ection 11, plaintiffs must allege
that they purchased securities pursuant to a materially false or
misleading registration statement." In re Adams Golf, Inc. Sec.
Litig., 381 F.3d 267, 273 (3d Cir. 2004). "To state a claim
under [S]ection 12(a)(2), plaintiffs must allege that they
purchased securities pursuant to a materially false or
misleading prospectus or oral communication." Id. (internal
quotations removed).

In this case, Defendants argue that the Section 11 and
12(a)(2) claims should be dismissed on the basis of: (1)

---

[20] This analysis is a bit academic as Plaintiffs' claims would fail
under the 1933 Act even if the pleading standard were that of Federal
Rule of Civil Procedure 8(a). As discussed below, Plaintiffs have
failed to make any showing of materiality or falsity with respect to
the challenged statements, and therefore the result would be the same
regardless of the pleading standard used. As such, although the court
finds that Rule 9(b) is the appropriate standard in this case, a
contrary result would not change the outcome for Plaintiffs.

56

negative causation;[21] (2) a failure to plead that the challenged statements were material misrepresentations or omissions; and (3) the PSLRA safe harbor provision (for the statements made in the Secondary Offering).[22]    Because the court finds that the

---

[21] Negative causation is an affirmative defense that precludes recovery for price declines that are not the result of an alleged misrepresentation.  There is authority that establishes that a motion to dismiss can be granted based on negative causation.  <u>Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.</u>, No. 07CV10528, 2010 WL 148617, at *11 (S.D.N.Y. Jan. 14, 2010).  For example, in <u>Blackmoss</u> the complaint alleged that the decline in the Defendant's stock was caused by allegedly false and misleading statements in the prospectus; however, the face of the complaint revealed that the Defendant's stock traded above its IPO price even as the company disclosed increased exposure to subprime mortgages, and thus the court dismissed the complaint on the basis of negative causation.  <u>Id.</u>

[22] The Primo Defendants also argue that Plaintiffs have failed to state a claim against them under Section 12(a)(2) because the Primo Defendants did not sell the stock to Plaintiffs or solicit the sales.  A claim under Section 12(a)(2) may be brought against only those individuals or entities who sold stock to the plaintiff and those who solicited the plaintiff to purchase stock.  <u>Pinter v. Dahl</u>, 486 U.S. 622, 644 (1988).  Neither involvement in preparation of a registration statement or prospectus nor participation in unspecified activities relating to the sale of securities, standing alone, demonstrates the kind of relationship between defendant and plaintiff that could establish statutory seller status.  <u>See</u> <u>Shaw</u>, 82 F.3d at 1194.
    In this case, only one allegation in the amended complaint may speak to this.  In paragraph 142, Plaintiffs allege that Defendants participated in "'Road Shows' to promote the offerings."  <u>See</u> <u>In re Nat'l Century Fin. Enters., Inc. Inv. Litig.</u>, 541 F. Supp. 2d 986, 1013 (S.D. Ohio 2007) (finding that plaintiffs had stated a claim under Section 12(a)(2) when the defendant assisted with and circulated a prospectus to plaintiffs and noting that "drafting, circulating, or presenting written sales material may, in the right circumstances, be enough to impose liability").  In this case, attendance at a road show to solicit sales of the securities at issue may be enough to state a claim under Section 12(a)(2).  <u>See</u> <u>In re Prof'l Fin. Mgmt., Ltd.</u>, 692 F. Supp. 1057, 1064 (D. Minn. 1988) (finding that plaintiff stated a claim under Section 12(a)(2) when plaintiff asserted that defendant assisted with financial appraisals and helped draft a prospectus that was distributed to prospective buyers).  However, this argument is academic, as the court is dismissing the Section 12(a)(2) claim for other reasons.

challenged statements are not materially false or misleading and
the PSLRA safe harbor applies, it does not reach the negative
causation argument.[23]

### a. Plaintiffs Fail to Show that any Statement was a Material Misrepresentation or Omission

Because the court has already addressed the materiality and
falsity of the Plaintiffs' allegations under the 1934 Act, the
discussion here will be brief.  Like the 1934 Act, the 1933 Act
requires that the challenged statements be misrepresentations of
material fact.  Greenhouse, 392 F.3d at 656; see also In re
Adams Golf, 381 F.3d at 273 (requiring for a Section 11 claim a
"materially false or misleading registration statement" and
requiring for a Section 12(a)(2) claim a "materially false or
misleading 'prospectus or oral communication'").  If the
misrepresentations are not of material fact, no liability will
attach and the statements will be insufficient as a matter of

---

[23]  Defendants argue that the amended complaint establishes that the
stock price declines complained of by Plaintiffs were not caused by
any of the challenged statements that are part of Plaintiffs' 1933 Act
claims.  Plaintiffs point to the August 2011 press release and the
November 2011 press release as the cause for the decline in Primo's
stock price.  However, neither of these press releases corrected, or
even dealt with, any of the statements challenged in the Offerings.
Thus, Defendants' negative causation argument appears to have some
force.  See In re Alamosa Holdings, Inc., 382 F. Supp. 2d 832, 866
(N.D. Tex. 2005) (granting motion to dismiss on the basis of negative
causation when the amended complaint alleged that stock plummeted in
response to a press release that did not concern the allegedly untrue
Registration Statement).

law to form the basis of a 1933 Act claim. <u>Greenhouse</u>, 392 F.3d at 656.

In this case, the statements challenged by Plaintiffs in the IPO and Secondary Offering are either not material or not false/misleading for the same reasons stated in determining that those statements could not form the basis of a 1934 Act claim. Accordingly, incorporating the reasoning used above, the court will dismiss the Section 11 and 12(a)(2) claims. <u>See</u> <u>supra</u> Part III.A.2.i.

### b. The "Safe Harbor" Provision Immunizes Some Challenged Statements from Liability

Although the safe harbor provision of the PSLRA does not apply to statements made in an IPO, <u>see</u> 15 U.S.C. § 77z-2(b)(2)(D), the statements made in the Secondary Offering Registration Statement are subject to the PSLRA's safe harbor provisions. <u>See</u> <u>In re Harmonic Sec. Litig.</u>, 163 F. Supp. 2d 1079, 1087 (N.D. Cal. 2001) (noting that the safe harbor applies to claims under the 1933 Act). As noted above, the PSLRA safe harbor protects forward-looking statements from liability (1) if the statements were accompanied by meaningful cautionary language, or (2) the plaintiffs have failed to plead that the speaker had actual knowledge of the statement's falsity at the time the statement was made. <u>Pozen</u>, 2009 WL 426235, at *14.

As noted, under the PSLRA, forward-looking statements include "'statement[s] containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items,' as well as '[] statement[s] of the plans and objectives of management for future operations[.]" _Id._ Statements made in the Secondary Offering about the company's market growth opportunities and the launch of the Flavor Station appliance constitute forward-looking statements because they are simply plans of the management for future operations and the expectation of additional growth. _See id._ at *14, *21 (noting that forward-looking statements are "future plans, expectations, and financial projections" and finding that a statement about an anticipated launch date of a product was forward-looking). Additionally, as discussed more fully above, _see_ _supra_ Part III.A.2.ii, the forward-looking statements in the Secondary Offering are accompanied by sufficient cautionary language to activate the PSLRA's safe harbor. (_See_ App. at 244-45 ("Our arrangements with . . . retailers . . . are nonexclusive and may be terminated at will"; "We depend on a small number of large retailers for most of our consumer sales"; "[W]e cannot provide any assurance of any future sales"; "We may not be able to introduce or sell products to be developed by the Omnifrio

60

Single-Serve Beverage Business within the anticipated timeframe or at all")); see also In re Lab. Corp., 2006 WL 1367428, at *5 (finding that even less specific cautionary language was sufficient to bring forward-looking statements within the PSLRA safe harbor). Accordingly, statements made in the Secondary Offering about Primo's growth opportunities and the launch of the Flavor Station appliance are immunized from liability under the 1933 Act due to the PSLRA safe harbor.

### 3. Section 15 Claim

Like the Section 20(a) claim under the 1934 Act, Section 15 establishes "control person" liability. Further, like its 1934 Act counterpart, Section 15 is also dependent on an underlying violation of the relevant securities laws, meaning that if there is no violation of Section 11 or 12(a)(2), there is no violation of Section 15. See Lowinger v. Johnston, No. 3:05-CV-316, 2007 WL 2344882, at *8 (W.D.N.C. Aug. 16, 2007) (adopting Report and Recommendation of United States Magistrate Judge) ("In light of the Plaintiff's failure to allege a primary violation of either Section 11(a) or 12(a)(2), discussed above, his Section 15 claim fails as well."); accord Kapps v. Torch Offshore, Inc., 379 F.3d 207, 221 (5th Cir. 2004).

Plaintiffs have alleged in the amended complaint that the Primo Defendants were acting as control persons. (See Doc. 52 at ¶ 150 ("Each of the Primo Individual Defendants acted as a

61

controlling person of Primo within the meaning of Section 15 of the Securities Act[.]")); In re Sourcefire, 2008 WL 1827484, at *7 (noting that a plaintiff is not required to allege culpable participation beyond the facts of control). However, because the Section 11 and 12(a)(2) claims are being dismissed, there is no primary violation of the securities laws. Accordingly, the Section 15 claim will be dismissed as well.

### 4. Item 303(a) and Item 503(c) Predicate for Liability

Plaintiffs finally allege and argue that the Registration Statements for the IPO and Secondary Offering violate the 1933 Act because they omitted disclosures required under 17 C.F.R. § 229.303(a)(3)(ii) ("Item 303(a)") and 17 C.F.R. § 229.503(c) ("Item 503(c)"). See Panther Partners Inc. v. Ikanos Commc'ns, Inc., 681 F.3d 114, 120 (2d Cir. 2012) (stating that a potential basis for liability under Sections 11 and 12(a)(2) is an "omission in contravention of an affirmative legal disclosure obligation"). For the reasons noted below, however, Plaintiffs' arguments fail.

#### a. Item 303(a)

Pursuant to Item 303(a), a registration statement must describe "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or

62

income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii).[24] Item 303(a) "essentially says to a registrant: If there has been an important change in your company's business or environment that significantly or materially decreases the predictive value of your reported results, explain this change in the prospectus." Kapps, 379 F.3d at 218 (quoting Oxford Asset Mgmt., Ltd. v. Jaharis, 297 F.3d 1182, 1191-92 (11th Cir. 2002)). A plaintiff must plead that the defendant had actual knowledge of the alleged trend in order for liability to attach. See J & R Mktg., SEP v. Gen. Motors Corp., 549 F.3d 384, 391-92 (6th Cir. 2008) (dismissing complaint where allegations demonstrated information was knowable, rather than known, to defendants because "duty of disclosure arising from Item 303 does require knowledge").

Thus, Item 303(a) imposes a disclosure duty "'where a trend, demand, commitment, event or uncertainty is both (1) presently known to management and (2) reasonably likely to have material effects on the registrant's financial condition or results of operations.'" Litwin v. Blackstone Group, L.P., 634 F.3d 706, 716 (2d Cir. 2011) (quoting Management's Discussion and Analysis of Financial Condition and Results of Operations,

---

[24] The regulation states further: "If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed." 17 C.F.R. § 229.303(a)(3)(ii).

Securities Act Release No. 6835, Exchange Act Release No. 26,831, Investment Company Act Release No. 16,961, 43 SEC Docket 1330 (May 18, 1989)). To state a claim based on a failure to comply with Item 303, a plaintiff must "allege facts showing defendants knew of an adverse trend, the material impact of that trend, and that the future material impacts are reasonably likely to occur from the present-day perspective." Mallen v. Alphatec Holdings, Inc., No. 10-cv-1673-BEN, 2013 WL 1294640, at *12 (S.D. Cal. Mar. 28, 2013) (internal citations and quotations omitted).

Plaintiffs claim that the disclosure requirements of Item 303(a) were not satisfied because the IPO Registration Statement and Secondary Offering did not disclose the following trends or uncertainties which Plaintiffs allege were reasonably expected to have an impact on Primo's continuing operations: (1) Primo was overstating by 1,500 the number of store locations offering Primo products; (2) Primo failed to market and promote its products; (3) 40% of locations selling Primo water were performing poorly; (4) Primo was not planning to increase promotional or marketing activities; (5) Primo's water bottle exchange machines were poorly manufactured and, without retailer supervision, resulted in theft and shrinkage of 25% because customers were illicitly obtaining coupons; (6) Primo's primary retailers could not order Primo products until retail customers

had cleared out other inventory; (7) Primo depended on Wal-Mart and Lowe's entering massive product promotions; (8) because of engineering problems, Primo would be unable to launch the Flavor Station by the fourth quarter of 2011; and (9) Primo had ended up with millions of dollars of inventory after its acquisition of the Culligan Refill Business. (Doc. 52 at ¶¶ 100, 129.) These issues, for the purpose of the court's analysis, will be identified below by the number assigned to them in this list (e.g., "Issue 1").

Despite Plaintiffs' attempts to rely on Item 303(a), their efforts fail to state a claim. First, Plaintiffs fail to adequately allege that the issues identified constitute "trends" or "uncertainties" under Item 303(a). The amended complaint does not allege that the identified facts "were uncertain or changed over time, but rather that they were always present." City of Roseville Emp. Ret. Sys. v. EnergySolutions, Inc., 814 F. Supp. 2d 395, 426 (S.D.N.Y. 2011). For example, Plaintiffs claim as to Issue 1 that Primo was materially overstating the number of retail locations at which its products were being offered at the time of the IPO. (Doc. 52 at ¶ 49.) Plaintiffs go on to claim that Primo continued to publicize this material overstatement throughout the entire Class Period. (See id. at ¶¶ 128, 176.) Accordingly, this alleged overstatement could not have constituted "an important change" in Primo's business.

65

Kapps, 379 F.3d at 218.  The same can be said of Issues 2
through 4 - none of them constitutes a significant or material
change in Primo's business that would have made investment in
Primo more risky or speculative, as Primo's alleged failure to
market and its underperforming stores are alleged to have been
constant throughout the Class Period.  Issue 5, which concerns
shrinkage, also suffers from this problem – Primo's shrinkage
figures are alleged in the complaint to have been inherent in
Primo's business since before the Class Period. (See Doc. 52 at
¶ 96 (discussing a meeting in mid-2010, before the IPO, that
discussed the shrinkage figures)); see also City of Roseville,
814 F. Supp. 2d at 426 ("The plaintiffs do not allege that the
Zion Trust Fund was trending toward inadequacy, but rather that
it was already inadequate and remained so.  Similarly, they do
not allege that the negative incentives of the LOP contracts or
the infirmities in the market . . . were uncertain or changed
over time, but rather that they were always present.").
Further, as to Issue 9, the fact that Primo allegedly had
millions of dollars in inventory in the Culligan warehouse would
not constitute a trend or uncertainty that would have a material
effect on Primo's financial condition as the record shows that
Primo had planned, and in fact was, simultaneously expanding to
additional stores and locations.  See In re Gander Mountain Co.
Sec. Litig., No. 05-183DWFAJB, 2006 WL 140670, at *15 (D. Minn.

66

Jan. 17, 2006) (finding that the plaintiff had failed to plead facts showing that the defendant violated Item 303(a) by failing to disclose its increasing inventories because the complaint alleged that the defendant was simultaneously expanding its product offerings; thus, this alleged trend would not have a material effect on the defendant's financial condition).

Further, even if some of the issues identified by Plaintiffs could be considered "trends or uncertainties" pursuant to Item 303(a), the record reveals that they were described in the Offerings. The IPO and Secondary Offering state that Primo had no control over retailers or their inventory (relevant to Issues 6 & 7), that its major retailers could choose to discontinue Primo products at any time and sell a competitor's products instead (relevant to Issues 6 & 7), and that Primo might never be able to launch the Flavor Station (relevant to Issue 8). (See App. at 20-22, 245-46); see also In re Convergent Tech. Sec. Litig., 948 F.2d 507, 516 (9th Cir. 1991) (noting that a company need not detail all current or prospective corporate events and finding disclosures sufficiently detailed pursuant to Item 303(a) when they listed the risks facing the company, including, among other things, reliance on certain manufacturing processes and retail channels); City of Roseville, 814 F. Supp. 2d at 426 (finding that the plaintiffs failed to allege a failure to make

67

disclosures required by Item 303 "when the Registration
Statements disclosed that the proposed change might be
rejected").

As such, Plaintiffs' allegations as to Item 303(a) fail to
serve as a basis for liability in this case.

### b. Item 503(c)

Item 503(c) states that a registration statement, "[w]here
appropriate," should include "a discussion of the *most
significant factors* that make the offering speculative or
risky." 17 C.F.R. § 229.503(c) (emphasis added). Item 503(c)
directs: "be concise and organized logically. Do not present
risks that could apply to any issuer or any offering. Explain
how the risk affects the issuer or the securities being
offered." Id. The Securities and Exchange Commission, in
issuing guidance on this provision, has stated that a discussion
of risk factors should be "specific to the particular company
and its operations, and should explain how the risk affects the
company and its operations, and should explain how the risk
affects the company and/or the securities being offered." In re
WorldCom, Inc. Sec. Litig., 346 F. Supp. 2d 628, 691 (S.D.N.Y.
2004) (quoting Statement of the Commission Regarding Disclosure
of Year 2000 Issues and Consequences by Public Companies,
Investment Advisers, Investment Companies, and Municipal
Securities Issuers, SEC Release No. 7558, 1998 WL 425894, at *14

68

(July 29, 1998)).  In this case, Plaintiffs contend that Item
503(c) is not satisfied because Defendants did not adequately
disclose in the Offerings Primo's overstatement of store
locations, insufficient marketing practices, decreasing or non-
existent growth opportunities, poor sales performance in 40% of
its selling locations, and negative impact of poorly
manufactured water exchange machines (these correlate to Issues
1, 2, 3, and 5 in the list used in the analysis under Item
303(a) above).  (Doc. 52 at ¶ 101.)

A careful review of Primo's risk disclosures reveals that
they were specific and tailored and fairly addressed the risks
that the amended complaint alleges resulted in the August 10 and
November 8, 2011 stock drops.  Primo covered not only such
risks, but specifically described how they would affect the
company and its operations.  (See, e.g., App. at 428 ("[I]f one
or more [of Primo's major retailers] were to materially reduce
or terminate its business with us, our sales would suffer . . .
retailers can discontinue our dispenser products or water bottle
exchange services at any time[.]").)  The risks that Plaintiffs
allege in fact resulted in a decline in the stock price
(according to the amended complaint and as noted in the August
2011 and November 2011 press releases) were: (1) "lower water
dispenser and corresponding water sales" (Doc. 52 at ¶ 226)
(warned about in the IPO and Secondary Offering - App. at 20-22

69

(e.g., "There is no guarantee that there will be significant market acceptance of our water bottle exchange service or that we will be successful in selling our water dispensers on a scale necessary to achieve sustained profitability"), 245-46 (e.g., "If we are unable to convince current and potential retails customers and individual consumers of the advantages of our products and services, our ability to sell our bottled water products and water dispensers will be limited")); (2) inventory constraints and other issues relating to retailers (Doc. 52 at ¶ 228) (warned about in the IPO and Secondary Offering - App. at 20 (e.g., "None of our significant retail accounts are contractually bound to offer our water dispensers or bottle exchange service . . . retailers can discontinue our products or services at any time and offer a competitor's products or services . . . certain of our retailers have multiple vendor policies and may seek to offer a competitor's products or services"), 244 (same)); and (3) the delay in the launch of the Flavor Station (Doc. 52 at ¶ 251) (which was not acquired until after the IPO and which was warned about in the Secondary Offering - App. at 245 (e.g., "We may not be able to introduce or sell products to be developed by the Omnifrio Single-Serve Beverage Business within the anticipated timeframe or at all.")).

Further, the additional factors alleged by Plaintiffs cannot be said to be the "most significant factors" that made the offerings speculative or risky. As noted previously, although Plaintiffs claim that Primo should have disclosed it was overstating the number of locations *selling* its product by 1,500, the amended complaint establishes that Primo was not over-reporting the number of locations at which its products were *offered*, and it would unreasonably stretch Item 503(c) to require Defendants to disclose allegedly under-performing stores. See <u>Marx v. Computer Scis. Corp.</u>, 507 F.2d 485, 491 (9th Cir. 1974) (noting that not every corporate event needs to be disclosed under the securities laws). Moreover, as noted, Primo disclosed revenue figures and retailer information, allowing investors to calculate sales averages. And, issues such as marketing and shrinkage cannot be said to be among the most significant risk factors making the Offerings speculative or risky. See <u>In re UBS AG Sec. Litig.</u>, No. 07 Civ. 11225(RJS), 2012 WL 4471265, at *30 (S.D.N.Y. Sept. 28, 2012) (determining that uncharged illegal conduct involving a minor business unit could not "be described as among the 'most significant factors' making the 2008 Rights Offering speculative or risky" under Item 503(c)). This conclusion is bolstered by the court's previous analysis, because the sufficiency of Item 503(c) disclosures generally tracks the materiality standard under Section 10(b),

71

which in this case is not satisfied with respect to Plaintiffs' allegations. See City of Roseville, 814 F. Supp. 2d at 426.

In sum, because Plaintiffs' allegations of inadequate risk disclosures fail, Item 503(c) cannot serve as the basis for liability in this case. See In re UBS AG Sec. Litig., 2012 WL 4471265, at *30 (determining that Plaintiffs' claim under Item 503(c) was subject to dismissal because the disclosures were adequate and the conduct at issue was not a significant factor making the offering speculative or risky).

## IV.  CONCLUSION

For the reasons stated, the court finds that Plaintiffs have failed to state a claim upon which relief can be granted against the Primo Defendants or the Underwriter Defendants under Sections 11, 12(a)(2), and 15 of the 1933 Act and Sections 10(b) and 20(a) of the 1934 Act, because the challenged statements are not material misrepresentations or omissions of material fact. Further, many of these same statements are forward-looking and protected by the PSLRA's safe harbor. Thus, dismissal of the amended complaint is appropriate.

IT IS THEREFORE ORDERED that Plaintiffs' motion to strike portions of the Primo Defendants' exhibits (Doc. 64) is GRANTED as to Appendix (Doc. 60) pages 687-90 and 772-73 and DENIED as moot as to pages 774-92.

IT IS FURTHER ORDERED that the motions to dismiss of the Primo Defendants (Doc. 58) and the Underwriter Defendants (Doc. 56) are GRANTED, and Plaintiffs' claims against them are DISMISSED WITH PREJUDICE.

A Judgment consistent with this Memorandum Opinion and Order will issue separately.

/s/   Thomas D. Schroeder
United States District Judge

August 14, 2013